1   Katherine Eskovitz (SBN 255105)        Sean Eskovitz (SBN 241877)
    ROCHE CYRULNIK FREEDMAN LLP            ESKOVITZ LAW
2   1158 26th Street, No. 175              1217 Wilshire Boulevard,
    Santa Monica, CA 90403                 No. 3683
3   keskovitz@rcfllp.com                   Santa Monica, CA 90402
                                           seane@eskovitz.com
4   Kyle Roche
    Joseph M. Delich                       BRANT W. BISHOP, P.C.
5   Richard R. Cipolla                     2000 Pennsylvania Avenue, NW
    ROCHE CYRULNIK FREEDMAN LLP            Suite 7000
6   99 Park Avenue, 19th Floor             Washington, DC 20006
    New York, NY 10016                     brant@bishop.us
7   kyle@rcfllp.com
    jdelich@rcfllp.com
8   rcipolla@rcfllp.com

9   *Counsel for Plaintiff Apothio LLC*

10                    UNITED STATES DISTRICT COURT
11                  EASTERN DISTRICT OF CALIFORNIA

12  APOTHIO, LLC,                          No. 1:20-CV-00522-NONE-JLT

13                Plaintiff,

14        v.                               **OPPOSITION TO F&W
                                           DEFENDANTS[1] CALIFORNIA
                                           DEPARTMENT OF FISH AND
15  KERN COUNTY; KERN COUNTY               WILDLIFE AND CHARLTON
    SHERIFF'S OFFICE; CALIFORNIA           H. BONHAM'S MOTION TO
    DEPARTMENT OF FISH AND WILDLIFE;       DISMISS**
16  DONNY YOUNGBLOOD; JOSHUA
    NICHOLSON; CHARLTON H. BONHAM;
17  JOHN DOES #1 THROUGH #10,
    UNKNOWN AGENTS OF THE KERN
18  COUNTY SHERIFF'S OFFICE; JOHN
    DOES #11 THROUGH #20, UNKNOWN
19  AGENTS OF THE CALIFORNIA FISH
    AND WILDLIFE DEPARTMENT,
20
                  Defendants.
21

22  ─────────────────────
23  [1] The "Kern Defendants" include Kern County, Kern County Sheriff's Office, Donny Youngblood,
    Joshua Nicholson, and John Does #1-10 Agents of the Kern County Sheriff's Office. The "F&W
    Defendants" include Department of Fish and Wildlife, Charlton Bonham, and John Does #11-20 Agents
    of the Department of Fish and Wildlife.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND.................................................................................. 2

ARGUMENT ..................................................................................................... 4

I.   THE MOTION TO DISMISS MUST BE DENIED BECAUSE IT FAILS TO
     ACCEPT APOTHIO'S ALLEGATIONS AS TRUE AND INSTEAD
     MOVES TO STRIKE FACTS THAT PRECLUDE DISMISSAL............................ 4

     A.   Defendants ignore the legal standard for a motion to dismiss............................ 4

     B.   Defendants' claim that the destroyed crops were "contraband" depends on
          improper and unsupported factual assertions .......................................... 4

II.  THE MOTION TO DISMISS FAILS BECAUSE IT MISCHARACTERIZES
     FEDERAL AND STATE LAW............................................................................ 6

     A.   Apothio's allegations establish its eligibility to cultivate hemp under
          both the California and federal research exemptions ........................... 7

     B.   Federal hemp law does not "preempt" California's EARI law ....................... 11

     C.   Hemp that exceeds 0.3% THC is not contraband per se.................................... 13

III. THE MOTION TO DISMISS FAILS BECAUSE APOTHIO'S FACTUAL
     ALLEGATIONS ARE MORE THAN SUFFICIENT TO STATE FOURTH
     AMENDMENT CLAIMS.................................................................................. 15

     A.   Apothio's well-pleaded allegations establish Defendants' lack of probable
          cause, and Defendants' cannot rely on the warrant to demonstrate otherwise ... 15

     B.   The open fields doctrine does not apply to seizures, which require
          probable cause ........................................................................... 19

     C.   California's Health and Safety Code § 11479 does not permit the seizure
          of private property without probable cause ....................................... 20

IV.  APOTHIO ADEQUATELY ALLEGES CAUSAL CONNECTIONS
     BETWEEN THE F&W DEFENDANTS' ACTIONS AND THE
     CONSTITUTIONAL VIOLATIONS .................................................................. 21

CONCLUSION.................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Kumagai*,
356 F. App'x 8 (9th Cir. 2009) ............................................................... 13, 18

*Armstrong v. Asselin*,
734 F.3d 984 (9th Cir. 2013) ....................................................................... 16

*Belridge Farms v. Agric. Labor Relations Bd.*,
21 Cal. 3d 551 (1978) ................................................................................. 10

*Bond v. United States*,
572 U.S. 844 (2014) ...................................................................................... 11

*Bravo v. City of Santa Maria*,
639 F. App'x 412 (9th Cir. 2016) ................................................................ 22

*Demoura v. Ford*,
No. 09-CV-01344-OWW, 2010 WL 5426850 (E.D. Cal. Dec. 27, 2010) ............... 18

*DeSoto v. Yellow Freight Sys., Inc.*,
957 F.2d 655 (9th Cir. 1992) ...................................................................... 24

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) ................................................................................... 19

*Doe v. County of Kern*,
No. 1:16-cv-01469, 2017 WL 5291687 (E.D. Cal. Nov. 13, 2017) ................... 21

*Finkelstein v. San Mateo Cty. Dist. Attorney's Office*,
No. 18-CV-09, 2019 WL 1048244 (N.D. Cal. Mar. 5, 2019) ................... 16, 23

*Frudden v. Pilling*,
877 F.3d 821 (9th Cir. 2017) ...................................................................... 17

*Gillespie v. Civiletti*,
629 F.2d 637 (9th Cir. 1980) ...................................................................... 21

*Gonzales v. City of Peoria*,
722 F.2d 468 (9th Cir. 1983) ...................................................................... 17

*Gravelet-Blondin v. Shelton*,
728 F.3d 1086 (9th Cir. 2013) ............................................................... 22, 23

*Harte v. Bd. of Commissioners of Cty. of Johnson, Kansas*,
864 F.3d 1154 (10th Cir. 2017) ................................................................... 22

*Hemp Indus. Ass'n. v. Drug Enf't Admin.,*
    357 F.3d 1012 (9th Cir. 2004) ........................................................ 15

*Hodgers-Durgin v. de la Vina,*
    199 F.3d 1037 (9th Cir. 1999) ........................................................ 17

*Innovative Nutraceuticals, LLC v. United States,*
    No. 18-CV-1400, 2019 WL 3017672 (C.D. Cal. Mar. 28, 2019) ........................... 6, 15

*Ireland v. Solano Cty.,*
    No. 2:19-CV-1104, 2020 WL 2770062 (E.D. Cal. May 28, 2020) ......................... 21

*Klein v. City of Beverly Hills,*
    865 F.3d 1276 (9th Cir. 2017) ........................................................ 16

*Larez v. City of Los Angeles,*
    946 F.2d 630 (9th Cir. 1991) ......................................................... 22

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) .......................................................... 4

