1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   BRUCE D. MCGAGIN, State Bar No. 170146
    Supervising Deputy Attorney General
3   STACEY L. ROBERTS, State Bar No. 237998
    Supervising Deputy Attorney General
4   ETHAN A. TURNER, State Bar No. 294891
    KELLY T. SMITH, State Bar No. 196821
5   Deputy Attorneys General
      1300 I Street, Suite 125
6     P.O. Box 944255
      Sacramento, CA 94244-2550
7     Telephone: (916) 210-6465
      Fax: (916) 322-8288
8     E-mail:  Kelly.Smith@doj.ca.gov
    *Attorneys for Defendants, Department of Fish and*
9   *Wildlife and Director Charlton H. Bonham*

10                IN THE UNITED STATES DISTRICT COURT

11              FOR THE EASTERN DISTRICT OF CALIFORNIA

12                           CIVIL DIVISION

13

14  **APOTHIO, LLC,**                    Case No. 1:20-cv-00522-NONE-JLT
                             Plaintiff,
15           v.                          **UNPUBLISHED CASES CITED IN
                                         STATE DEFENDANTS' REPLY BRIEF
16  **KERN COUNTY; KERN COUNTY           IN SUPPORT OF MOTION TO DISMISS
    SHERIFF'S OFFICE; CALIFORNIA         THE COMPLAINT**
17  DEPARTMENT OF FISH AND
    WILDLIFE; DONNY YOUNGBLOOD;**        Date:          August 10, 2020
18  **JOSHUA NICHOLSON; CHARLTON H.**    Time:          8:30 a.m.
    **BONHAM; JOHN DOES #1 THROUGH**     Dept:          Courtroom 4
19  **#10, UNKNOWN AGENTS OF THE KERN**  Judge:         NONE
    **COUNTY SHERIFF'S OFFICE; JOHN**
20  **DOES #11 THROUGH #20, UNKNOWN**    Action Filed:  April 10, 2020
    **AGENTS OF THE CALIFORNIA FISH**
21  **AND WILDLIFE DEPARTMENT,**

22                            Defendants.

23

24          Pursuant to Fed. R. App. P. 32.1, please find attached unpublished cases cited in the reply

25  brief of state defendants California Department of Fish and Wildlife and Charlton H. Bonham:

26          1. *Finkelstein v. Jangla*, 2020 WL 3411272 (9th Cir. June 22, 2020).

27          2. *People v. Jackson*, 2011 WL 902029 (Cal. Ct. App. Mar. 16, 2011).

28  / / /

                                          1

1   Dated:  July 29, 2020

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
BRUCE D. MCGAGIN
Supervising Deputy Attorney General

  /s/ Kelly Smith

KELLY T. SMITH
Deputy Attorney General
*Attorneys for Defendants, Department of
Fish and Wildlife and Director Charlton H.
Bonham*

SA2020300599
34272764.docx

2

2020 WL 3411272
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 9th Cir. Rule 36-3.
United States Court of Appeals, Ninth Circuit.

John FINKELSTEIN; Jennifer
Finkelstein, Plaintiffs-Appellees,
v.
Vishal D. JANGLA, Defendant-Appellant,
and
San Mateo County District
Attorney's Office; et al., Defendants.
John Finkelstein; Jennifer
Finkelstein, Plaintiffs-Appellees,
v.
Nicolas Ryan, Defendant-Appellant,
and
Vishal D. Jangla; et al., Defendants.
John Finkelstein; Jennifer
Finkelstein, Plaintiffs-Appellees,
v.
Jeffrey S. Cichocki, Defendant-Appellant,
and
Vishal D. Jangla; et al., Defendants.

No. 19-15139, No. 19-15497, No. 19-15511
|
Argued and Submitted April 14,
2020 San Francisco, California
|
FILED June 22, 2020

**Attorneys and Law Firms**

Julius Finkelstein, Attorney, Law Office of Julius L. Finkelstein, Palo Alto, CA, Mark E. Merin, Esquire, Attorney, Paul H. Masuhara, III, Law Office of Mark E. Merin, Sacramento, CA, for Plaintiffs-Appellees

Seth Gordon, Esquire, Attorney, Katherine Ann Alberts, Leone & Alberts, Walnut Creek, CA, Tara E. Heumann, San Mateo County Counsel's Office, Redwood City, CA, Karen Rosenthal, Attorney, Office of the County Counsel, Redwood City, CA, Katherine Ann Alberts, Claudia Leed, Esquire, Attorney, Leone & Alberts, Concord, CA, for Defendant-Appellant

Appeal from the United States District Court for the Northern District of California Edward M. Chen, District Judge, Presiding, D.C. No. 3:18-cv-00009-EMC

Before: GOULD, CHRISTEN, and BRESS, Circuit Judges.

## MEMORANDUM[*]

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Detective Nicolas Ryan, Detective Jeffrey S. Cichocki, and Deputy District Attorney Vishal D. Jangla appeal the district court's denial of summary judgment based on qualified immunity. With jurisdiction under 28 U.S.C. § 1291 and reviewing *de novo*, *Mena v. City of Simi Valley*, 226 F.3d 1031, 1036 (9th Cir. 2000), we reverse on each claim, except for the denial of summary judgment for Deputy District Attorney Jangla on the judicial-deception claim, which we affirm.[1]

[1] Because the parties are familiar with the facts and procedural history of the case, we recite only those facts necessary to decide this appeal.

### I

The first question we address is whether the Defendants are entitled to qualified immunity for the probable-cause claims. We answer affirmatively.

A law enforcement officer is entitled to qualified immunity unless a plaintiff can prove (1) the officer violated a constitutional right and (2) the right was clearly established at the time of the conduct. *Pearson v. Callahan*, 555 U.S. 223, 231–32, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In the context of this case, the question is whether the Defendants conducted a search without probable cause, and whether the law clearly established that there was no probable cause. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence

unreasonable will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (citing *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)); *see also Messerschmidt v. Millender*, 565 U.S. 535, 547–48, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012).

We hold that the district court erred in denying summary judgment on the probable-cause claims because, although the Defendants' belief in the existence of probable cause was incorrect, it was not wholly unreasonable.

Here, probable cause was predominantly predicated on the connection between John Finkelstein's personal email address and a Skype account which was used in the alleged sexual exploitation of a minor. Whoever registered the Skype account had entered Mr. Finkelstein's email address to complete the registration process.

*Chism v. Washington*, 661 F.3d 380 (9th Cir. 2011), recognizes that cyber-evidence may not be reliable in certain circumstances. *Id.* at 391. But in *Chism*, the affidavit's affirmative misrepresentations and omissions made the link between the suspect and the crime more tenuous than here. *Id.* at 390. Nor does the law as established by *Chism* and its predecessors, *see, e.g., United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006) (*en banc*), delineate the boundaries of the doctrine such that this case is an obvious one. *Cf. White v. Pauly*, — U.S. ——, 137 S. Ct. 548, 552, 196 L.Ed.2d 463 (2017) (*per curiam*).

It was not "entirely unreasonable" for the Defendants to believe that probable cause existed. *Messerschmidt*, 565 U.S. at 547, 132 S.Ct. 1235 (quoting *Leon*, 468 U.S. at 923, 104 S.Ct. 3405). The Defendants are therefore entitled to qualified immunity on the probable cause claims.

## II

The second question we answer is whether Detective Cichocki and Deputy District Attorney Jangla are entitled to qualified immunity on the judicial-deception claims. We answer affirmatively for Detective Cichocki but negatively for Deputy District Attorney Jangla.

To overcome qualified immunity on a judicial-deception claim, a plaintiff "must 1) make a substantial showing of [an officer's] deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the [searches and arrest] would not have occurred." *Chism*, 661 F.3d at 386 (second alteration in original) (quoting *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997)). Here, the issue is whether the Finkelsteins made a substantial showing that Detective Cichocki's and Deputy District Attorney Jangla's failure to clarify the meaning of the word "valid" was in reckless disregard for the truth.

### A

The Finkelsteins made a substantial showing of the recklessness of Deputy District Attorney Jangla but not of Detective Cichocki.

The distinction lies in the proof offered, in their disparate relevant experience and testimony. The record shows that Deputy District Attorney Jangla has experience in prosecuting cybercrimes and, in particular, in warrant applications in cybercrime investigations. Most importantly, Deputy District Attorney Jangla testified unequivocally that he was aware that the term "valid email address" meant a string of characters in an email address format, not an email account that Skype verified by requiring that its registering user interact with a confirmatory email message. The Finkelsteins made a substantial showing that Deputy District Attorney Jangla's failure to clarify the meaning of the word "valid" in the affidavit was in reckless disregard for the truth.

### B

But this was not so for Detective Cichocki. The record shows that Detective Cichocki had experience in investigating crimes involving the sexual exploitation of children but not in investigating cybercrimes. Detective Cichocki's testimony does not unequivocally demonstrate that he understood the distinction between a "valid" and "verified" email address. Finally, Detective Cichocki's acquiescence to Detective Ryan's suggestion to use the term "valid" to reflect the terminology Skype itself employs indicates that Detective Cichocki's actions were not in reckless disregard for the

truth. Detective Cichocki's lack of knowledge paired with his passivity in the matter lead us to conclude that the Finkelsteins have not made a substantial showing as to Detective Cichocki's recklessness.

### III

We hold that Detective Ryan, Detective Cichocki, and Deputy District Attorney Jangla are entitled to qualified immunity on the probable-cause claims. On the judicial-deception claims, we hold that Detective Cichocki is entitled to qualified immunity but Deputy District Attorney Jangla is not.

**AFFIRMED IN PART; REVERSED IN PART.** [2]

[2] The parties shall bear their own costs.

BRESS, Circuit Judge, dissenting in part:
I agree with the majority in all but two respects.

First, although the court holds that all defendants are entitled to qualified immunity on plaintiffs' claims that the search warrant lacked probable cause, the majority concludes, without analysis, that defendants' "belief in the existence of probable cause was incorrect." In my view, we should not have opined in this manner on what is an involved and fact-bound constitutional question, especially when doing so is not necessary to our resolution of this appeal given our determination that defendants deserve qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 237, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). I thus do not join this aspect of the court's disposition.

Second, I believe we should also reverse the denial of qualified immunity on the judicial deception claim against Deputy District Attorney Jangla. I thus respectfully dissent from Part II.A of the majority's disposition, which allows this claim to proceed.

**\*3** A judicial deception claim will survive summary judgment on grounds of qualified immunity only if the plaintiffs make, among other things, " 'a substantial showing of [a defendant's] deliberate falsehood or reckless disregard for the truth.' " *Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011) (quoting *Liston v. Cty. of Riverside*, 120

F.3d 965, 973 (9th Cir. 1997)). Plaintiffs have not met that high standard as to Jangla, and so he deserves qualified immunity on this claim.

In this case, and as relevant to the judicial deception claim, someone used a Skype account to sexually exploit a minor. An investigation revealed the account was linked to Mr. Finkelstein's email address, so law enforcement obtained a warrant to search his home and belongings. The warrant application, which Jangla reviewed and approved, stated that "[i]n order to create a Skype account a valid email is necessary" and that Mr. Finkelstein's email was "used to create" the suspect's Skype account.