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*
    519 F.3d 1025 (9th Cir. 2008) ......................................................... 4

*Merritt v. Cty. of Los Angeles,*
    875 F.2d 765 (9th Cir. 1989) ......................................................... 21

*Messerschmidt v. Millender,*
    565 U.S. 535 (2012) .................................................................. 17

*New York v. Burger,*
    482 U.S. 691 (1987) .................................................................. 20

*O'Neal v. Johnson,*
    No. 2:14-CV-2374 DB PS, 2017 WL 416128 (E.D. Cal. Jan. 31, 2017) ................... 18

*One 1958 Plymouth Sedan v. Com. of Pa.,*
    380 U.S. 693 (1965) .................................................................. 13

*People v. Hobbs,* 7 Cal. 4th 948 (1994) ................................................ 16

*People v. Jackson,*
    No. G041185, 2011 WL 902029 (Cal. Ct. App. Mar. 16, 2011) .......................... 20

*Rubie's LLC v. First Am. Title Co.,*
    No. 1:18-CV-01052 DAD, 2018 WL 6419674  (E.D. Cal. Dec. 6, 2018) ................... 1

*United States v. $186,416.00 in U.S. Currency,*
    590 F.3d 942 (9th Cir. 2010) ......................................................... 18

*United States v. Harrell*,
   530 F.3d 1051 (9th Cir. 2008) ........................................................................... 13

*United States v. Henderson*,
   243 F.3d 1168 (9th Cir. 2001) ........................................................................... 13

*United States v. Talley*,
   No. 19 Crim. 605, 2020 WL 3275735 (N.D. Cal. June 16, 2020)........................ 17

*Wakefield v. Thompson*,
   177 F.3d 1160 (9th Cir. 1999) ........................................................................... 21

**Rules**

34 C.F.R. § 600.4(a)(4)(i) .......................................................................................... 8

**Statutes**

7 U.S.C. § 1639p .......................................................................................................14

7 U.S.C. Section 5940(b)(1) ......................................................................................11

20 U.S.C. 1001 .......................................................................................................7, 8

Cal. Food & Agric. Code § 81000(a)(4)(A) .............................................................. 8

Cal. Food & Agric. Code § 81000(a) (4)(B) .......................................................8, 10

Cal. Food & Agric. Code § 81003(a) (2019) ............................................................ 7

Cal. Food & Agric. Code § 81006(e)(9) ...................................................................14

California Health & Safety Code § 11479.................................................................23

**Other Authorities**

*Establishment of a Domestic Hemp Production Program*, 84 Fed. Reg. 58522-01 (Oct. 31,
   2019) .......................................................................................................................14

*Statement of Principles on Industrial Hemp*, USDA, DOJ, DOJ, HHS, & FDA, 81 Fed. Reg.
   53395 (Aug. 12, 2016)............................................................................................ 9

### INTRODUCTION[2]

The California Attorney General, representing the state defendants in this case, attempts to defend the Kern County Sheriff's abuse of power in bulldozing 500 acres of Apothio's legal hemp by advancing astounding legal positions that would undermine the entire U.S. hemp industry. The Attorney General incorrectly argues that when Apothio was cultivating that hemp in 2019—long after California voters passed Proposition 64 (which unambiguously authorized hemp cultivation) and in the wake of Congress's passage of the 2018 Federal Farm Bill (which immediately removed hemp from the federal Controlled Substances Act)—all commercial hemp farming was somehow still illegal. *See, e.g.*, ECF No. 21 ("MTD") at 13. And, while expressly recognizing that industrial hemp could be cultivated under federal law for research purposes, Defendants further disregard the well-pleaded allegations in the Complaint establishing Apothio's qualifications to cultivate hemp under that federal law. Worse still, the Attorney General advances a baseless legal theory that would expose every hemp farm to criminal liability, contrary to state and federal law, for any hemp cultivation that results, even temporarily, in a single flower of a single plant fluctuating above 0.3% THC. *See, e.g., id.* at 1.

Apothio has alleged in detail how the Kern County Sheriff's Office (KCSO), with the assistance of the California Department of Fish and Wildlife ("CDFW")—but conspicuously *without* any involvement of any federal drug enforcement authority—ignored federal and state law by treating Apothio's legal hemp as a controlled substance. The F&W Defendants' main response

---

[2] For the Court's convenience, Apothio proposed to file a joint opposition brief, of no more than 35 pages, that would address both of the motions to dismiss that Defendants filed in this case. Because Defendants would not agree and insisted on separate opposition briefs, Apothio has filed two separate briefs with some overlapping content. In addition, Apothio notes that Defendants failed to satisfy their obligation to meet and confer on several of the grounds presented in their motions, *see* Standing Order, Dkt. No. 2-2 at 2, which could have addressed many of the baseless substantive and technical issues they raise. *See Rubie's LLC v. First Am. Title Co.*, No. 1:18-CV-01052 DAD, 2018 WL 6419674, at *2 (E.D. Cal. Dec. 6, 2018).

is to claim, based on a grievous distortion of the Complaint, that Apothio alleges "marijuana" was destroyed. This mischaracterization and mis-citing of the allegations of the Complaint is no basis for a motion to dismiss, for which the Court accepts as true Apothio's allegations that it cultivated legal hemp and destroyed any hemp plants exceeding 0.3% THC on a dry weight basis. *See* ECF No. 1 ("Compl.") ¶¶ 35, 62, 82, 108. Defendants repeatedly and improperly rely for their motion on alternative facts beyond the well-pleaded Complaint.

Because their motion depends on these gross distortions of the operative allegations and controlling law, and others discussed further below, the F&W Defendants' motion to dismiss should be denied in its entirety.

## FACTUAL BACKGROUND

Apothio cultivates hemp as an "established agricultural research institution" (EARI). Both itself, and in conjunction with institutes of higher learning, with whom Apothio has research agreements, Apothio studies potential uses of the cannabinoids in hemp to treat serious medical conditions, including epilepsy. Compl. ¶¶ 2, 3.

Since the 2016 passage of Proposition 64 in California, which encourages hemp cultivation and research, and the 2018 Farm Bill, which legalized hemp by removing it as a federal controlled substance, hemp production has become widespread in California and many other states. *Id.* ¶¶ 32, 33, 34, p.2 n.1. Given its legal status and commercial benefits, California agencies and towns, including Kern County, encourage and permit businesses like Apothio to grow hemp. *Id.* ¶¶ 74, 84.

Apothio was always transparent about its business and regularly communicated about its hemp cultivation with relevant government authorities. *See, e.g.*, *id.* ¶¶ 79, 80, 86, 95, 98. Even though as an EARI Apothio was permitted to possess hemp that tested above 0.3% THC, and was

1    not required to provide test results,[3] Apothio shared its test results with the County, and destroyed

2    any hemp that tested above 0.3% THC dry weight, a rare occurrence. *Id.* ¶¶ 35, 62, 82, 86, 92, 108.