The issue is whether it was false or recklessly misleading for the search warrant application to state that Skype required a "valid" email address, when at the time Skype did not require registrants to supply a "verified" email address. Because Jangla testified he understood the difference between a "valid" and "verified" email address, the majority concludes plaintiffs "made a substantial showing" that Jangla's "failure to clarify the meaning of the word 'valid' in the affidavit was in reckless disregard for the truth."

I respectfully disagree. The warrant application was accurate on its face: Skype at the time required only a "valid" email address, and the warrant application tracked the language on Skype's own website, which instructed registrants to "[u]se a valid email address" when creating an account. That Jangla understood the technical difference between a "valid" and "verified" email address does not connote judicial deception. I am aware of no evidence suggesting that Jangla should have known that referring to a "valid" email address would misleadingly suggest that a "verified" address was required, or that a "valid" address is commonly regarded as a "verified" one. Jangla himself did not believe this. He testified that requiring a verified email address is not "standard in the industry" and there "are a lot of services that don't offer that or don't require that."

I thus cannot conclude that Jangla demonstrated a reckless disregard for the truth. He did not engage in judicial deception and is entitled to qualified immunity on this claim.

**All Citations**

--- Fed.Appx. ----, 2020 WL 3411272

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 902029
Not Officially Published
(Cal. Rules of Court, Rules 8.1105 and 8.1110, 8.1115)
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts
citation of unpublished opinions in California courts.

Court of Appeal, Fourth District, Division 3, California.

The PEOPLE, Plaintiff and Respondent,
v.
Thomas JACKSON, et al.,
Defendants and Appellants.

No. G041185.
|
(Super.Ct.No. 04ZF0075).
|
March 16, 2011.

Appeal from judgments of the Superior Court of Orange
County, Lance Jensen, Judge. Affirmed.

**Attorneys and Law Firms**

Susan D. Shors, under appointment by the Court of Appeal,
for Defendant and Appellant Thomas Jackson.

Michael Ian Garey for Defendant and Appellant Edward
Nevarez.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette,
Chief Assistant Attorney General, Gary W. Schons, Assistant
Attorney General, Lilia E. Garcia and Jeffrey J. Koch, Deputy
Attorneys General, for Plaintiff and Respondent.

OPINION

O'LEARY, J.

**\*1** Thomas Jackson, Edward Nevarez, and Brian
Magallanes were charged by grand jury indictment in 2004
with (1) conspiracy to sell or transport a controlled substance
and possession for sale of a controlled substance, (2)
transportation of a controlled substance, and (3) possession
for sale of a controlled substance. Attached to all these
counts were enhancements for personal arming with a firearm
and for possessing over 80 kilograms of cocaine. In 2007,

the jury convicted Jackson and Nevarez of all charges and
found true the enhancement allegations. The jury was unable
to reach a verdict as to the charges against Magallanes. The
trial court sentenced Jackson to 28 years in prison and
Nevarez to 30 years in prison. On appeal, Nevarez raises
several evidentiary issues and both defendants claim the court
should have granted their respective motions to suppress. We
conclude all the contentions raised lack merit, and we affirm
the judgments.

I

On October 30, 2003, Deputies Kenneth Olszewski and
William Baker, working as part of a narcotics task force,
had under their surveillance Nevarez driving a silver Toyota
Sequoia SUV (silver SUV). They watched Nevarez engage in
"counter surveillance driving" before pulling the silver SUV
into 12327 Woodruff (the Woodruff property). Baker saw
three individuals, which included Nevarez, load several duffel
bags from the silver SUV into an 18–wheel tractor trailer big
rig (big rig).

The officers saw a different man drive away in the silver SUV.
When the big rig pulled out of the Woodruff property, it was
followed by a black Chevrolet Suburban SUV (black SUV).
The black SUV stopped following the big rig once it reached
the freeway.

Not wanting to alert Nevarez and the others there was an
ongoing narcotics investigation, Olszewski asked another
law enforcement officer to pull over the big rig. Deputy
Christopher Thompson stopped the big rig and discovered
250 kilograms of cocaine stored in 15 duffel bags, as well
as seven cellular telephones. There were no fingerprints on
the packages. The following day, the tow truck driver who
took the big rig to the impound yard found a pistol on the
floorboard next to the driver's seat.

Jackson admitted "Hector" and someone else put the duffel
bags into his cab. He looked in one of the bags and saw a "
'white form' " he assumed was cocaine. He said he was paid
$100,000 to deliver the bags to a truck stop in Bolingbrook,
Illinois. As for the pistol, Jackson claimed he found it on the
side of the road in Oklahoma in 1999, and he kept it in an area
behind the driver's seat.

After Jackson's arrest, the deputies continued their
surveillance of Nevarez and others until February 22, 2004.

Case 1:20-cv-00522-NONE-JLT Document 39-1 Filed 07/29/20 Page 8 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

The deputies then obtained and executed search warrants at premises and vehicles, including those associated with Nevarez. At Nevarez's house at 8920 Arrington, in the City of Downey (the Arrington residence) agents found a large sum of cash and keys to the silver SUV. They also found a memorandum book in the china cabinet containing various alpha and numeric notations inside (pay/owe sheets), as well as the sheriff's office case number for Jackson's arrest. In the silver SUV, agents found a secret compartment containing a loaded semi-automatic pistol. They also found five unboxed cell phones in the vehicle.

**\*2** Before trial, the court partially granted Nevarez's motion for discovery under Pitchess v. Superior Court (1974) 11 Cal.3d 531 (Pitchess ). The court conducted an in camera hearing of Baker's records and determined there was nothing to disclose. Nevarez's motions to suppress evidence, traverse the search warrant, and suppress statements were denied. Jackson's motion to suppress evidence based on his claim of involuntary consent to search and Miranda[1] violations was also denied.

[1] Miranda v. Arizona (1966) 384 U.S. 436.

After the trial started, an issue arose over the destruction of the contraband. Nevarez moved to dismiss or exclude evidence based on violations of due process and Health and Safety Code section 11479. The motions were denied. Nevarez also filed a motion in limine to exclude evidence of items seized and events occurring after October 30, 2003 (the date of Jackson's arrest) including: (1) documents, .38 caliber revolver, and $3,711 seized from the Arrington residence; (2) six cell phones and a .40 caliber handgun seized from the silver SUV; (3) drugs, three handguns, and documents seized from 8533 5th Street, Downey; (4) documents seized from the Woodruff property; and (5) documents seized from 6105 Pala Ave, Maywood. This motion was denied.

At trial, over defense objections, Baker provided expert testimony about how drug traffickers typically transport cocaine from Columbia, through Mexico and into the United States. Because this testimony is challenged on appeal, a more detailed description is saved for our discussion of this issue.

The defense aggressively attacked the integrity of Baker's testimony and the surveillance photographs. The court denied Nevarez's efforts to admit photographs and videotape recreations of the duffel bags being transferred.

II

*A. Expert Testimony*

Nevarez made numerous objections to Baker's and Olszewski's expert witness testimony as to the structure of large scale narcotics organizations, information about their international scope, counter surveillance driving, and habits of drug traffickers (such as the use of lookouts and "tail gunning" vehicles carrying large quantities of drugs). He asserted their testimony was like drug courier profile evidence that has been condemned by many state and federal courts. (See People v. Brown (1981) 116 Cal.App.3d 820; People v. Hernandez (1977) 70 Cal.App.3d 271.) Specifically, Nevarez complained Baker's testimony tended to connect the events of one day (October 30) with an uncharged international conspiracy, and Olszewski's testimony impermissibly referred to Nevarez's mental state while driving, attributing to him a particular motive. We find no reversible error.

First, as pointed out by the Attorney General, the objections raised below to the expert evidence related to discovery obligations and lack of foundation. The Attorney General argues Nevarez did not preserve the issue of "profile evidence" for appeal. We agree.

Olszewski testified about his surveillance of Nevarez's driving for several days in October, including the date of the October 30, 2003 incident. On that day, he began watching Nevarez at 7 a.m. The team followed the silver SUV driven by Nevarez to a carwash, and then to the Woodruff property. This was a gated area containing boats and off-road vehicles. Nevarez's name was on the gas bill for this address.

**\*3** Nevarez dropped off a male Hispanic at the Woodruff property and then drove to a house on Fifth Street. After stopping briefly, Nevarez returned to the Woodruff property. He first drove southbound past the Woodruff property's gated area, he made a three-point turn and drove northbound past the gated area again. He then made a U-turn to return southbound to the Woodruff property and he parked in front of it.

Olszewski was next asked whether based on his training and experience this driving pattern had any significance "as it relates to narcotics." Nevarez's counsel objected on foundational grounds. The court sustained the objection.

Case 1:20-cv-00522-NONE-JLT  Document 39-1  Filed 07/29/20  Page 9 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

The prosecution then asked Olszewski to describe in detail his training and background in law enforcement, particularly with respect to narcotics trafficking. Olszewski stated he received training on counter surveillance. He explained counter surveillance driving "is a type of driving used to either detect if law enforcement is following you or to be consistent with driving that would not allow you to be followed to any particular location ... while you are driving." When asked again if Nevarez's driving had any significance, Nevarez objected again stating "no foundation." This time the trial court overruled the objection. Olszewski opined the driving he saw looked like counter surveillance driving.

Baker recited his 21 years of training and experiences in law enforcement and in particular his expertise with respect to narcotics trafficking. Baker explained for the past six years he has been assigned to the Regional Narcotics Suppression Program (RNSP) where he investigates cocaine traffickers every day. The prosecutor asked Baker to describe, based on his training, how cocaine typically gets into the United States. He replied it usually comes from South America. He explained the rock cocaine is processed in Columbia, is transported to Mexico, and then usually driven across the border. He stated the drugs are stored for a short time in a "stash location" in the Los Angeles area before being moved to other large cities around the United States such as New York, Miami, Chicago, and Detroit.

Nevarez's counsel asked for a sidebar conference and asked if the prosecution intended to offer Baker as an expert on narcotics trafficking. When counsel heard the answer was "yes," counsel asked for copies of the expert's reports. He was told none existed. Nevarez's counsel then objected on the grounds the prosecution had not complied with its discovery disclosure obligation by providing a report as to what Baker would be testifying to as an expert witness. Nevarez's counsel stated he was under the impression Baker was a fact witness, not an expert witness. The court overruled the objection.

Baker continued testifying by stating that in 2003 the value of one kilogram of cocaine would be about $13,000. Baker also described for the jury the "division of labor ... in a major trafficking of multiple kilo[gram]s of cocaine[.]" He stated at the top of the chain were the drug cartels in Mexico. Under them were "brokers" in Los Angeles who received and arranged for large distributions to other cities, where the drugs were given to smaller dealers to sell on the street. Baker testified narcotics traffickers carry firearms not to shoot the police but for protection against theft because cocaine is so valuable. Nevarez's counsel interrupted by asking the court to note his continuing objection to this line of questioning. The court stated, "As previously discussed and noted, yes."