3          The levels of THC in hemp vary throughout its lifecycle: "For example, younger undried

4    hemp plants may contain relatively high levels of THC, but by the time the plants mature and are

5    ready to be harvested, that THC has often been converted to other chemicals. *Id*. ¶ 43. Apothio's

6    research "has focused on developing varietals of hemp that, when mature and dry, contain little or

7    no detectable THC." *Id.* ¶ 52. As the Complaint states, "Apothio routinely tests its plants for THC

8    content . . . all of its hemp varietals have been independently tested . . . and certified to contain

9    below 0.3% THC when measured in the mature, dried flower of the plants." *Id.* ¶ 61.

10         On October 24, 2019, Defendant Nicholson of the KCSO sought a search warrant, wrongly

11    claiming that Apothio was illegally cultivating marijuana, a misdemeanor offense in California. *Id.*

12    ¶ 10. Although the KCSO has thus far stonewalled Apothio's repeated efforts to obtain access in

13    California state court to any probable cause affidavit that was submitted in support of the search

14    warrant, Apothio alleges that the affidavit intentionally omitted material information, including (1)

15    Apothio's legal status as a hemp grower and EARI, (2) Apothio's constant communication and

16    transparency with the County, and (3) the County's approval and lack of any concern expressed to

17    Apothio in meetings and written communications. *Id.* ¶ 107.

18         On October 25, 2019, Defendant Nicholson appeared with several officers from the KCSO

19    and the CDFW in tactical gear, and they jointly proceeded to bulldoze *all* of Apothio's hemp

20    crops—including two fields that Nicholson admitted contained only legal hemp—ignoring legally

21    mandated testing procedures and their own negative test results. *Id.* ¶¶ 11, 113. Defendants

22    destroyed 500 acres of Apothio's crops, causing enormous financial damage to the company at a

23

---

[3] "Hot" hemp denotes hemp that tests above 0.3% THC dry weight. Compl. ¶ 97.

critical time in the hemp industry. *Id.* ¶¶ 1, 236, 247–51. To date, nobody has been arrested or charged in connection with the matter.

## ARGUMENT

**I.   THE MOTION TO DISMISS MUST BE DENIED BECAUSE IT FAILS TO ACCEPT APOTHIO'S ALLEGATIONS AS TRUE AND INSTEAD MOVES TO STRIKE FACTS THAT PRECLUDE DISMISSAL.[4]**

### A.   Defendants ignore the legal standard for a motion to dismiss

On a motion to dismiss, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Defendants cannot obtain dismissal by contradicting, disputing, or moving to strike factual allegations because "factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

### B.   Defendants' claim that the destroyed crops were "contraband" depends on improper and unsupported factual assertions

Rather than accepting Apothio's allegations that the destroyed crops were hemp, the F&W Defendants' improperly recharacterize them as marijuana and therefore "contraband" in order to claim that there can be no federally protected property interest. MTD at 4–7. Defendants' cannot distort, ignore, and rewrite Apothio's complaint to suit their motion. Because this contraband argument is the only asserted basis to dismiss the Fourth Amendment excessive destruction, due process, takings, some Bane Act Claims, and state tort claims, Defendants' motion must be denied as to claims One, Two, Three, Six, Seven, Eight, Nine, and Ten.

---

[4] Apothio responds to F&W Defendants' motion to strike in its Joint Opposition to Defendants' Motions to Strike filed simultaneously herewith.

Apothio's Complaint repeatedly alleges that the destroyed crops were legal hemp, as defined in the 2018 Farm Bill. For example, Apothio's allegations include: "all of its hemp varietals" had been "independently tested via laboratory-grade chromatographs and certified to contain below 0.3% THC when measured in the mature, dried flower of the plants," Compl. ¶ 61;[5] "when Apothio plants have demonstrated high THC levels at maturity, Apothio has destroyed them," *id.* ¶ 62; and Defendant Nicholson admitted to destroying two fields containing no plants above 0.3% THC, *id.* ¶ 113.

The F&W Defendants resort to distorting Apothio's allegations in order to assert that the crops were contraband. Specifically, as if reading an entirely different Complaint, Defendants incorrectly claim that Apothio's Complaint "admits it was growing marijuana with more than 0.3 percent THC." MTD at 1 (citing Compl. ¶¶ 62, 82, 92), and "Apothio admits to cultivating and possessing a far greater amount of marijuana than allowed," *id.* at 5 (citing Compl. ¶¶ 85, 88, 91-92). But these allegations are nowhere in the Complaint. The paragraphs cited by Defendants confirm precisely the opposite: "On the occasion when Apothio plants have demonstrated high THC levels at maturity, Apothio has destroyed them," Compl. ¶ 62; Apothio's 2018 testing of a *prior* crop "confirmed that the plants would have THC levels of less than 0.3% at maturity, and this indeed turned out to be the case when the plants were finally harvested," and "Apothio was carefully tracking the few exceptions testing above that threshold so they could be destroyed if they were not compliant with the 0.3% limit at the time of harvest," *id.* ¶ 82 (referring to 2018 harvest the year before the destruction); In February 2019, Apothio had "500 additional acres of hemp" *id.* ¶ 85; In

---

[5] Thus as this allegation shows, and contrary to F&W Defendants' criticism, Apothio, did, in fact, cite "studies of its own showing its plants' THC levels were below 0.3 percent," MTD at 6.

1   March 2019, Apothio "planted approximately 17 million industrial hemp seeds on the 50 acres of

2   land," *id.* ¶ 88; and Apothio had planned to "extract the legal components of hemp," *id.* ¶ 91.

3        None of these paragraphs allege that Apothio possessed plants above 0.3% THC dried

4   weight at the time of the destruction. Paragraph 92 alleges that Apothio "remained in contact with

5   the County to inform the County about its continued work," throughout 2019, and "Apothio

6   provided updates on testing that included test results of plants currently above 0.3% THC." This

7   sole allegation merely indicates that when Apothio provided updates, it would include any results

8   of plants that tested above 0.3% THC, but there is not a single factual allegation in the fifty-eight

9   page Complaint that any plants testing above 0.3% THC dried weight remained at the time of

10   Defendant's massive destruction of Apothio's property in late October 2019. To the contrary, the

11   Complaint alleges Apothio routinely destroyed hot hemp, *id.* ¶¶ 62, 82, and expressly challenges

12   the reliability of any testing—none of which has been disclosed to date—that could have found

13   Apothio's plants to have exceeded 0.3% THC at the time Defendants destroyed Apothio's crop, *id.*

14   ¶¶ 123, 124.

15       "Taking the factual allegations in the Complaint as true," Defendants have "not

16   demonstrated that the goods seized by [law enforcement] were in fact contraband." *Innovative*

17   *Nutraceuticals, LLC v. United States*, No. 18-CV-1400, 2019 WL 3017672, at *3–4 (C.D. Cal. Mar.

18   28, 2019).

19   **II.   THE MOTION TO DISMISS FAILS BECAUSE IT MISCHARACTERIZES**
         **FEDERAL AND STATE LAW**

20

21        Even though the Complaint clearly pleads that Apothio cultivated legal hemp, and not

   marijuana, the F&W Defendants incorrectly claim that Apothio's activities were still unlawful

22   because Apothio does not meet the requirements of a state EARI or a federal research exemption.

23   See MTD at 10-12. They further make the astounding claim that even if Apothio met the

1  requirements of a state EARI, California's hemp production laws for EARIs have always been

2  illegal and preempted by federal law. *See id.* at 12 ("Federal Hemp Law preempts any State

3  Research Loophole."). But Apothio's allegations establish its eligibility to cultivate hemp under

4  both the federal and California research exemptions, as discussed below in Part II, Section A.