*4 Baker went on to describe the ways drug traffickers protected their operations from being discovered by law enforcement. For example, he said the police use wire taps and so to avoid detection the drug traffickers "use more than one phone and they compartmentalize their organization. Maybe on one phone they will talk to this truck driver and maybe on this phone they will talk to the source of cocaine. Maybe on this phone they will talk to the guy that brings them money [ ... etc.]" He added they also use counter surveillance driving and use lookouts. Baker said the drug traffickers drive in a way that they can see if they are being followed, such as making frequent lane changes and quick U-turns to see if anyone makes a turn behind them.

Baker testified about seeing Nevarez load duffel bags into the big rig and that he believed Nevarez followed the big rig in a black SUV in a "tail gunning" tandem manner to look out for law enforcement. He opined this kind of driving was significant in relation to narcotics trafficking, stating, "I always liken it to World War II, and how the fighter pilots would escort ... the B–52s to their mission. And it was the fighter pilot's job to get in the way so that the B–52 could accomplish its mission. [H]e's supposed to look for the enemy, for law enforcement, or for other drug traffickers. So he would follow in tandem and just watch for us." Nevarez's counsel did not object to this testimony, but at the next recess he renewed his objection to Baker testifying as an expert witness "until the defense has been given a written report of his testimony" and moved to strike his prior testimony. The prosecution agreed the defense would be entitled to a report if one existed, but explained not all witnesses prepare reports. Nevarez's attorney proposed the defense was entitled to an oral statement from the prosecutor as to what the expert would testify to. The court stated the objections were noted for the record, but were overruled. It denied the motion to strike Baker's testimony. Nevarez's and Jackson's motions for a mistrial were also denied.

Baker's testimony continued about his surveillance of Nevarez after October 30. He twice saw Nevarez use a payphone. When he began discussing the reasons a drug trafficker would use payphone, Nevarez's objection for "no foundation" was sustained. To address this objection, the prosecutor asked Baker to recount his past experience with

Case 1:20-cv-00522-NONE-JLT   Document 39-1   Filed 07/29/20   Page 10 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

surveillance and his conversations with drug traffickers about their use of payphones when they have cell phones. The trial court overruled Nevarez's objections based on speculation and an improper hypothetical.

Baker stated that if a narcotics trafficker believes he or she is a target of law enforcement and his or her cell phone has been compromised, he or she will make important calls from a payphone because typically they are not wire tapped. He added, "They could be making a phone call to tell somebody, I've got a new cell phone number [or] ... meet me here....." Nevarez objected again and moved to strike the testimony as nonresponsive and speculative. The court agreed and ruled everything after "[t]hey could be ..." was stricken.

**\*5** "A profile is a collection of conduct and characteristics commonly displayed by those who commit a certain crime," and "[p]rofile evidence is generally inadmissible to prove guilt" because it is " 'inherently prejudicial' " due to " 'the potential of including innocent people as well as the guilty' " within the profile. (🖼 *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084–1085.) Profile evidence unfairly relies upon deductive reasoning that "criminals act in a certain way; the defendant acted that way; therefore, the defendant is a criminal." (*Id.* at p. 1085.) This sort of evidence invites the jury "to conclude that, because the defendant manifested some characteristics, he committed a crime." (*Id.* at p. 1087.) As summarized by the Supreme Court in 🖼 *People v. Smith* (2005) 35 Cal.4th 334, 358 (*Smith* ), "Profile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt."

Nevarez cannot point to any part of the record, and we found none, in which he objected to the testimony as being overly prejudicial "profile" evidence. We recognize " 'profile evidence' ... is not a separate ground for excluding evidence; such evidence is inadmissible only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative.... [Citation.]" (🖼 *Smith, supra,* 35 Cal.4th at p. 357.) However, none of Nevarez's objections at trial related to whether the testimony improperly invited the jury to conclude he fit the profile of a drug trafficker. Rather, his objections related to perceived discovery abuses and that the deputy lacked the foundation for his opinions.

Consequently, Nevarez has forfeited the "profile evidence" arguments by failing to raise them at trial. It is well settled an " 'objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' " (🖼 *People v. Holt* (1997) 15 Cal.4th 619, 666–667; Evid.Code, § 353, subd. (a).) A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal.

For example, in 🖼 *People v. Hill* (1992) 3 Cal.4th 959 (*Hill* ), disapproved on another ground in 🖼 *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13, the prosecutor objected to the admission of a hearsay statement, and the defense responded that the evidence was not hearsay because it was in the form of a question. The court in *Hill* held the defense could not appeal the exclusion of the evidence on the ground the statement was not hearsay because it explained the defendant's state of mind, as the defense had not presented that ground to the court and the prosecutor at trial. (🖼 *Hill, supra,* 3 Cal.4th at pp. 988–989.) Likewise, in 🖼 *People v. Visciotti* (1992) 2 Cal.4th 1, defendant objected to only two specific inquiries during cross-examination, and based those objections on relevancy and assuming facts not in evidence. The Supreme Court ruled defendant had failed to preserve his appellate claims that the prosecutor's questions amounted to improper testimony and that the cross-examination exceeded the scope of direct examination. (🖼 *Id.* at pp. 51–52.) Similarly, we find in this case Nevarez failed to preserve his challenges to the admissibility of the purported profile expert testimony.

**\*6** In any event, the trial court did not abuse its discretion in admitting the expert testimony as it was relevant and probative to the case. It gave the jury background information to better understand the nature of the evidence presented. (🖼 Evid.Code, § 801 [expert testimony admissible if the subject matter is beyond common experience and would assist the trier of fact].) "Not all testimony concerning general patterns of criminal activity is 'profile' testimony." (🖼 *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1555 (*Lopez* ).) "Background testimony is not 'profile' evidence and does not specifically address the guilt or innocence of the defendant. Instead, it enables the jury to understand other evidence that does address guilt or

innocence. [Citation.] Thus, in a prosecution for possession of cocaine for sale, the evidence might show recovery of only a small amount of the drug at defendant's house together with recovery of a large number of small plastic baggies. A police officer with appropriate expertise may be allowed to testify that cocaine is sold in small plastic baggies in order to explain the meaning of the evidence itself. [Citation.]" (*Id.* at p. 1556.)

And in *People v. Harvey* (1991) 233 Cal.App.3d 1206, a police expert was permitted to testify in detail concerning the organization and methods employed by Colombian cocaine rings. He then testified as to the meaning of evidence in the case against the backdrop of the organizational structure and methodology. (*Id.* at pp. 1216–1217.)

Here, Olszewski and Baker did not opine Nevarez's activities necessarily made him a drug trafficker. Rather, they described the type of activity often employed by drug traffickers to explain why they found the activities of Nevarez and his companions significant. Stated another way, it offered a possible explanation of the activity observed, which would be beyond the experience of an ordinary juror. As aptly noted by the Attorney General, the evidence is comparable to the evidence in gang cases where the expert is permitted to assist the jury in understanding a gang member's motive in shooting or committing a crime when there appears to be no provocation or ordinary reason. (See *People v. Williams* (1997) 16 Cal.4th 153, 192–193.)

Finally, we note the jury was instructed to carefully examine the expert testimony and qualifications. (CALCRIM No. 332.). The jurors can "disregard any opinion that [they] find unbelievable, unreasonable, or unsupported by the evidence." (*Ibid.*) Considering the strength of the case against Nevarez, we perceive no reasonable probability of a different result if the experts had not explained how drug traffickers operated. The prosecution's case was based on the extensive surveillance efforts of several different officers. Nevarez was seen driving to the Woodruff property and loading duffel bags containing 250 kilograms of cocaine into Jackson's truck. Nevarez was interested in Jackson's case after his arrest by recording and keeping safe the case number—an act further linking the two men. Any possible error in admitting the expert's testimony was harmless.

*B. Motion in Limine Regarding Evidence Collected After October 30, 2003*

**\*7** Nevarez filed a motion in limine to exclude any evidence of events that occurred after October 30, 2003. The prosecutor argued the evidence was relevant and probative because it supported the prosecution's theory Nevarez played a bigger role than just loading the big rig in the narcotics conspiracy. The prosecutor asserted, "The [P]eople have to prove his knowledge of the narcotics and that he was in possession of those narcotics either for purpose of sale by himself or aiding and abetting others for the purposes of sales." In addition, the prosecutor claimed the evidence was relevant because the defense was trying to prove Baker committed perjury and the evidence would corroborate Baker's testimony. Nevarez responded by arguing evidence seized four months after the crime could not be relevant to the crime and it would not bolster Baker's credibility. The court disagreed, and determined the items in question were relevant and admissible.

Later, Nevarez filed a supplemental motion in limine to exclude evidence of uncharged misconduct occurring four months after the October 30 incident. Specifically, the prosecution's proposed to admit evidence Nevarez delivered a black bag to a residence on February 12, 2004, containing $150,000. The court stated the evidence was not admissible under Evidence Code sections 1101, subdivision (b), and 352. However, the court stated it reserved issuing a ruling in case the defense opened the door by attacking Baker's credibility.

The first day of trial, Nevarez filed another motion in limine to exclude evidence seized in February 2004. In making its ruling, the court clarified its prior rulings on this type of evidence, stating, "All right, then. I'll go off the property list here then. [¶] The court having read defense counsel's motion in limine as well as having heard argument, as well as going through each and every item and pursuant to Evidence Code section 352, and weighing of its prejudice as well as probative value, the court rules as follows: The court will find items 1, 2, 3, 8, 11, 14 as to the scale only, 15 as to the plastic packaging only, 16 as it relates to photos of the defendant and the surveillance search terms used. The court finds their probative value outweighs their prejudicial value and therefore under [Evidence Code section] 352 they will be allowed in. [¶] At this time I also want to supplement my ruling on [Nevarez's counsel Evidence Code section] 402 motion, similar type [of] motion that we had last week. And while the court indicated that it was admitting certain evidence on relevance grounds and not admitting some evidence because it was not relevant, the court failed to elaborate and indicate that as to each and every item that was discussed and that was admitted,

as to items that were admitted, the court did [an Evidence Code section] 352 analysis and found that its probative value outweighed its prejudicial value and therefore allowed it in. [¶] As to all items that were excluded as part of that motion, the court again under [Evidence Code section] 352 [found] its prejudicial value far outweighed its probative value and therefore excluded it."

*8 During the trial, Nevarez's counsel cross examined Baker and brought to light the limited number of days Baker personally conducted surveillance of Nevarez, giving the impression Baker was not doing very much with the investigation for a period of four months. Defense counsel asked Baker to mark the days he personally watched Nevarez on a calendar, which turned out to be a total of four days in October, three days in November, three days in December, zero days in January, and two days in February.

In redirect, the prosecutor asked Baker to explain the scope of his surveillance efforts, particularly in January. Over multiple defense objections, Baker stated that in early October his team started surveillance of Degoberto Rodriguez, whom they had determined was a drug trafficking "facilitator." He explained a "facilitator" is responsible for equipping vehicles with "hidden compartments to stash money and cocaine" typically used to cross the Mexican/California border.