5  Moreover, federal law does not preempt California's EARI law, as discussed in Part II, Section B.

6      Not content merely to delegitimatize California's hemp industry, Defendants attempt to

7  criminalize it as well. Defendants advocate an extreme, and unfounded, legal position that

8  contradicts the express intent of both Congress and the California legislature. Their legal theory

9  leads to the sweeping conclusion that regardless of whether any individual or entity intends to

10 cultivate legal hemp, the entire industrial hemp industry, including any educational institutions

11 conducting hemp research, face criminal liability (and suffers the destruction of its entire crop) any

12 time a single flower in a single plant fluctuates above 0.3% THC, a not uncommon circumstance in

13 the course of legal hemp cultivation. *See, e.g.*, Compl. ¶ 43. This is also not the law, as explained

14 in Part II, Section C.

15      A.  <u>Apothio's allegations establish its eligibility to cultivate hemp under both the California and federal research exemptions</u>

16      While California law provides for a registration process and imposes other requirements on

17 hemp growers generally, throughout 2019 it exempted EARIs from nearly all such requirements.

18 Cal. Food & Agric. Code § 81003(a) (2019). California law defines an EARI as "any institution

19 that is either: (1) A public or private institution or organization that maintains land or facilities for

20 agricultural research, including colleges, universities, agricultural research centers, and

21 conservation research centers; or (2) An institution of higher education (as defined in . . . 20 U.S.C.

22 1001) that grows, cultivates or manufactures industrial hemp for purposes of research conducted

23 under an agricultural pilot program or other agricultural or academic research." Cal. Food & Agric.

1    Code § 81000(a)(4)(A), (a)(4)(B).[6] Apothio's well-pleaded allegations establish that it qualifies as

2    an EARI under both prongs of the California statute. Compl. ¶¶ 2–3, 49–50, 66, 68.

3         While the Kern Defendants concede that Apothio's Complaint adequately alleges facts

4    qualifying Apothio as an EARI under California law, *see* Kern MTD at 5, the F&W Defendants

5    argue that Apothio does not qualify because it "is not a college or education institution" and would

6    have commercialized its hemp. MTD at 11. The F&W Defendants are wrong: Apothio's Complaint

7    qualifies it as an EARI under both of the above-quoted subsections of the Food & Agricultural

8    Code. With respect to subsection (a)(4)(A), the Complaint expressly alleges that Apothio has

9    maintained "land and facilities to support [hemp] research and development, since 2015," and that

10   it is "authorized to research and commercialize hemp under both federal and state law." Compl.

11   ¶¶ 2–3, 49–50. With respect to subsection (a)(4)(B), the Complaint further alleges Apothio's

12   qualification as an EARI based on its "research agreements with multiple institutes of higher

13   learning," Compl. ¶ 2, including a 2015 agreement with Pardee Rand Graduate School[7] to provide

14   "microeconomic data on the cost of cultivating and processing domestic hemp product," *id.* ¶ 65,

15   and 2018 and 2019 agreements with Cerro Coso Community College, *id.* ¶¶ 66, 68.[8]

16        Even though Apothio is not itself an "institution of higher education," that is not a

17   requirement to qualify as an EARI of the California statute; indeed, the express above-quoted

18   language from subsection (a)(4)(B) makes clear that any "public or private institution or

19

20   ---
     [6] Previously codified at § 81000(c) in October 2019.

21   [7] Pardee Rand is an "institution of higher education" as defined by federal law. *See* 20 U.S.C. § 1001; 34
     C.F.R. § 600.4(a)(4)(i); *Pardee Rand Graduate School*, DEP'T OF ED. DATABASE OF ACCREDITED

22   POSTSECONDARY INSTITUTIONS AND PROGRAMS (accessed July 9, 2020),
     https://ope.ed.gov/dapip/#/institution-profile/106023.

23   [8] The 2018 agreement was a "research and internship agreement" in which Apothio would offer its sites
     for vocational training. Compl. ¶¶ 66–67. The 2019 agreement created "the first National Industrial
     Hemp Research, Development, and Commercialization Center." *Id.* ¶ 69.

1   organization" may qualify as a California EARI. Moreover, it is also not a prerequisite under

2   subsection (a)(4)(B) of California's EARI definition, which tracks the language of the federal

3   research exemption created by the 2014 Farm Bill because that federal exemption has consistently

4   been interpreted as extending beyond institutions of higher education and state departments of

5   agriculture to include parties with whom they have contractual relationships for hemp cultivation

6   and research, like Apothio. *See, Statement of Principles on Industrial Hemp*, USDA, DOJ, DOJ,

7   HHS, & FDA, 81 Fed. Reg. 53395 (Aug. 12, 2016) (recognizing that "persons employed by or

8   under a production contract or lease with [an institution of higher education or a department of

9   agriculture] to conduct such research, may grow or cultivate industrial hemp" pursuant to the federal

10  research exemption); *see also*, *e.g.*, Hrg. Tr., *Kentucky Dep't of Ag. v. DEA (KDA)*, 3:14-cv-00372-

11  JGH, ECF No. [20], at 3:17–22, at 5:12–6:4[9] (June 18, 2014). Indeed, few institutions could

12  meaningfully cultivate or research hemp without the ability to contract with outside parties. *See,*

13  *e.g.*, Br., *Kentucky Dep't of Ag. v. DEA*, 3:14-cv-00372-JGH, ECF No. [17-1], at 1516 (W.D. Ky.

14  June 12, 2014).[10] The EARI definition contained in Cal. Food & Agric. Code § 81000(a)(4)(B) must

15  be construed with the same scope. *Belridge Farms v. Agric. Labor Relations Bd.*, 21 Cal. 3d 551,

16

---

17  [9] "**THE COURT**: So then as a general rule, that these growers that Jonathan and Dick represent, if they

18  are growing pursuant to a proper memorandum of understanding, and the KDA or Kentucky wouldn't be able to get the seeds unless they had made an application and it had been approved, so then if they are operating under the memorandum, then they are operating within the law. Is that the way it works?

19  **MR. SCHECTER [for the DEA]:** This is Ben. Generally speaking, that's correct….So I think that's the

20  implicit recognition and the explicit representation in the May 22nd letter, which is as long as we are all following the Farm Bill and conducting research to grow and cultivate industrial hemp and these MOUs are in place and they are adhering to their own state law, I think we are in good shape."

21  [10] "KDA obviously does not have the capability to use any of its own small office staff to plant hemp

22  seeds and cultivate test plots. Thus, *forbidding KDA from contracting with private farmers to carry out the agricultural pilot programs would effectively preclude KDA from cultivating or growing industrial hemp for the pilot programs. As to the colleges and universities, while they may have limited capability*

23  *to use their own employees to actually cultivate test plots, it is, as the Court noted during the May 21hearing in this case, normal and expected that colleges and universities contract with private individuals and firms to carry out research projects*." (Emphasis added).

1   557 (1978) (giving "like interpretation" to "state statutes which are patterned after (the) federal

2   statutes").