Baker also was permitted over defense objections to explain why his team determined Rodriguez was a facilitator. Baker said that in September 2003, agents discovered Rodriguez took part in a conspiracy to distribute cocaine. Specifically, Baker said his team saw Rodriguez meet with an individual and hand him a bag "we believed ... it to have been money." The agents followed the individual, driving a gold BMW X5, until he entered Mexico. The agents waited for the vehicle to return and when they searched it they found 14 kilograms of cocaine. Baker stated "based on the other individuals that he was meeting with [and] the other arrests that we subsequently made, we knew that that's what he was doing. And he was subsequently convicted in federal court of conspiracy to distribute cocaine."

Baker then stated during their surveillance of Rodriguez on October 6, they followed him to a house in Norwalk, next to Nevarez's Arrington residence. Rodriguez met Nevarez in front of the house.

The prosecution asked Baker to recall the defense's cross-examination questions about his lack of surveillance in

January, and then inquired if Baker had been following Rodriguez during that time period. Baker replied that on December 30 he saw Rodriguez meet with two females, and a search of their residence uncovered $268,000. Defense counsel's motion to strike his testimony was granted. However, Baker continued to discuss his investigation of Rodriguez in January, stating the information he gathered in January was part of the search warrant he later wrote regarding Nevarez and Magallanes. Baker stated his investigation of Rodriguez also involved Nevarez. He gave as an example his surveillance of Rodriguez's house on January 6, 2004. Baker followed him to Nevarez's brother's business. Baker saw Rodriguez put a briefcase into the trunk of a Toyota Avalon. They followed the Toyota to a residence in Downey, but then terminated their surveillance. Baker said another investigation that "related to ... Nevarez" occurred the following day, January 7. Baker's team followed a BMW X5 to an automobile auction in Anaheim, but then terminated their surveillance.

*9 Nevarez's counsel asked for a sidebar conference. The court asked the prosecutor about the relationship between the briefcase and Nevarez. The prosecutor stated he believed the issue related to the "incident that we 402'd. And you said I could raise the issue later" if Baker's credibility was challenged. The prosecutor explained, Nevarez's counsel "went month by month, asking [Baker] exactly what he did in relation to investigating this case. And I think the jury has been given a false impression because [Nevarez] was followed on February 12 of 2004."

The court stated it believed the prosecution was "just going a little too far in going into one of the 402 areas." The court added, "I don't have a problem with you going back and bolstering, you know, that appearance [Baker did not do much for four months] by indicating what he's done as far as surveillance as it relates to this case. It is just the matter of how far we're going to stretch that.... [I]f we stretch it too far we're going to get ... not only into previous 402's but we're going to get into an area where it's going to become more prejudicial than probative." The prosecutor repeated Nevarez opened the door because his counsel questioned Baker if that was "all the investigation you [ (Baker) ] did that month, which is not true." The court replied, "there is a difference between what additional information you did [gather] and the extent that we're going to get into that additional surveillance you did.... I don't have a problem with you showing through this witness that he has done, there is more that he did other than the impression [Nevarez's counsel] left. [¶] My concern

is to the extent ... we're going to allow that to go .... that then becomes prejudicial." The court indicated it was going to stop any further testimony about what Baker saw Rodriguez do with the briefcase of money during his surveillance.

The court asked if there was anything else, and Nevarez's counsel said "Yes. On this January investigation, the questions were couched in terms of what was your investigation. Nevarez is not involved in this investigation with [Rodriguez]. This witness makes a mental connection between the two. And they have got [Rodriguez] doing all this stuff and ... [¶] ... [¶] there is just no foundation for this, and we have been given no discovery about this, except for this search warrant."

Nevarez moved to strike all the testimony about the January investigation "allegedly involving ... Nevarez as prejudicial. There is no discovery, [it falls under Evidence Code section 352], and it should not be considered by the jury." The court denied the motion, finding the evidence more probative than prejudicial and overruled all the other objections.

On appeal, Nevarez asserts the court erred in refusing to strike evidence of Rodriguez's uncharged crimes. He asserts this evidence was irrelevant and improperly served to show Nevarez had a criminal disposition by association with uncharged parties who are criminals. The Attorney General responds that under Evidence Code section 1101, subdivision (a), evidence of Nevarez's activities before and after the October 30 crime was admissible to prove there was a conspiracy to sell/transport/possess drugs. The Attorney General asserts evidence of Nevarez's subsequent independent bad acts *as well as* "his association with Rodriguez and Rodriguez's bad acts were relevant because it tended to show that Nevarez was part of a conspiracy to sell and transport large amounts of cocaine." We conclude it was error not to grant Nevarez's motion to strike the testimony, but the error was harmless.

*10 In cross-examination, Nevarez created the impression Baker did little investigation of Nevarez in the four months following the October 30 crime. Nevarez's questions elicited admissible evidence that arguably created a misleading impression, but it did not directly contradict or otherwise impeach Baker's testimony. As such, on redirect, the prosecution was certainly permitted to present relevant evidence to correct any misleading implications. The court correctly concluded the prosecution could come back and bolster Baker's investigation in the case. However, the court

also properly concluded such evidence should be limited. It was right to stop the prosecution from going any further into the specific nature of Baker's discoveries during his investigation and surveillance of other suspects. However, we conclude the court should have gone one step further and granted Nevarez's motion to strike testimony relating to Baker's surveillance of uncharged criminal acts of a third party (Rodriguez). The significance of such evidence reached well beyond repairing misconceptions about Baker's investigation efforts.

The Attorney General argues, without supporting case authority, the court could admit subsequent uncharged bad acts of third parties under Evidence Code section 1101, subdivision (a), to prove a *defendant's* knowledge of a crime (committed four months earlier). Nonsense. A defendant can seek to admit evidence of a third party's crimes to try shifting the blame and identify the third party as the perpetrator. (See ▭ *People v. Davis* (1995) 10 Cal.4th 463, 501.) However, the prosecutor cannot admit evidence of crimes committed by a third party not on trial to prove an element of the crime charged. (See ▭ *People v. Jackson* (1967) 254 Cal.App .2d 655.) "[C]onviction of a felony cannot rest upon the tenuous evidence of other crimes of a third person, not because an essential element of the crime charged is inferred from circumstantial evidence derived from the third person's commission of other crimes, though subtle proof indeed, but because evidence of crimes committed by a third person who is not on trial saddles a defendant with the burden of proving the innocence of another." ▭ (*Id.* at p. 660.)

The evidence was more prejudicial than probative because there was no evidence Nevarez had anything to do with Rodriguez's 14 kilogram drug deal in September or with the briefcase delivery in December/January. That Baker clearly conveyed his belief Nevarez was involved in the same sort of misconduct as Rodriguez, a facilitator, and impermissibly created the inference of guilt by association on the charges in this case. The relationship between Nevarez and Rodriguez was not in the scope of the accusatory pleading and merely served to show a criminal disposition (which is prohibited). Details regarding Rodriguez's subsequent bad acts could not serve to rehabilitate Baker's creditability as an investigator.

The erroneous admission of prior or subsequent bad acts evidence does not require reversal unless a result more favorable to the defendant would have been reasonably

probable absent the disputed evidence. ( People v. Scheer (1998) 68 Cal.App.4th 1009, 1018–1019.) As previously stated, there was substantial evidence of Nevarez's guilt: A deputy saw Nevarez drive to the Woodruff property, Baker saw Nevarez load duffel bags containing 250 kilograms of cocaine into Jackson's truck, and after Jackson's arrest Nevarez kept tabs on his criminal case. We conclude the erroneous admission of a third party's criminal activity taking place after the crime did not result in a miscarriage of justice, which would compel reversal of Nevarez's convictions. A result more favorable to Nevarez would not have been reasonably probable if such evidence had been excluded.

### C. Nevarez's Gun

*11 Four months after the October 30, 2003 crime, deputies found a .40 caliber semi-automatic handgun hidden in Nevarez's silver SUV. As discussed above, the court denied Nevarez's motion to exclude all the evidence seized after the crime (including this gun). Nevarez asserted evidence of the gun was improperly admitted at trial. He argues the prosecution impermissibly commented on this evidence, pointing out the relationship between guns and narcotics traffic in closing argument. Nevarez concludes the handgun is not related in any way to the events on October 30 "and could only have had the impermissible effect of showing an evil disposition on the part of ... Nevarez."

The Attorney General argues the gun was relevant under Evidence Code section 1101, subdivision (b), "to show that Nevarez was an integral part of a on-going major drug trafficking organization.... The presence of other guns was relevant to show that Nevarez knew Jackson would have a gun [on October 30, 2003,] because drug traffickers carry guns to protect against thefts from other drug traffickers and from law enforcement." The Attorney General points out Nevarez was charged with the vicarious use of a firearm through Jackson's agency on October 30, 2003, and the proof Nevarez owned a gun four months later "was circumstantial evidence that Nevarez would have known that Jackson would have a gun when he was moving 250 kilos of cocaine."

The cases relied upon by the Attorney General are inapt. (See People v. Hill (1971) 19 Cal.App.3d 306, 319– 320; People v. Durham (1969) 70 Cal.2d 171, 181; People v. Griffin (1967) 66 Cal.2d 459, 464–465.) While evidence of prior drug use and drug convictions is admissible under Evidence Code section 1101, subdivision (b), for the

limited purpose of proving defendant's knowledge of the drug or his intent to sell, the same does not apply to possessing a gun. Evidence Nevarez owned a gun four months after the crime does not prove he is a drug dealer but merely suggests he fits the "profile" of a criminal. Moreover, without referring to impermissible profiling evidence, gun ownership would not necessarily infer or reflect knowledge about other drug dealers having a gun on a particular day four months earlier. To the extent this bad character evidence was relevant, it was more prejudicial than probative and should have been excluded.

We conclude any error was harmless applying the standard of review articulated in People v. Watson (1956) 46 Cal.2d 818, 836. (See People v. Marks (2003) 31 Cal.4th 197, 226–227 [errors of rules of evidence such as Evidence Code section 352 do not implicate the federal Constitution and are reviewed under the Watson "reasonable probability" standard] ). As articulated in more detail above, it is not probable there would have been a different verdict given the overwhelming evidence against Nevarez.

### D. Exclusion of Nevarez's Evidence

After the prosecution rested, Nevarez sought to introduce photographs and a videotape reconstruction of what Baker's view perhaps would have been of the Woodruff property on October 30, 2003. Nevarez said his investigator used police reports and search warrant affidavits to reconstruct the crime using similar vehicles and duffel bags loaded with 55 pounds of sugar each. The photographs and videotape suggested Baker could not have seen it was Nevarez who loaded the duffel bags into the big rig. The court thought the evidence lacked the proper foundation without calling Baker as a witness to testify as to the accuracy of the reconstruction. It also indicated the evidence was "cumulative at this point." The court stated it was inclined to deny admission of the videotape on the grounds a proper foundation had not been established.

*12 Before making a final ruling, the court decided to conduct a foundational hearing. Nevarez's defense investigator, Alan Stevens, testified about how he made the videotape and photograph reproductions. During cross-examination, the prosecution revealed there were several discrepancies between the reenactment and Baker's circumstances when he observed the crime. The court ruled the reconstruction was like an expert's hypothetical, but speculative and inadmissible under Evidence Code section

352. The court concluded the evidence was prejudicial because "the angle is more off to the side than direct, from what Baker said" and the design of the SUV and big rig were different. The court listed several other discrepancies concluding, "And those are just a few of the bits and pieces of evidence that clearly show that it is not an accurate reconstruction. Again, using the hypothetical given to an expert witness analogy, the reconstruction does not, is not supported by the evidence that's been presented so far in the case. [¶] So therefore, the reconstruction [evidence] will not be admitted ... at this time."