3       Moreover, the nature of these permissible and profitable contractual relationships and,

4   indeed, the plain language of the California EARI statute undercuts the F&W Defendants'

5   conclusory assertion that Apothio cannot be an EARI because it has a "commercial purpose." MTD

6   at 11. The F&W Defendants fail to identify anything that prohibits an EARI from engaging in

7   commercial activity; they cite no statutory or case authority to support this invented restriction.

8   Contrary to the F&W Defendants' argument, however, California law makes clear that so long as

9   an institution meets the EARI definition set forth in California Food & Agricultural Code section

10  8100(a)(4)—which Apothio's allegations establish it does—then the following statutory sections

11  governing California EARIs apply to them. There is no prohibition or disqualification under

12  California law (or federal law, for that matter) for EARIs that engage in commercial activity.

13      With respect to Apothio's qualification for the research exemption under federal law,

14  Apothio's Complaint alleges facts that qualify it under that exemption for the same reasons they

15  qualified Apothio as an EARI under the "institution of higher education" definition contained in

16  Cal. Food & Agric. Code § 81000(a)(4)(B). The F&W Defendants again offer no analysis or legal

17  authority for their conclusory claim that Apothio does not qualify under the federal research

18  exemption, MTD 11–13, and they ignore the above-cited authorities that contradict their position.

19      The F&W Defendants further argue, again without any support, that under the federal

20  research exemption, Apothio would still not be permitted to grow hemp because California has not

21  promulgated any "pilot program." *See id.* at 12. But the F&W Defendants selectively and

22  misleadingly cite only the statutory definition of "agricultural pilot program," ignoring that the

23

1  exemption itself permits cultivation of industrial hemp under "an agricultural pilot program *or* other

2  agricultural or academic research." 7 U.S.C. Section 5940(b)(1) (emphasis added).

3         B. <u>Federal hemp law does not "preempt" California's EARI law[11]</u>

4     Faced with Apothio's well-pleaded allegations qualifying it as an EARI, the F&W

5  Defendants also advance the misguided argument that Apothio's EARI status under California law

6  is not relevant because, due to alleged federal preemption, "at the time of the eradication, legitimate

7  industrial hemp can only be cultivated for 'agricultural or academic research' [under the 2014

8  federal Farm Act exemption]." MTD at 13 (citing 7 USC § 5940(b)(1). But in passing the 2018

9  Farm Bill, Congress removed hemp from the Controlled Substances Act, thereby immediately

10  removing any federal prohibition against hemp cultivation. The 2014 federal research exemption

11  from illegal hemp cultivation (7 U.S.C. § 5940), in no way narrowed states' ability to permit the

12  cultivation of hemp once the 2018 Farm Bill legalized hemp.

13     Defendants further contend that because California has not yet received USDA approval for

14  a new plan pursuant to the 2018 Farm Bill, and the USDA has not issued a final plan, California's

15  existing legal and regulatory regime lacked any force at the time of the destruction, and all of the

16  agricultural property developed in reliance on California law is somehow converted into

17  contraband. But until the USDA publishes its final rule[12] or a new state plan is approved by the

18  USDA, growers like Apothio may cultivate hemp under existing law, without any concern about

19  violating the Controlled Substances Act. *See Bond v. United States*, 572 U.S. 844, 854 (2014) ("the

20

21

22  [11] See pages 11-14 of Apothio's Joint Opposition to the Kern Defendants' Motions for an extended discussion of the interaction between federal and state law.

23  [12] USDA promulgated an interim final rule on October 31, 2019, but that rule was not in effect until after Apothio's crop was destroyed.

1    National Government possesses only limited powers; the States and the people retain the

2    remainder").

3         Indeed, to this day, the California Department of Food and Agriculture recognizes in its

4    written public guidance that, as a result of the 2018 Farm Bill, "hemp is no longer federally

5    regulated as a controlled substance" and that the growth of industrial hemp is "legal in California,"

6    pursuant to California Food and Agricultural Code Section 81000, by "registered growers, hemp

7    breeders, and *established agricultural research institutions*." *California Industrial Hemp Program:*

8    *Frequently Asked Questions*, CAL. DEP'T FOOD & AG. (accessed July 13, 2020) (emphasis added),

9    https://www.cdfa.ca.gov/plant/industrialhemp/faq.html. [13] Other than preserving (against any

10   possible USDA regulation) protections for hemp growers that were established by the 2014 Farm

11   Bill through the one-year anniversary of the USDA's new plan,[14] Congress did not provide for any

12   federal role during this interim period, thereby vesting states with such regulatory power.

13        The 2018 Farm Bill removed hemp from the CSA's list of controlled substances (with

14   immediate effect—not only once new state plans were submitted and approved), established a path

15   for federal regulation of hemp production *only* once the USDA steps in, and continued to safeguard

16   (against USDA regulation) the cultivation of hemp for research under the 2014 Farm Bill for one

17   year after the USDA's final plan is approved. In sum, by removing hemp from the Controlled

18   Substances Act, hemp immediately became legal to cultivate, and Apothio complied with all the

19   relevant California laws to cultivate hemp.

20

21

22   [13] Such directly contradictory public guidance from a government actor implicates principles of equitable
     estoppel and undermines, if not entirely forecloses, the F&W Defendants' argument. *See* Apothio's Joint
     Opp. to Kern Defendants' Motions at Part II, Section D.

23   [14] "Effective on the date that is 1 year after the date on which the Secretary establishes a plan . . . the
     Agricultural Act of 2014 (7 U.S.C. § 5940) is repealed." 2018 Farm Bill, 132 Stat. at 4829.

1    In any event, Defendants concede that the cultivation of industrial hemp for research

2    purposes remains permitted under the 2014 grandfathered federal research exemption (7 U.S.C. §

3    5940), MTD at 13, which Apothio also satisfies for the reasons explained in the prior section.

4    C.   Hemp that exceeds 0.3% THC is not contraband per se

5    Defendants appear to argue for the criminalization of any hemp cultivation that results, even

6    temporarily, in a single flower of a single plant fluctuating above 0.3% THC. MTD at 4. For the

7    reasons explained above, that argument is not only incapable of carrying their burden on this

8    motion,[15] see Part II, Section A, but it is also demonstrably wrong as a matter of law. To the

9    contrary, because hemp that may fluctuate above the 0.3% THC level does not qualify as contraband

10   per se, Apothio would have a property interest even in such hemp.

11   Because the per se contraband label extinguishes a protectable property interest, it only

12   applies to the narrow set of items for which "no legal purpose" exists; its possession "constitutes a

13   crime." *See, e.g.*, *United States v. Harrell*, 530 F.3d 1051, 1057 (9th Cir. 2008). With the enactment

14   of the 2018 Farm Bill's amendment to the Controlled Substances Act, hemp crops that contain some

15   plants with a THC in excess of 0.3% are now like many goods that can be legal or illegal depending

16   on the circumstances, and is thus not eligible for per se treatment. *Cf. One 1958 Plymouth Sedan v.*

17   *Commonwealth of Pennsylvania*, 380 U.S. 693, 699 (1965) (whether a car is contraband depends

18   on whether it is stolen). Holding otherwise would subject hemp farmers that do not intend to grow

19   marijuana to criminal sanctions, against the typical rule that that criminal law punishes only

20   intentional acts. *United States v. Henderson*, 243 F.3d 1168, 1173 (9th Cir. 2001) ("intentional

21   violation" is required to impose "criminal liability" for unlawful act that might happen

22

23   [15] Defendants' claim that Apothio has no "property interest" in alleged "hot hemp" has no bearing on Apothio's Fourth Amendment claims. *See Allen v. Kumagai*, 356 F. App'x 8, 9 (9th Cir. 2009) (overturning dismissal of section 1983 claim because defendants lacked probable cause where state law authorized use of medical marijuana despite federal prohibition).