On appeal, Nevarez maintains the court's ruling restricted his Sixth Amendment right to attack Baker's credibility. However, we conclude the right to admit such evidence can properly be restricted by the trial court under Evidence Code section 352 to relevant and probative evidence. And in this case it cannot be said the court abused its discretion in excluding evidence it determined was inaccurate.

"To be admissible in evidence, an audio or videotape recording must be authenticated. [Citations.] A videotape recording is authenticated by testimony or other evidence " 'that it accurately depicts what it purports to show.' " [Citation.]" ( People v. Mayfield (1997) 14 Cal.4th 668, 747.) "In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them." ( People v. Rodrigues (1994) 8 Cal.4th 1060, 1114–1115 [inaccuracies in a videotape, including different lighting conditions, did not make it inadmissible]; People v. Gonzalez (2006) 38 Cal.4th 932, 953 [inaccuracies in crime scene videotape offered by the defense warranted exclusion].)

In this case, the court determined the photograph and videotapes did not accurately illustrate the issue for which it was offered, i.e., could Baker see from his vantage point Nevarez load the duffel bags into the truck. The record shows the court reasonably concluded there were several discrepancies that rendered the evidence not sufficiently similar to the actual circumstances. We find no abuse of discretion. ( People v. Boyd (1990) 222 Cal.App .3d 541, 566.)

*E. Destruction of Narcotics—Health and Safety Code section 11479*

**\*13** Before Nevarez was arrested in February 2004, law enforcement destroyed all the seized contraband found in Jackson's big rig. Nevarez moved to dismiss the case or exclude the evidence on two grounds. First, he asserted the failure to preserve this evidence violated Health and Safety Code section 11479. He also claimed his due process rights were violated because agents had probable cause to arrest him but waited until after they destroyed the cocaine, thereby failing to provide him adequate notice of the intended destruction. The trial court determined both grounds lacked merit and denied the motion and forbid the defense from mentioning the destruction of evidence. On appeal, Nevarez contends if the contraband had been preserved, "either dismissal [of the case] or at least dismissal of the enhancement pursuant to Health and Safety Code section 11370.4 [enhancement for over 80 kilograms] should have resulted." We disagree.

Health and Safety Code section 11479 requires in pertinent part that destruction of a controlled substance in excess of 10 pounds can occur if: "[¶] (a) At least five random and representative samples have been taken, for evidentiary purposes, from the total amount of suspected controlled substances to be destroyed. These samples shall be in addition to the 10 pounds required above .... [¶] (b) Photographs have been taken which reasonably demonstrate the total amount of the suspected controlled substance to be destroyed. [¶] (c) The gross weight of the suspected controlled substance has been determined either by actually weighing ... or by estimating the weight after dimensional measurement of the total .... [¶] (d) ... [¶] Subsequent to any destruction of a suspected controlled substance pursuant to this section, an affidavit shall be filed within 30 days in the court which has jurisdiction over any pending criminal proceedings pertaining to that suspected controlled substance...." Because section 11479 is essentially a legislative declaration of the required "rigorous and systematic procedure" designed to preserve evidence of a controlled substance, nothing less than strict compliance with its provisions will satisfy the dictates of due process. ( People v. O'Hearn (1983) 142 Cal.App.3d 566, 572 (O'Hearn ).)

Here, the court found no merit to the due process argument about the timing of the destruction. It also determined law enforcement substantially complied with Health and Safety Code section 11479. It considered evidence Orange County

Case 1:20-cv-00522-NONE-JLT   Document 39-1   Filed 07/29/20   Page 16 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

Sheriff's Department Forensic Science Services weighed and preserved samples from the packages of cocaine. Agents determined the net weight of 83 of the packages/bricks. From these packages, 83 samples were preserved. In addition, 10 kilograms of the packages were kept.

On appeal, Nevarez acknowledges Health and Safety Code section 11479 permits destruction of evidence if certain requirements are met. He states this statutory provision should be viewed as codification of due process principles. He then jumps to the conclusion the destroyed evidence was exculpatory, skipping any explanation as to why. Specifically, Nevarez failed to articulate whether he believed the court was wrong in concluding (1) there was substantial compliance with Health and Safety Code section 11479, or (2) in ruling there were no due process concerns arising from the prosecution's delay in filing charges against him after the evidence was destroyed, or (3) wrong on both issues.

*14 Nevarez concludes his argument on appeal by inserting two lengthy quotations from the *O'Hearn* case, but this legal authority is not particularly instructive because the case is not analogous. In *O'Hearn, supra,* 142 Cal.App.3d at pages 569 to 572, the court explained, "The trial court found that the sheriff made a good faith attempt to comply with the provisions of Health and Safety Code section 11479 in the destruction of the 2,970 pounds of marijuana collected in the state truck from 16 different places, which included appellants'. But by that time it was too late to comply with that section as to each grower. *The problem created in this case preceded the actual destruction of the plants.* The effective destruction occurred when the approximately 100 pounds of plants found in the pickup were commingled with the 2,870 pounds of other plants since they could no longer be identified, analyzed or used as evidence in any way to establish quantity and quality. Quantity is, of course, a key question on the issue of possession for sale or for personal use. This cannot be considered an attempt to adhere to 'rigorous and systematic procedures' to preserve the evidence as required by [well settled case authority], ... nor compliance with Health and Safety Code section 11479. Here ... it is clear that the procedure employed by the sheriff in commingling all the plants seized in the 16 areas resulted not in the preservation of evidence, but rather, in its destruction by not being identifiable." (Italics added.)

In the case before us, the evidence (cocaine) was not commingled with drugs from other crimes. The *O'Hearn* court's imposition of sanctions was due to the sheriff's handling of the contraband before it was destroyed. Sanctions were not imposed as a result of its actual destruction. In this case, Nevarez's motion was based both on how and when the evidence was destroyed. On appeal, Nevarez does not articulate what aspect of the trial court's ruling was incorrect, or why it was made in error. A trial court's ruling is presumed to be correct and the burden of demonstrating error rests squarely on the appellant. (See *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631–632, and cases cited therein.) When an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785, see also *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [appellate court not required to consider points not supported by citation to authorities or record].) An appellant may not simply make the assertion the ruling is erroneous and leave it to the appellate court to figure out why. Because Nevarez does not explain how he was prejudiced by the destruction before he was charged, or explain how there was not substantial compliance with the statute, we conclude the trial court properly denied the dismissal/suppression motion. (See *People v. Superior Court (Calamaras)* (1986) 181 Cal.App.3d 901, 905.)

*F. Nevarez's Motion to Suppress Based on Inadequate Probable Cause for the Search Warrant*

*15 Nevarez asserts the affidavit in support of the search warrant contained stale information and, therefore, did not demonstrate probable cause. He explains Jackson's arrest and the search of his truck was old information (four months old) by the time the search warrant was issued. He concludes such information would not reasonably support probable cause the items to be seized would still be found at the target locations. The Attorney General responds the affidavit was sufficient because in addition to the event occurring on October 30, there was information about Nevarez's suspicious activity in the months before and after the October 30 incident, demonstrating his illegal activities were ongoing. We agree, and conclude the motion to suppress was correctly denied.

Baker prepared an affidavit to support the search warrant. In the statement of probable cause he first recounted his training and experience. He recounted his duties with the RNSP included the investigation, surveillance, and apprehension of major narcotics traffickers in Southern California. He stated RNSP began its investigation on September 11, 2003, of

a group of suspected traffickers (which ultimately included Nevarez).

The RNSP first started with surveillance of Rodriguez and determined he had six vehicles all registered using an address in Perris, California. The team began surveillance of the Perris residence. They noted Rodriguez's residence had three vehicles in the driveway that were not registered to him, a technique often used by drug traffickers to protect their identity from law enforcement.

In mid-September 2003, RNSP observed Rodriguez park his vehicle near a gold BMW at a McDonald's restaurant and saw him hand a bag to its two occupants. RNSP knew the BMW had a hidden compartment and followed the vehicle until it crossed the border into Mexico. RNSP believed Rodriguez likely gave the men money to bring cocaine back into the United States. The BMW was stopped and searched by U.S. Customs when it reentered the United States. Seventeen kilograms of cocaine were found in a hidden compartment on the floor.

Baker described in detail his investigation of Rodriguez, the various people he met, and the vehicles he drove in October. For example, Baker saw Rodriguez's associates engaged in counter surveillance driving. He explained this behavior was commonly used by persons involved in drug sales to avoid detection. He said RNSP conducted a trash search and determined neither Rodriguez, nor his associate, Francisco Ramirez, had any utility bills or paper work with names, addresses or phone numbers, which is consistent with the protective measures taken by drug traffickers.

In early October, RNSP followed Rodriguez and saw him meet with three men, all Mexican nationals. The three men's vehicles were later stopped and a narcotics detection dog signaled narcotics had recently been in the vehicles. A few days later, RNSP followed Rodriguez to a residence in Downey, where he met two men and they walked inside the residence together. Two hours later, two men driving a silver Toyota Sequoia entered the same Downey residence. One returned to the Toyota Sequoia 14 minutes later to retrieve a dark gym bag. Baker stated he believed drug dealers will leave narcotics or money in their vehicle when they arrive at a money/stash house, and then retrieve the money/narcotics when they have met with the buyer/seller and reached an agreement over the items.

**\*16** Later that day, Baker saw the same silver Toyota Sequoia being driven by Nevarez to a mall, where he met two men. One of the men was Rodriguez's associate, Ramirez. Baker opined drug dealers prefer to meet with only the buyer of their narcotics to protect themselves and keep secret their narcotics activities. In October 2003, RNSP decided to put Nevarez under surveillance. They saw Nevarez drive Ramirez to a moving and storage facility in South Gate, and then they drove back to the mall together, where Nevarez dropped off Ramirez in the parking lot. The next day members of RNSP began surveillance at Nevarez's house and followed his car. On October 21, Baker resumed his surveillance of Rodriguez and believed he picked up a large sum of cash from a forklift shop and took it to the bank. On October 22, RNSP seized 1,500 pounds of marijuana from a nursery in Riverside, arresting several people including Ramirez. Agents also seized $35,000 cash from Ramirez's house. During the last few days of October, RNSP continued their surveillance of Rodriguez. Baker described in detail the events leading up to the seizure of cocaine and Jackson's arrest at the end of October.

The surveillance continued in November. Baker stated he drove to the Woodruff property on November 17, 2003, and saw a Ford truck attached to a trailer carrying a 2002 Eliminator boat, a toy hauler, and a sand rail. He determined the truck was registered to Nevarez. The boat was jointly owned by Rodriguez and Nevarez. They purchased it in December 2001 for $110,000. The next day, Baker watched the Arrington property and saw two men take inside a large, heavy, black duffel bag, similar to the ones seized in Jackson's truck. Baker believed the duffel bag contained cocaine.