"innocently"); *see also* 7 U.S.C. § 1639p (expressly recognizing that no criminal liability for negligent growth of hot hemp can be imposed under any new state or federal plans under the 2018 Farm Bill).

Possession of hot hemp, at least temporarily, is a legitimate—and, indeed, virtually inevitable—aspect of legal hemp cultivation. That is because the levels of THC in hemp plants can fluctuate throughout its lifecycle: "For example, younger undried hemp plants may contain relatively high levels of THC, but by the time the plants mature and are ready to be harvested, that THC has often been converted to other chemicals." *Compl.* ¶ 43. Apothio "has focused on developing varietals of hemp that, when mature and dry, contain little or no detectable THC." *Id.* ¶ 52.

Indeed, because it is practically impossible to grow hemp without occasionally fluctuations above the 0.3% THC level for some individual plants, the USDA recognized, in drafting its new plan, that with the legalization of hemp it is not even *negligent* for hemp producers to exceed the "acceptable hemp THC level," which could exceed 0.3% THC to account for "the uncertainty in the test results," so long as they "use reasonable efforts to grow hemp and the plant does not have a THC concentration of more than 0.5% on a dry weight basis." *See* USDA, *Establishment of a Domestic Hemp Production Program*, 84 Fed. Reg. 58522-01 (Oct. 31, 2019); *see also* Cal. Food & Agric. Code § 81006(e)(9) (absolving hemp growers that produce hemp between 0.3% and 1.0% THC on a dry weight basis from criminal liability). Subjecting growers to criminal liability (and the potential destruction of their entire crops, including even millions of plants that do not exceed 0.3% THC dry weight) for that possession would destroy the commercial hemp industry and all research into hemp strains that *do not* exceed the THC threshold: no hemp farmer would experiment with new hemp

1   strains, or *any* hemp strains for that matter, because they obviously cannot guarantee, in advance, all

2   THC values during the entire lifecycle of a plant.

3       Finally, there is no conceivable basis for labeling as contraband Apothio's mature stalks and

4   other portions of its plants that have been excluded from the definition of marijuana (regardless of

5   THC content) since even before the 2018 Farm Bill. *Hemp Indus. Ass'n. v. Drug Enf't Admin.*, 357

6   F.3d 1012, 1014 (9th Cir. 2004); *Innovative Nutraceuticals*, 2019 WL 3017672, at \*3–4 ("Those

7   portions of the cannabis plant which are not included in the definition of marijuana are not regulated

8   under the CSA and are not contraband."). Apothio's hemp plants averaged between 15 to 18 feet at

9   mature height. *Id.* ¶ 52.[16] These stalks that Defendants destroyed were expected to produce millions

10  of pounds of fiber, and are expressly excluded from the definition of marijuana. *See Compl.* ¶ 242.

11  **III.    THE MOTION TO DISMISS FAILS BECAUSE APOTHIO'S FACTUAL
12      ALLEGATIONS ARE MORE THAN SUFFICIENT TO STATE FOURTH
        AMENDMENT CLAIMS**

13          A. <u>Apothio's well-pleaded allegations establish Defendants' lack of probable cause,
14             and Defendants' cannot rely on the warrant to demonstrate otherwise</u>

            Defendants claim, contrary to the well-pleaded allegations of the Complaint, that the warrant

15  was somehow valid because "illegal THC level provides the essential good cause for the warrant."

16  MTD at 8. But as discussed *infra* at pp. 7-9, there is not a single allegation in the Complaint that

17  THC levels were illegal at the time of the destruction, and dozens of well-pleaded allegations

18  establish that the hemp was below 0.3% THC on a dry weight basis, i.e., legal hemp. *See, e.g.*,

19  Compl. ¶¶ 61, 62. This argument therefore fails.

20

21

22  ────────────────────

23  [16] Visual plant differences between hemp and marijuana generally include plant height (hemp is often encouraged to grow tall, whereas marijuana is selected to grow short and tightly clustered). "Defining Hemp: A fact Sheet," March 2019, Congressional Research Service, https://crsreports.congress.gov R44742.

1    Defendants further try to argue that even though Apothio has "never seen the statement of

2    probable cause," the warrant should be "presumed valid." MTD at 8, But rather than supporting

3    Defendants' attempt to deprive Apothio of its legal remedies, the absence of any probable cause

4    affidavit is precisely why a liberal pleading standard is applied in circumstances such as here.

5    Despite Apothio's diligent pursuit of the probable cause affidavit, the government refuses to provide

6    a single page, over eight months after the execution of the warrant. *See Klein v. City of Beverly*

7    *Hills*, 865 F.3d 1276, 1279 (9th Cir. 2017) (when plaintiff "diligently pursue[s] the facts underlying

8    [the] judicial deception claim;" "repeatedly [seeks] access to the warrant and the supporting

9    affidavit;" and "petition[s] the . . . Superior Court to unseal the warrant and affidavit," it "is hard to

10   imagine what more [a plaintiff] could [do] to pursue the factual basis for [a] judicial deception

11   claim"). In the analogous context of a criminal proceeding, where a defendant has challenged the

12   truth of an affidavit submitted in support of a search warrant that has been sealed, California courts

13   relieve the defendant from the burden of making the required preliminary showing to pursue the

14   challenge. *See People v. Hobbs,* 7 Cal. 4th 948, 971-72 (1994); *see* Apothio's Joint Opp. to Kern

15   Defendants' Motions at 22 (citing additional cases). Therefore, this Court should deny Defendants'

16   motion to dismiss as to Claims One and Four due to Defendants' illegal search without probable

17   cause.[17]

18    The Court thus cannot assess the facial validity of the search warrant (which is riddled with

19   errors, including the wrong physical description and social security number for Trent Jones, *see*

20   Compl. ¶¶ 103-105) for purposes of qualified immunity because there is no probable cause affidavit

21   attached to it. *See, e.g.*, *Armstrong v. Asselin*, 734 F.3d 984, 993 (9th Cir. 2013). Without providing

22

23   ───────────────

[17] Apothio may bring a claim for lack of probable cause "independent of what was claimed in the search warrant application" which goes to what officers "should have known." *Finkelstein v. San Mateo Cty. Dist. Attorney's Office*, No. 18-CV-09, 2019 WL 1048244, at *14 (N.D. Cal. Mar. 5, 2019).

the probable cause affidavit, Defendants fail to meet their burden on the affirmative defense of qualified immunity. *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017) ("Qualified immunity is affirmative defense that the government has the burden of pleading and proving."). Indeed, Defendant's cited case, *Messerschmidt v. Millender*, 565 U.S. 535, 549 (2012), is a summary judgment case.