On November 24, Baker followed Nevarez who was driving Magallanes around town to various locations, and they had a meeting with two men in a Del Taco restaurant. Baker stated Nevarez engaged in counter surveillance driving that day. The next day, RNSP followed Nevarez and Magallanes again. They were driving a car registered to someone else RNSP had under surveillance.

In early December, RNSP searched the trash from the Arrington property. They saw torn mail for Nevarez and several of his family members. Baker stated he believed the occupants of the property shredded their trash to hide their identities. RNSP saw Rodriguez take the boat to a residence in Downey and knew the occupants there were the targets of a U.S. Customs wiretap case involving the sale and trafficking of large amounts of cocaine. On December

10, RNSP saw Nevarez and Magallanes drive to a payphone, which was unusual because Nevarez was usually seen using his cell phone. Baker stated drug traffickers are aware of wire taps and will use public payphones to avoid detection. He believed Nevarez was making calls about the sales of controlled substances.

Between December 15 and January 2, RNSP and Baker conducted surveillance of a group of individuals who associated with Rodriguez. They seized $268,000 cash and a vehicle equipped with a hidden compartment. They followed Nevarez on December 29, 2003, and saw him visit the same automobile repair shop where an informant had seen nine kilograms of cocaine earlier that year (April 2003).

*17 In January 2004, the RNSP continued its surveillance of Rodriguez and his associates, including Nevarez. In early February, Baker learned Nevarez had sold the boat to his brother in December. Agents looked at Rodriguez's bank account statements and learned he wrote Nevarez a check for $20,000.

On February 10, 2004, RNSP followed Nevarez to several locations. At one location, Nevarez parked 300 yards away from the residence. Baker stated he believed Nevarez did not want his vehicle seen in front of a stash house for narcotics. The following day, Baker watched Nevarez and Rodriguez and concluded they took money into the Arrington residence where it was counted. Meanwhile, their associates moved cocaine using counter surveillance tactics.

Later in the month, Baker watched Nevarez back into a driveway and take a suitcase inside the residence. Baker later searched the suitcase and found it contained $152,000 cash. Agents also discovered 10 ounces of "ice" in the same bedroom as the suitcase. One of the residents stated the money was dropped off by someone named " 'Miguel' " and it was intended to buy 10 kilograms of cocaine. Baker stated narcotic traffickers will often back into a driveway to offload money or drugs to conceal their activities from others. On another day, Nevarez was seen with Hector Magallanes, who had just been released from prison for trying to purchase 40 kilograms of cocaine. They were seen in a grocery store parking lot programming cell phones. Baker stated narcotic traffickers use cell phones to contact their customers, and suppliers, and to run their narcotics businesses.

Baker opined, "Based on my training and experience and the information in this affidavit, I believe ... Nevarez runs a mostly family operated narcotics trafficking organization. Based on the amount of cocaine, marijuana, and money seized during this investigation, it is my opinion [Nevarez] is a major level narcotics trafficker. Since we have begun investigating [him], we have never seen him engaged in lawful employment. I also believe [Nevarez's] family is assisting him in his narcotics trafficking by providing stash locations for money and narcotics, as well as residences for him to live." Baker noted the residences are very well maintained and much nicer than the average homes in the neighborhood. In addition, Nevarez's family members are all driving newer and more expensive vehicles. He believed the search of several locations would yield cocaine and marijuana for sale, as well as "assets and proceeds from the sale of the 250 kilograms of cocaine [agents] seized on [October 30 2003]."

Nevarez raised the issue of staleness in his motion to traverse the search warrant. On this issue, the court stated, "I'm hoping that appellate courts don't require judges to play ostrich and stick their heads in the sand. You can't be in this job very long and not pick up on what's happening. [¶] We have an occurrence in which ... Jackson was apprehended ... in October, and then another incident [in] February ... in which [$152,000] ... was dropped off at a residence in South Gate, and then there was discussion about purchase and sale of controlled substances. [¶] This is an ongoing criminal enterprise. I don't think there's anything in the law that would require the court to strike this warrant on staleness. There's sufficient activity going on in the intervening months. I don't think we cut and dissect and say, 'well, this happened there, and that's the end of it.' This is an ongoing criminal enterprise. So the motion's denied...." The trial court was absolutely right. We will not require trial judges to stick their heads in the sand.

*18 " 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' [Citation.] [¶] 'Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." ' [Citation.] '[T]he probable-cause requirement looks to whether evidence will be found *when the search is conducted* ....' [Citation.]" ( *People v. Hirata* (2000) 175 Cal.App.4th 1499, 1504 (*Hirata* ).)

"Stale information in a search warrant affidavit does not establish present probable cause for a search. (People v. Hulland (2003) 110 Cal.App.4th 1646, 1652 (Hulland).) However, "No bright-line rule defines the point at which information is considered stale. [Citation.] Rather, 'the question of staleness depends on the facts of each case.' [Citation.] 'If circumstances would justify a person of ordinary prudence to conclude that an activity had continued to the present time, then the passage of time will not render the information stale.' [Citation.] [¶] Courts have upheld warrants despite delays between evidence of criminal activity and the issuance of a warrant, when there is reason to believe that criminal activity is ongoing or that evidence of criminality remains on the premises. [Citations.]" (People v. Carrington (2009) 47 Cal.4th 145, 163–164.)

For example, in People v. Brown (1985) 166 Cal.App.3d 1166 (Brown), a neighbor reported seeing marijuana plants growing on defendant's land. About six weeks later, a deputy obtained a search warrant and discovered approximately 100 marijuana plants. He decided to conduct surveillance of the property and enter with the warrant when he saw someone on the property. Based on his observations of the property, the deputy obtained successive warrants until defendant was arrested and the plants were seized. (Id. at pp. 1168–1169.) Defendant argued the warrants were invalid, because the original warrant was based on stale information. (Id. at p. 1169.) The appellate court disagreed, holding the information relied on to issue the first warrant was not stale, because the plants were observed "in a very early stage of growth" and under these circumstances there was a reasonable inference the activity was a continuing one and the plants would still be growing there a month or so later. (Id. at p. 1170.) The Brown court noted a lapse of time, standing alone, is not controlling especially in cases involving an activity such as marijuana cultivation. However, in other cases involving "highly transitory activity," such as the sale of narcotics, even a brief delay may preclude a finding of probable cause. (Id. at p. 1169.)

**\*19** The two cases Nevarez relies upon involved the "highly transitory 0ctivity" of narcotics sales. (Hirata, supra, 175 Cal.App.4th at p. 1505; Hulland, supra, 110 Cal.App.4th at p. 1648.) In these two cases the issue was the constitutionality of the delay between the time police had knowledge of a narcotics sale and the date police relied on this information in an affidavit to obtain a search warrant of a residence related to the sale. The affidavits had little or no information suggesting controlled substances could still be located in the residence.

For example in Hulland, supra, 110 Cal.App.4th at page 1648, a police officer purchased drugs from defendant in a controlled buy and then waited 52 days to seek a warrant for defendant's two residences. In holding the warrant lacked probable cause the court reasoned, "There was no information before the magistrate regarding any prior or subsequent criminal activity by Hulland, nor was there any evidence of such activity ever taking place at his residence. Although evidence of drug dealing may be sufficient by itself to furnish probable cause to search the defendant's residence [citation], nothing about the nature of the transaction here supports an inference that Hulland continued to sell marijuana until the time of the search, much less that he would be keeping the drugs at his residence [citation]. This conclusion is buttressed by the fact that the controlled buy took place in a parking lot in a different city." (Id. at pp. 1652–1653.)

In Hirata, supra, 175 Cal.App.4th at page 1504, there was a gap of 82 days (from June to September) between date of drug transaction involving defendant and the date of warrant. The trial court granted the motion to quash and to suppress the evidence, rejecting the prosecutor's theory defendant was a major part of an on-going criminal conspiracy. It determined the affidavit's description of drug transactions in July and August involved other suspects and did not suggest defendant was part of the conspiracy. "Delays beyond four weeks may be justified where there is a reasonable inference that the defendant's actions 'will continue until the time of the search.' [Citation.] But here the affidavit contains no facts showing that between June 15 and September 4, there were any drug sales at [defendant's] house or that he engaged in such transactions." (Id. at pp. 1504–1505.)

The facts and circumstances of this case can be distinguished. Baker submitted evidence Nevarez's conduct of loading drugs into Jackson's truck on October 30 was not an isolated incident, but rather part of an ongoing drug trafficking conspiracy. The affidavit included facts that between October 30 and February 24 Nevarez was involved in suspicious activity indicating he was part of the conspiracy. For example, over the four-month period of continuing investigation, Baker described how Nevarez engaged in counter surveillance driving, used payphones, shredded his mail, received duffel bags in his home, and had meeting with other drug suspects in a manner typical of someone engaged in an ongoing drug-

Case 1:20-cv-00522-NONE-JLT Document 39-1 Filed 07/29/20 Page 20 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

related criminal enterprise. He and his family lived a lavish lifestyle without the benefit of gainful employment. There was not an empty gap of four months of non-suspicious activity. As late as February, Nevarez was seen delivering a suitcase containing a large sum of cash into a house where the occupants believed it was to be used to purchase drugs. As noted by the trial court, there was ample evidence of an ongoing criminal enterprise, and even "where the facts yield conflicting inferences, we defer to the implied findings of the trial court." ( Hirata, supra, 175 Cal.App.4th at p. 1505.)

**\*20** We agree with the trial court the search warrant was not based on stale information and the trial court properly decided to deny the motion to suppress. In our independent judgment, there was probable cause for the issuance of the search warrant.

*G. Nevarez's Motion to Suppress Based on a Mistake in the Search Warrant*

Three attachments were submitted with the search warrant affidavit: (1) attachment 1A referred to nine locations; (2) attachment 1B referred to 17 vehicles; and (3) attachment 2A listed items related to drug trafficking such as controlled substances and currency.

In the section of the search warrant titled, "You Are Therefore Commanded to Search," Baker referred to two attachments (1A and 2A). Under the section titled, "The Following Property or Persons," he referred to attachment 2A. After a magistrate issued the warrant, Baker later realized he had made a typographical error. The section of the warrant titled, "You are Therefore Commanded to Search," should have referred to the locations (attachment 1A) as well as the vehicles listed in attachment 1B (not 2A). No reference had been made to attachment 1B containing the list of vehicles. Baker attempted to contact the magistrate but was unsuccessful. He contacted the on-call magistrate, who asked him to write an amendment to the search warrant to explain the error. Baker prepared the amendment indicating the typographical error but made no other changes. The on-call magistrate gave Baker the authority to sign his name to the warrant.

In his motion to traverse the search warrant, Nevarez argued the error was not cured by the amendment and the vehicles listed in attachment 1B should not have been searched. The trial court disagreed, stating it was a clerical error and the amendment did not change anything about the warrant. "I just

don't see that a scrivener's error rises to the level of allowing a traversal of the warrant and suppression of the evidence." We agree. The search warrant is supported by a 35–page detailed supporting affidavit. A typographical error in designating the attachments as 1A and 2A rather than 1A and 1B does not render the affidavit infirm, especially since it was clear from the affidavit that vehicles in addition to locations were the subject of surveillance and criminal activity. Neither the original warrant or the amendment contained a substantial irregularity.