Defendants' further argument that Apothio's research status as an EARI is not "material" to probable cause relies upon their mistaken claim that Apothio did not qualify as an EARI. This is wrong for the reasons discussed in Part II, A and B above, including because the F&W Defendants are ignoring Apothio's well-pleaded allegations. Indeed, even the Kern Defendants acknowledge that Apothio's EARI status must be assumed true for purposes of a motion to dismiss. See ECF No. 18 at 5.

Defendants further ignore Apothio's Complaint in claiming that Apothio has failed to allege facts demonstrating that it was unreasonable for Defendants to believe there was probable cause to seize and destroy Apothio's crops.[18] MTD at 8-9. First, Apothio's well-pleaded allegations establish that Defendants knew or should have known Apothio was growing legal hemp, which is not criminal under California law, and regardless that Apothio, as an EARI, was exempt from the THC limits and testing requirements under California law. And as explained repeatedly in cases addressing

---

[18] Only state law is relevant to the existence of probable cause in this case. *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 948 (9th Cir. 2010) ("Nothing . . . supports the proposition that the LAPD thought it was pursuing a violation of federal law."); *United States v. Talley*, No. 19 Crim. 605, 2020 WL 3275735, at *3–4 (N.D. Cal. June 16, 2020) ("[P]ost-hoc explanations that federal law supported probable cause are insufficient. . . ."). In fact, Defendants would not have been able to seek a search warrant for any violation of federal law because California Penal Code Section 1524 does not authorize it. *See Gonzales v. City of Peoria*, 722 F.2d 468, 475 (9th Cir. 1983) (examining "whether state law grant[ed] Peoria police the affirmative authority to make arrests under" certain federal immigration statutes and concluding it did not), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc).

1    judicial deception in the context of California's marijuana laws, when a search target may qualify

2    under a statutory exemption, that prospect heightens, often insurmountably, the probable cause

3    Defendants are required to demonstrate. *See, e.g.*, *United States v. $186,416.00 in U.S. Currency*,

4    590 F.3d 942, 952 (9th Cir. 2010) ("[T]he LAPD simply ignored copious evidence of [defendant's]

5    compliance with state law and failed to inform the state court judge of it."); *Allen*, 356 F. App'x at

6    9 ("[T]he officers' knowledge of his medical authorization [for marijuana use] may be relevant to

7    whether they had probable cause to believe he had committed a crime."); *O'Neal v. Johnson*, No.

8    2:14-CV-2374 DB PS, 2017 WL 416128, at *8–9 (E.D. Cal. Jan. 31, 2017) ("[A] finding of

9    probable cause to arrest plaintiff must account for the fact that plaintiff was a qualified medical

10   marijuana patient.") (collecting cases); *Demoura v. Ford*, No. 09-CV-01344-OWW, 2010 WL

11   5426850, at *5 (E.D. Cal. Dec. 27, 2010) (describing the detailed factors under state law to

12   determine whether probable cause existed for violation of California's Medical Marijuana Program

13   Act in light of statutory exemption).

14        Here, Defendants knew that Apothio was growing legal hemp as an EARI: Apothio met

15   regularly with Kern County officials, including Defendant Nicholson, who executed the warrant.

16   Complaint ¶¶ 75-80. At each of these meetings, Apothio reiterated, with documentary support, that

17   it was growing hemp as an EARI, without any disagreement, contradiction, or question. *Id.* ¶ 80.

18   On the day of the destruction, when first arriving at the hemp crops, Defendant Nicholson

19   acknowledged (with "a number of expletive-laced statements") that he was aware of, but chose to

20   disregard, the fact that Apothio was an EARI. *Id.* ¶¶ 100-101, 112.

21        Defendants wrongly assert that Apothio's EARI status can be disregarded because officers

22   need not "rule out a suspect's innocent explanation." MTD at 5 (quoting *District of Columbia v.*

23   *Wesby*, 138 S. Ct. 577, 588 (2018)). Defendants confuse non-legal "explanations" with actual legal

1  exemption, and their distorted reading of the law would functionally undermine the legal regime

2  governing hemp, among others, and permit law enforcement to disregard inconvenient law. The

3  case on which Defendants mistakenly rely, *Wesby,* does not support any such interpretation, but

4  merely involved a "totality of the circumstances" assessment by officers who received incredulous

5  explanations when called to a loud house party at a vacant house operating as a "makeshift strip

6  club." 138 S. Ct. at 586-87 ("[S]ome of the partygoers claimed the event was a bachelor party, but

7  no one could identify the bachelor"). The cases cited above, including *$186,416.00 in U.S.*

8  *Currency, Allen, O'Neal, and Demoura*, all recognize that statutory exemptions are material to a

9  probable cause showing.

10      Second, Apothio's well-pleaded allegations establish that Defendants knew or should have

11  known that legal hemp and marijuana are variants of the same plant, Compl. ¶ 32, and that careful,

12  certified laboratory testing is required to distinguish between them before any probable cause

13  showing of a crime can be established, *see id.* ¶ 124 (citing Cal. Food & Agric. Code § 81006).

14  California's Food & Agricultural Code Section 81006(e)(9) expressly absolves hemp growers that

15  produce hemp between 0.3% and 1.0% THC on a dry weight basis from criminal liability. Yet, as

16  described below, Defendants lacked the necessary training and equipment to test Apothio's plants,

17  *see supra* at pp. 22-23; *see also* Compl. ¶¶ 109, 124-132, 135-139. and they failed to properly use

18  the unsuitable equipment they did have. Compl. ¶¶ 130-32. Defendants knew or should have known

19  about these shortcomings given California law, their extensive communications with Apothio, and

20  the field test manufacturer's own guidance. *Id.* ¶¶ 76, 77, 78, 107.

21          B.   The open fields doctrine does not apply to seizures, which require probable cause

22      Defendants next claim that even if the warrant they sought and obtained was invalid, they

23  did not actually need a warrant to seize 500 acres of legal hemp. MTD at 8. Defendants' invocation

of the open fields doctrine is unavailing because that doctrine merely allows officers to *enter*, but it does not allow any Fourth Amendment *seizure* without probable cause. Thus it fails to authorize Defendants' actions after they entered the property, including the seizure and destruction of Apothio's property. The case Defendants rely on is inapposite. In *New York v. Burger*, 482 U.S. 691, 696 (1987), after conducting a warrantless search, law enforcement took specific steps to determine that auto parts they encountered were in fact stolen (by cross-referencing the parts against a stolen parts list) and, therefore, had probable cause for the seizure. *See id.* Defendants, in contrast, did not have probable cause to seize millions of legal hemp plants for the many reasons discussed above, including their complete failure to test the plants in any reliable way, no less in accordance with California's own laws. *See, e.g.*, Compl. ¶¶ 126-27.

   C. <u>California's Health and Safety Code § 11479 does not permit the seizure of private property without probable cause</u>

   Finally, Defendants try to excuse their constitutional violation by suggesting that they could seize and destroy Apothio's legal hemp under California Health & Safety Code § 11479. MTD at 8. But that statute does not permit the seizure of private property without probable cause; indeed, it expressly states that it applies "after seizure." Section 11479 exists to govern the preservation and destruction of evidence following a legal seizure, *see People v. Jackson*, No. G041185, 2011 WL 902029, at *13 (Cal. Ct. App. Mar. 16, 2011), but it does not allow the government to circumvent Fourth Amendment rights by seizing property without probable cause. In addition, Defendants ignore entirely Apothio's well-pleaded allegations that they failed to comply with the statute's requirements. Compl. ¶¶ 110, 149.