To support his argument, Nevarez cites to People v. Jordan (1984) 155 Cal.App.3d 769. The case does not assist him. In Jordan, the defendant asserted the affidavit for the search warrant was fatally defective because the "officer failed to fill in a space left blank for specification of the numbers of the attachments appended to the affidavit." (Id. at p. 777.) The court explained, "Except for the attachments the affidavit consisted of three pages containing no substantive averments and there was nothing other than the attachments to supply probable cause. It cannot be assumed the magistrate issued the warrant with no basis whatever. '[A]bsent some palpable indication to the contrary, it is assumed the magistrate considered all the material presented him in support of an application for search warrant. [Citation.] This assumption is not indulged where substantial irregularity appears on the face of the record....' [Citation.] [¶] The failure to fill in the blank referring to the attachments, although careless, is not a 'substantial irregularity' so as to call the warrant into question. [Citation.]" (Id. at p. 778.) The court concluded "defendant's argument unduly places form over substance" as "[t]he magistrate could and presumably did properly consider all the attachments." (Ibid.) Similarly, in the case before us it can be presumed the original magistrate properly considered and understood the purpose of each attachment, and the amendment correcting a careless clerical error was not a substantial irregularity rendering the warrant invalid.

*H. Pitchess Motion*

**\*21** The court held an in camera hearing to review Baker's personnel records. Nevarez requested our independent review of those proceedings for possible error pursuant to Pitchess, supra, 11 Cal.3d 531. (See also People v. Prince (2007) 40 Cal.4th 1179, 1285–1286 [trial court's decision on discoverability of material in officer's files reviewed for abuse of discretion].) We have independently examined the reporter's transcript of the trial court's in camera hearing and review, and conclude the trial court followed the

Case 1:20-cv-00522-NONE-JLT Document 39-1 Filed 07/29/20 Page 21 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

required procedure for in camera review under *People v. Mooc* (2001) 26 Cal.4th 1216, 1228–1229, that the record is adequate for meaningful appellate review, and that the trial court did not abuse its discretion in refusing to disclose the contents of Baker's personnel files on Nevarez's *Pitchess* motion. ( *People v. Myers* (2007) 148 Cal.App.4th 546, 553.)

### I. Jackson's Motion to Suppress

Jackson moved to suppress all the items seized from his truck on October 30, 2003, including 12 duffel bags containing 250 kilograms of cocaine, seven cell phones, a .45 caliber semi-automatic handgun, and a magazine with six .45 caliber rounds. Jackson argued the consent he gave to search the cab of this truck was coerced and involuntary due to the length of the detention and the officer's show of authority. In addition, Jackson sought to suppress all his statements made to the deputies claiming he should have been advised of his *Miranda* rights prior to any interrogation. We conclude the motion was properly denied.

### Background Facts

Orange County Sherriff's Deputy Thompson was working commercial traffic enforcement, and was familiar with enforcing traffic violations committed by drivers of big rigs such as Jackson's. On the afternoon of October 30, 2003, he saw Jackson's big rig traveling on Interstate 5. He noticed a plastic cover and decorative license plate frame obscured the plate's issuing state in violation of the Vehicle Code. Thompson had the truck stop on the freeway shoulder. He started a videotape camera to record the traffic stop and wore a microphone.

The traffic stop lasted 22 minutes before Jackson consented to a search of the duffel bags. Jackson spent the first 10 minutes providing Thompson with the logbook and all the paperwork for the registration for the tractor and trailer. Specifically, during the first five minutes, Thompson asked Jackson if he had a co-driver and if he could look into the interior of the cab. Jackson said he was alone and pushed aside the curtains to the sleeper compartment. Thompson saw the stacked duffel bags in the sleeper compartment. He asked about them, and Jackson said they contained die cast cars and air tools.

Jackson next gave Thompson his logbook which had not been kept current. Thompson pointed this out and asked for proof of registration and insurance. In response to Thompson's

questions, Jackson said his co-driver had flown home and he was driving an empty truck to Chula Vista to pick up a load of cherry tomatoes. Thompson asked Jackson if he had paperwork relating to his last vehicle inspection.

**\*22** During the next five minutes, Jackson denied carrying weapons and permitted Thompson to see a bag he kept in the cab containing his shaving kit. He also showed Thompson a manifest and said the truck was apportioned for California and registered in Canada. He added the trailer was registered in Michigan. Thompson asked about what kind of die cast cars Jackson collected and asked where he had recently driven. Jackson replied he had been to several different states. Thompson asked Jackson to turn off the engine and follow him to the rear of the truck. Jackson said the license plate was issued in Michigan, and after Thompson mentioned it was hard to read, Jackson gave him the registration for the trailer.

After approximately 10 minutes, Thompson now had all the paperwork and he contacted his dispatcher to request license plate checks. For the next few minutes, Thompson asked questions about the empty trailer, and Jackson confirmed he had an empty load by opening the trailer's door. Thompson queried why the duffel bags were not stored in the trailer, and Jackson explained he did not want his fragile cargo crushed. Thompson asked Jackson how many duffel bags he possessed, and if he had other violations. Jackson said he had a prior logbook ticket.

After a total of 15 minutes had passed (from the time of the initial stop) Thompson started to write Jackson a citation for not keeping his logbook up to date (Veh.Code, § 34506.3). He looked at Jackson's driver's license, asked about his current address, and noted his license did not list his weight. When asked about prior arrests, Jackson admitted he had child support tickets that led to warrants but nothing else. Another deputy arrived on the scene as back up around the same time the dispatcher radioed Thompson with information about the trailer. Thompson asked the other deputy to speak with the dispatcher.

Thompson repeated his questions about prior arrests and Jackson revealed he had been arrested for carrying a pistol in his vehicle, but he claimed the charge was thrown out by a court. Thompson asked Jackson if he was carrying any weapons, or if there were any weapons in the truck. Jackson said no. Thompson pressed the matter, but Jackson again denied having any weapon.

Case 1:20-cv-00522-NONE-JLT   Document 39-1   Filed 07/29/20   Page 22 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

During the course of the conversation about arrests, Thompson said he was going to do a quick inspection of the truck cab to make sure there were no weapons. He told Jackson that he would be placed out of service for 24 hours due to the logbook violation. He repeatedly asked Jackson if he had anything illegal in the truck. Jackson said he did not. At this point the traffic stop has lasted 18 minutes.

Thompson asked Jackson, "You don't mind if I check just to make sure [there is nothing illegal in the truck]?" Jackson replied, "You can go over there." When Thompson asked if he could also check the duffel bags, Jackson said, "Well, you can check." Before looking, Thompson again inquired what was inside, and Jackson stated, "Oh, go ahead. You already have me."

**\*23** This statement prompted a friendly side discussion between Jackson and Thompson about what was inside the duffel bags. Thompson wanted to know if there was anything illegal and he named several items such as explosives, snakes, and pornography. Jackson volunteered it was "not dye cast cars" but he did not say anything about the contents other than suggesting it was, "Stuff that's not supposed to be in there." The traffic stop had lasted 21 minutes at this juncture. The following conversation then transpired:

"Thompson: Okay. So I'm gonna be extra careful before I look in there, and also see if your Michigan license, but, uh, before I do, I'm gonna handcuff you, because I don't want to have to fuss with you by the freeway. So what I'd like you to do, put your hands behind your back. Put your palms together. There you go. Huh?

Jackson: [Inaudible statement].

Thompson: Right now you're not under arrest. Okay? But you ...

Jackson: [Inaudible statement] ... make sure I don't go across the street?

Thompson: You know, I don't want to chase you across the freeway. And you said there's something that—is it illegal or you're just not supposed to have, that you wife doesn't want you to have? Is it something illegal?"

Jackson admitted it was something illegal and then Thompson put on the handcuffs and patted him down for weapons before searching the duffel bags. After finding the drugs, Thompson

told Jackson, "I really do collect dye cast police cars." Jackson replied, "I know you do. But I really do. I got everything." Thompson stated, "I appreciate you being so nice." And Jackson replied, "That's all right. I mean, if I'm wrong, I'm wrong."

In ruling on Jackson's motion to suppress, the court noted that because the traffic stop had been videotaped "the court's really not called upon to make too many findings of fact since we have a videotape of a vast majority of this stop, so, for reviewing court purposes, the facts are the facts." The court concluded the original stop was supported by two violations of the Vehicle Code relating to the obscured license plate. It determined, "The other question is whether or not this was a prolonged stop. There is no time limit. I don't think the courts have ever placed time limits on any type of detention. It has to be reasonable or unreasonable under the circumstances. [¶] Again, a viewing of the videotape sets out everything that was being done at the time. I do believe there is a difference between a passenger vehicle stop and a commercial vehicle stop. The law enforcement authorities have a great deal more to do when we are talking about commercial vehicles, especially a vehicle this large. There are logbooks to look at, obviously registration and licensing. I don't see anything in this videotape that would lead me to believe it was unduly prolonged. So I'm going to deny the motion to suppress."

*Legal Authority Regarding Motions to Suppress and the Issue of Consent*

**\*24** Although Jackson contested the legitimacy of the traffic stop in the trial court, he does not raise the issue again on appeal. Rather his claim relates to whether his consent to search the cab was coerced and involuntary due to the prolonged length of the detention and Thompson's show of authority. This argument narrows our recitation of the applicable legal authority as follows:

"Where, as here, the prosecution relies on consent to justify a warrantless search or seizure, it bears the 'burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority. [Citation.]' [Citation.] Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure. [Citations.] Where an illegal detention occurs, unless 'subsequent events adequately dispel the coercive taint of the initial illegality, i.e., where there is no longer causality, the subsequent consent

Case 1:20-cv-00522-NONE-JLT   Document 39-1   Filed 07/29/20   Page 23 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

is' ineffective. [Citations.]" ( People v. Zamudio (2008) 43 Cal.4th 327, 341.)

Jackson acknowledged a motorist may be stopped based on an officer's objectively reasonably suspicion of a Vehicle Code violation or some other law. ( Whren v. United States (1996) 517 U.S. 806, 810.) However, an officer may not prolong a traffic stop beyond the time needed to address the traffic violation. "Under Terry v. Ohio [citation], the judicial inquiry into the reasonableness of a detention is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. Detention, not questioning, is the evil at which Terry's second prong is aimed. [Citation.]" ( People v. Brown (1998) 62 Cal.App.4th 493, 496 (Brown ).)

"[W]hile a police officer may stop a motorist for a traffic violation, the detention cannot be prolonged beyond the time period necessary to address the violation. [Citation.] There is no hard-and-fast limit as to the amount of time that is reasonable; rather, it depends on the circumstances of each case. [Citation.]" ( People v. Gallardo (2005) 130 Cal.App.4th 234, 238.) "[I]nvestigative activities beyond the original purpose of a traffic stop, including warrant checks, are permissible as long as they do not prolong the stop beyond the time it would otherwise take. [Citations.]" ( Brown, supra, 62 Cal.App.4th at p. 498.) "Mere questioning is neither a search nor a seizure. [Citations.] While the traffic detainee is under no obligation to answer unrelated questions, the Constitution does not prohibit law enforcement officers from asking. [Citations.]" ( Id. at p. 499 .) Similarly, an officer is permitted to ask for consent to search, because the search, like the questioning, does not necessarily unduly prolong the traffic stop. ( Id. at pp. 499–500.)