   In sum, Apothio has adequately pleaded that there was insufficient probable cause for the seizure of its legal hemp and that Defendants knew it.

1
2

**IV.   APOTHIO ADEQUATELY ALLEGES CAUSAL CONNECTIONS BETWEEN THE F&W DEFENDANTS' ACTIONS AND THE CONSTITUTIONAL VIOLATIONS**

3
4
5
6
7
8
9

   Apothio's claims stem from a simple set of circumstances with few actors and a few discrete events. As to the F&W Defendants, based on all of the information now available to Apothio, the Complaint alleges that multiple John Does from CDFW physically destroyed the hemp crops, *id.* ¶ 115, and that CDFW and Charles Bonham ratified unconstitutional conduct and failed to train the officers to properly test the hemp, *id.* ¶ 133. Nonetheless, the F&W Defendants argue that this fact pattern prejudices them because they are incapable of discerning what immunities might apply. MTD at 13.

10
11
12
13
14

   First, the F&W Defendants wrongfully misconstrue cases about the use of naming John Doe *plaintiffs* as problematic for Apothio, despite a plethora of cases holding that the naming of John Doe *defendants* is permitted through the end of discovery. *Compare Doe v. County of Kern*, No. 1:16-cv-01469, 2017 WL 5291687, at *3 (E.D. Cal. Nov. 13, 2017) *with Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) *and Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999).

15
16
17
18
19

   Second, Defendants ignore Apothio's explicit allegations regarding *Monell* liability that would apply to CDFW and Bonham.[19] Apothio asserts Section 1983 claims under two theories. The first is that CDFW had a deliberate indifferent and deficient training program that resulted in constitutional violations. *See Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989). The second is that a final decision maker "ratified" the constitutional violations of a subordinate. *See,*

20
21
22
23

---

[19] Typically, "[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." *Ireland v. Solano Cty.*, No. 2:19-CV-1104, 2020 WL 2770062, at *2 (E.D. Cal. May 28, 2020) (internal quotation marks omitted). However, because CDFW have indicated that they might raise an Eleventh Amendment immunity defense that would not be available to claims that seek injunctive relief against Bonham in his official capacity, Apothio requests that neither of the F&W Defendant be dismissed at this time.

1    *e.g.*, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013). These theories are also

2    sufficient for imposing supervisorial liability over superiors. *See Bravo v. City of Santa Maria*, 639

3    F. App'x 412, 414 (9th Cir. 2016) (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th

4    Cir.2007)); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 645-648 (9th Cir. 1991). Apothio

5    expressly alleges both theories, despite Defendants' incorrect assertion claim that Apothio "fails to

6    identify any links between the alleged constitutional violations any specific actions of [CDFW] and

7    Charlton Bonham." MTD at 13. Once again, Defendants fail to engage with the substance of the

8    Complaint.

9         Apothio's Complaint details the procedural and technical failures of Defendants' testing.

10   Compl. ¶¶ 124-132, 135-139. For example, under California law, hemp crop testing, where

11   applicable, must be performed by laboratory grade equipment. (*Id.* ¶ 124 (citing Cal. Food &

12   Agriculture Code § 81006)). But the manufacturer of the field testing equipment Defendants used

13   admits it is not laboratory grade. *Id*. ¶ 130. Defendants also failed to follow other protocols when

14   using that equipment or testing crops, such as calibrating the machine correctly; photographing

15   samples; testing only mature, dried plants; and testing the right number and parts of the plant. *Id.*

16   ¶¶ 131–35.

17        These allegations state a claim under a failure to train theory. Allegations of Defendants'

18   failure to use drug testing equipment correctly, pursuant to the manufacturer's own specifications,

19   and in accordance with state law is sufficient to support a failure to train claim. *See Harte v. Bd. of

20   Commissioners of Cty. of Johnson, Kansas*, 864 F.3d 1154, 1167 (10th Cir. 2017) (permitting

21   *Monell* claim for Sheriff's "decision to authorize the use of inconclusive field tests with a high false

22   positive rate, and without the laboratory confirmation expressly required by the manufacturer's

23   label, as the sole basis for probable cause. . . . [because] implicit in the statutory scheme is a

requirement that the use be in accord with the label, and the label here required confirmation by laboratory analysis"). Moreover, courts have upheld failure to train theories based on officials' failure to train officers on specific technologies relevant to an investigation. *See Finkelstein*, 2019 WL 1048244, at *16. Here, Apothio has gone further; it also alleges that Defendants disregarded negative or inconclusive test results, Compl. ¶¶ 113, 132, which is the type of ad hoc approach appropriate training is meant to prevent.

Beyond a failure to train, municipalities can also be found liable when a final decisionmaker ratifies unconstitutional conduct. *See Gravelet-Blondin v. Shelton*, 728 F.3d at 1097. Apothio has alleged that the search warrant purported to permit the destruction of the crops pursuant to California Health & Safety Code § 11479, which requires approval from the "chief of the law enforcement agency"—the position held by Defendant Youngblood. Compl. ¶¶ 10, 107, 108, p.29 n.5. The language of the statute itself provides the necessary link to find plausible Apothio's allegations that Charlton Bonham, as the head of the other government entity in charge of the search, approved the decision to destroy Apothio's hemp crop.

In short, far from "throw[ing] . . . [D]efendants into one basket" without describing "which [D]efendants allegedly did what," MTD at 13, Apothio adequately describes how the F&W John Does assisted in destroying Apothio's crops because CDFW and its Director failed to trained them correctly and incorrectly ratified the destruction of the hemp fields.

**CONCLUSION**

Defendants' motion to dismiss should be denied in its entirety. Should the Court be inclined to grant any part of Defendants' Motion, Apothio requests leave to amend, to cure any deficiencies in accordance with the Federal Rules and the Ninth Circuit's liberal policy on amendments. *See, e.g.*, *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

Dated: July 13, 2020

*/s/ Katherine Eskovitz*
ROCHE CYRULNIK
 FREEDMAN LLP
Katherine Eskovitz
1158 26th Street, No. 175
Santa Monica, CA 90403
keskovitz@rcfllp.com
(646) 791-6883

Kyle W. Roche (*pro hac vice*)
Joseph M. Delich (*pro hac vice*)
Richard R. Cipolla (*pro hac vice*)
99 Park Avenue, 19th Floor
New York, NY 10016
kyle@rcfllp.com
jdelich@rcfllp.com
rcipolla@rcfllp.com

*/s/ Sean Eskovitz*
ESKOVITZ LAW
Sean Eskovitz
1217 Wilshire Boulevard, No. 3683
Santa Monica, CA 90402
seane@eskovitz.com

*/s/ Brant W. Bishop*
BRANT W. BISHOP, P.C. (*pro hac vice*)
2000 Pennsylvania Avenue, NW
Suite 7000
Washington, DC 20006
brant@bishop.us

*Counsel for Apothio LLC*