*Standard of Review*

**\*25** In reviewing a motion to suppress, we defer to the lower court's findings of fact supported by substantial evidence, but exercise independent judgment in determining whether the detention was reasonable under the Fourth Amendment. ( People v. Glaser (1995) 11 Cal.4th 354, 362.)

*Analysis*

Applying this standard of review and based on the videotape and testimony at the suppression hearing we reject Jackson's claim his involuntary consent to search was due to the coercive effect of Thompson's actions and statement, magnified by the prolonged detention.

We agree with the trial court's conclusion the 22–minute detention was not unduly prolonged beyond the time necessary due to the fact Jackson was driving a commercial vehicle with registrations from two different states. Unlike the traffic stop of a passenger vehicle, Thompson's traffic stop of the big rig required more than a cursory check of the driver's license and registration. As Thompson testified, "There is a lot more to a commercial traffic stop.... [P]art of the reason for stopping them will include an inspection of the vehicle. And a commercial driver is also required to have more documentation. Not only his license but a medical card, one with his insurance, registration for the truck and trailer, and any manifests. And if he's an interstate or long-haul type trucker, which can also be intrastate, then he is required to have a logbook, which will need to be examined also."

In this case it took Jackson 10 minutes to produce all the necessary paperwork. When Thompson received all the documents, he timely requested license plate checks. It took another six minutes for the dispatcher to respond with the requested information. It was permissible for Thompson to ask Jackson questions while waiting for the response. During the final six minutes of the encounter, Thompson was filling out a citation and questioned Jackson about the fact his driver's license did not have his weight listed. One minute after telling Jackson he was going to be out of service for a logbook violation, Jackson gave permission to search the duffel bags. We conclude Thompson conducted the traffic stop in a timely fashion.

Jackson also asserts he had no choice in the matter because under Vehicle Code section 2800 he had to submit once the officer announced his intention to inspect the cab. True, "It is unlawful to willfully fail or refuse to comply with a lawful order, signal, or direction of a peace officer who is performing duties under the Vehicle Code, or to refuse to submit to a lawful inspection. (Veh.Code § 2800, subd. (a); see also Veh.Code 2800, subd. (b) [unlawful to fail or refuse to comply with lawful out-of-service order issued by peace officer performing duties under Code]; People v. Ritter (1980) 115 Cal.App.3d Supp. 1, 4 [ (Ritter ) ] [passenger who disobeyed officers' order to remain in vehicle while they administered field sobriety test to driver violated [Veh.Code

§ ] 2800; 'lawful order' is one related to traffic officer's duty to enforce rules of the road].)" (2 Witkin, Cal.Criminal Law (3rd ed. 2000) Crimes Against Public Peace and Welfare, § 260, p. 818.) As the court in *Ritter* explained, Vehicle Code section 625 "places a duty on traffic officers to enforce the rules of the road.... [Vehicle Code] section 2800, on the other hand, can properly be interpreted to be a reasonable and necessary implied power to aid in the performance of duties imposed." (*Ritter, supra,* 115 Cal.App.3d Supp. at p. 4.)

**\*26** We agree with the Attorney General's conclusion the scope of Vehicle Code section 2800 is limited to actions and orders relating to enforcing the rules of the road. Here, the officer asked to "check" the truck, and then separately asked to "check" the duffel bags. A commercial trucker would not have understood a Vehicle Code provision to give a police officer authority to search his personal property, items unrelated to issuing a logbook traffic citation.

Jackson also makes much of the fact he was handcuffed, arguing it vitiated any subsequent consent to search. Certainly, "[h]andcuffing substantially increases the intrusiveness of a detention and is not part of a typical detention." (⌐ *People v. Stier* (2008) 168 Cal.App.4th 21, 27 (*Stier* ).) However, because police officers may take precautions to ensure their own safety, handcuffing a suspect does not necessarily transform the detention into a de facto arrest. (⌐ *People v. Celis* (2004) 33 Cal.4th 667, 675 (*Celis* ).) Rather, the "issue is whether the use of handcuffs during a detention was reasonably necessary under all of the circumstances of the detention. [Citations.] We look to 'the facts known to the officers in determining whether their actions went beyond those necessary to effectuate the purpose of the stop, that is, to quickly dispel or confirm police suspicions of criminal activity.' [Citation.]" (⌐ *In re Antonio B.* (2008) 166 Cal.App.4th 435, 441 (*Antonio B.*), quoting ⌐ *Celis, supra,* 33 Cal.4th at pp. 675–676.) Jackson asserts this case is similar to the *Stier* case where it was determined the trial court had erred in denying the motion to suppress because the prosecution did not establish a police officer lawfully detained defendant by placing him in handcuffs and thereafter lawfully obtained his consent to be searched. (⌐ *Stier, supra,* 168 Cal.App.4th at pp. 23–24.)

However in this case Jackson consented to the search of the duffel bags before he was handcuffed. When Thompson asked if he could check the duffel bags, Jackson said "Well, you can

check" and when Thompson asked what was inside, Jackson again consented to the search, stating, "Oh, go ahead, you already have me." Jackson was not placed in handcuffs until after he and Thompson discussed more about what was inside the duffel bags. Jackson revealed he had "Stuff that's not supposed to be in there." The handcuffing did not negate Jackson's earlier consent to search.

We conclude the detention was not prolonged and Jackson freely and voluntarily gave Thompson his consent to search the duffel bags. The trial court properly denied the motion to suppress.[2]

[2] Jackson also challenges the prosecutor's alternative justification for the search as being incident to arrest under 🔖 *New York v. Belton* (1981) 453 U.S. 454. The Attorney General agrees with Jackson's argument the Supreme Court's recent opinion 🔖 *Arizona v. Grant* (2009) 556U.S. 332, 129 S.Ct. 1710, clarifies the search-incident-to-an-arrest exception to the warrant requirement would not apply in this case. However, based on our ruling affirming the trial court's denial of the motion to suppress on other grounds, this alternative theory is not dispositive and need not be discussed further.

### *Jackson's Motion to Suppress Statements—Miranda Violation*
Jackson moved to suppress his statements made during the traffic stop, claiming he should have been given his *Miranda* rights. He argued that when Thompson kept his paperwork and said he was "out of service," Jackson was not free to leave and therefore should have been *Mirandized* before asked any further questions. The prosecutor stated Jackson's statements following the handcuffing would not be used against him in the case. The prosecutor argued Jackson may have been detained before the handcuffing, but he was not in custody for *Miranda* purposes.

**\*27** The trial court considered the videotape and Thompson's testimony and explanation offered for each step of his investigation. It agreed with the prosecutor, finding there was nothing during the 21–minute stop creating a custodial environment in which Jackson felt intimidated, coerced, or extorted into answering questions. It stated, "As to the first encounter with ... Jackson by Officer Thompson, the court having looked at all the evidence presented and looking at the totality of the circumstances, finds that at the time that ...

Case 1:20-cv-00522-NONE-JLT Document 39-1 Filed 07/29/20 Page 25 of 27
People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

Jackson was contacted and throughout the 20–or–so–minute encounter ... the court would agree with the prosecution that it was very cordial, it was very friendly, there didn't appear to be anything of an interrogative, intimidative [*sic* ], coercive type nature. It was a temporary detention that fell within a reasonable time for a commercial stop, considering the fact that commercial stops often take ... longer than normal passenger vehicle stops. Given the documents, inspections, logbooks and all the other myriad of things that traditionally have to be looked into when you are stopping a commercial vehicle. [¶] ... [T]here was nothing unusual about the length of time. It seemed to unfold, having looked at the videotape, unfold in a naturally progressive manner as a commercial stop would unfold. There was not anything about the nature of the questions, nor the environment that in the court's opinion created an intimidating, coercive or extortive environment, thereby warranting a need for the deputy to give ... Jackson his *Miranda* statements. [¶] It would appear that all the statements were given freely and voluntary. And therefore, the court finds *Miranda* [need] not have been given at that time and, therefore, those statements will be allowed in."

"*Miranda* warnings are required 'as soon as a suspect's freedom of action is curtailed to a "degree associated with a formal arrest.' " ( Berkemer v. McCarty (1984) 468 U.S. 420, 440 (*Berkemer* ).) This determination presents a mixed question of law and fact. [Citation.] We apply a deferential substantial evidence standard to the trial court's factual findings, but independently determine whether the interrogation was custodial. [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 (*Pilster* ).)

"Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole. [Citations.] Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of questioning.' [Citation.] Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were

'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview. [Citation.]" (*Pilster, supra,* 138 Cal.App.4th at pp. 1403–1404, fn. omitted.)

**\*28** "The test is sometimes phrased as follows: How would a reasonable person in the suspect's position have understood his or her situation? But the issue under *Berkemer* 'is not whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with formal arrest.' [Citation.]" (*Pilster, supra,* 138 Cal.App.4th at p. 1403, fn. 1, italics omitted.)

On appeal, Jackson asserts the trial court's analysis was "oversimplified" as it restricted all the "evidence the defense sought to present at the hearing" and failed to consider Jackson "was not pulled over for a normal, limited truck inspection, but was detailed for the express purpose of 'developing' probable cause to arrest him for the transport of narcotics." He argues the totality of the circumstances must include the fact it was pretext stop and the officer was not going to let Jackson go free at any point. We disagree.

The videotape tape shows the encounter between Thompson and Jackson was not coercive or threatening. The determination whether an individual was in custody for *Miranda* purposes "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." ( Stansbury v. California (1994) 511 U.S. 318, 323.) An officer's beliefs are relevant only to the extent they are conveyed to the person being questioned. (*Id.* at p. 325.) Thompson never conveyed his subjective views about the nature of the traffic stop or his intent to eventually arrest Jackson. The objective circumstances of the interrogation reflected an ordinary commercial vehicle stop by an officer assigned to commercial vehicle traffic enforcement. There was nothing about the site of the interrogation, the nature of the questions, or the length or form of questioning to invoke *Miranda* protections. The motion to suppress statements made during the traffic stop was properly denied.

III

The judgments are affirmed.

People v. Jackson, Not Reported in Cal.Rptr.3d (2011)
2011 WL 902029

WE CONCUR: RYLAARSDAM, Acting P.J., and BEDSWORTH, J.

**All Citations**

Not Reported in Cal.Rptr.3d, 2011 WL 902029

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# CERTIFICATE OF SERVICE

Case Name:   **Apothio, LLC v. Kern County, et al.**     No.   **1:20-cv-00522-NONE-JLT**

I hereby certify that on July 29, 2020, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**UNPUBLISHED CASES CITED IN STATE DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 29, 2020, at Sacramento, California.

| Ngoc T. Huynh | */s/ Ngoc Huynh* |
|---|---|
| Declarant | Signature |

SA2020300599
34276331.docx