1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  APOTHIO, LLC,                           No.  1:20-cv-00522-JLT-BAK (EPG)

12                  Plaintiff,              ORDER GRANTING STATE
                                            DEFENDANTS' MOTION TO DISMISS ON
13          v.                              RULE 8 GROUNDS AND DECLINING TO
                                            ADDRESS THE REMAINDER OF STATE
14  KERN COUNTY, et al.,                    DEFENDANTS' MOTION;

15                  Defendants.             GRANTING IN PART AND DENYING IN
                                            PART COUNTY DEFENDANTS' MOTION
16                                          TO DISMISS; AND

17                                          DENYING COUNTY DEFENDANTS'
                                            MOTION TO STRIKE
18
                                            (Docs. 19, 21, 24, 74)
19

20                          **I.       INTRODUCTION**

21          This case concerns the seizure and destruction in 2019 of hundreds of acres of hemp

22  plants cultivated by Apothio, LLC in Kern County.  After its hemp was destroyed pursuant to a

23  warrant, Plaintiff filed civil rights and tort claims against Kern County, Kern County Sheriff's

24  Office, Kern County Sheriff Donny Youngblood, Sergeant Joshua Nicholson's (collectively,

25  "County Defendants"), and Charlton H. Bonham and the California Department of Fish and

26  Wildlife ("DFW") (collectively, "State Defendants").

27          County Defendants have filed a motion to strike (Doc. 19) and motion to dismiss (Doc.

28  24).  State Defendants filed motions to dismiss and for a more definite statement.  (Doc. 18.)

                                            1

1  After State Defendants filed copies of two relevant search warrants in a subsequent filing, (Doc.

2  66), Plaintiff filed a motion for leave to file and notice of supplemental information regarding

3  Defendants' disclosure of the probable cause affidavits associated with those warrants.  (Doc. 74.)

4  County and State Defendants have filed notices indicating that they wish to join in each other's

5  briefs and motions.  (Docs. 36, 40, 42, 74.)

6        For the reasons set forth below, the Court will grant State Defendants' motion to dismiss

7  (Doc. 21), deny County Defendants' motion to strike (Doc. 19), grant in part and deny in part

8  County Defendants' motion to dismiss (Doc. 24).  The Court will also take judicial notice of the

9  search warrants and has considered Plaintiff's notice of supplemental information (Doc. 74).

10                        **II.    BACKGROUND**

11  **A.    Legal Background**

12        1.    Federal Marijuana and Hemp Law

13        Federal law defines marijuana as "all parts of the plant Cannabis sativa L., whether

14  growing or not; the seeds thereof; the resin extracted from any part of such plant; and every

15  compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin."

16  21 U.S.C. § 802(16)(A).  Hemp or industrial hemp is defined as "the plant Cannabis sativa L. and

17  any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids,

18  isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9

19  tetrahydrocannabinol [('THC')] concentration of not more than 0.3 percent on a dry weight

20  basis."[1] 7 U.S.C. §§ 1639o(1), 5940(a)(2); *see* 21 U.S.C. § 802(16)(B)(i).  Marijuana and any

21  part of the plant *Cannabis sativa L.* with a THC concentration above 0.3 percent are Schedule I

22  controlled substances.  21 U.S.C. § 812, Schedule I, (c)(10), (17).

23        On February 7, 2014, the Agricultural Act of 2014 ("2014 Farm Bill") was signed into law

24  and contained a provision entitled "Legitimacy of Industrial Hemp Research."  *See* Pub. L. 113-

25  79, 128 Stat. 912 § 7606 (Feb. 7, 2014) (codified at 7 U.S.C. § 5940).  According to a "Statement

26  ───────────────

27  [1]  The federal definition of marijuana also excludes "the mature stalks of such plant, fiber produced from
    such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt,
    derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil,

28  or cake, or the sterilized seed of such plant which is incapable of germination."  21 U.S.C.
    § 802(16)(B)(ii).

2

of Principles" published jointly in the Federal Register by the U.S. Department of Agriculture, the

Drug Enforcement Administration, and the Food and Drug Administration, that provision of the

2014 Farm Bill:

> legalized the growing and cultivating of industrial hemp for research purposes in States where such growth and cultivation is legal under State law, notwithstanding existing Federal statutes that would otherwise criminalize such conduct. The statutorily sanctioned conduct, however, was limited to growth and cultivation by an institution of higher education[2] or State department of agriculture[3] for purposes of agricultural or other academic research or under the auspices of a State agricultural pilot program for the growth, cultivation, or marketing of industrial hemp.

> Section 7606 authorized State departments of agriculture to promulgate regulations to carry out these pilot programs but did not provide a specific delegation to the U.S. Department of Agriculture (USDA) or any other agency to implement the program. As well, the statute left open many questions regarding the continuing application of Federal drug control statutes to the growth, cultivation, manufacture, and distribution of industrial hemp products, as well as the extent to which growth by private parties and sale of industrial hemp products are permissible. Section 7606 did not remove industrial hemp from the controlled substances list. Therefore, Federal law continues to restrict hemp-related activities, to the extent that those activities have not been legalized under section 7606.

81 Fed. Reg. 53,395 (Aug. 12, 2016).

More specifically, the 2014 Farm Bill permits an "institution of higher education" or a

"State department of agriculture" to "grow or cultivate industrial hemp if":

> (1) the industrial hemp is grown or cultivated for purposes of research conducted under an agricultural pilot program[4] or other agricultural or academic research; and

---

[2] An institution of higher education is defined in 20 U.S.C. § 1001.

[3] A state department of agriculture is defined as "the agency, commission, or department of a State government responsible for agriculture within the State." 7 U.S.C. § 5940(a)(4).

[4] An agricultural pilot program is defined as "a pilot program to study the growth, cultivation, or marketing of industrial hemp—(A) in States that permit the growth or cultivation of industrial hemp under the laws of the State; and (B) in a manner that—(i) ensures that only institutions of higher education and State departments of agriculture are used to grow or cultivate industrial hemp; (ii) requires that sites used for growing or cultivating industrial hemp in a State be certified by, and registered with, the State department of agriculture; and (iii) authorizes State departments of agriculture to promulgate regulations to carry out the pilot program in the States in accordance with the purposes of this section." 7 U.S.C. § 5940(a)(1).

3

1

2

> (2) the growing or cultivating of industrial hemp is allowed under the laws of the State in which such institution of higher education or State department of agriculture is located and such research occurs.

3

4    7 U.S.C § 5940(b).[5]

5            Subsequently, the Agriculture Improvement Act of 2018 ("2018 Farm Bill") was signed

6    into law, which, in part, amended the Controlled Substances Act to remove hemp and hemp-

7    derived products from the definition of marijuana.  Pub. L. 115-334, 132 Stat. 4490 § 12619

8    (Dec. 20, 2018); *see also* 7 U.S.C. § 1639o(1); 21 U.S.C. § 802(16)(B)(i).  The law requires the

9    USDA to promulgate regulations and guidelines to administer a program for hemp production.

10   Hemp production may be administered directly by the USDA or by a state or Indian tribe that has

11   a USDA-approved plan.  7 U.S.C. §§ 1639p, 1639q.  However, when a state does not have a

12   USDA-approved plan to regulate the production of hemp, "it shall be unlawful to produce hemp

13   in that State . . . without a license issued by the Secretary [of the USDA] under subsection (b) [of

14   § 1639q]."  7 U.S.C. § 1639q(c)(1).  It is undisputed that on the dates relevant to this case,

15   California did not have an approved plan to regulate the production of hemp and Plaintiff did not

16   possess a license from the USDA.

17           It is also undisputed that as of the dates relevant to this case, the USDA had not yet

18   published rules regarding the issuance of licenses for hemp production.  It was not until October

19   31, 2019—*after* the search and seizure in dispute in this case—that the USDA published its

20   "interim final rule to establish the domestic hemp production program and to facilitate the

21   production of hemp, as set forth in the 2018 Farm Bill."  84 Fed. Reg. 58,523 (Oct. 31, 2019); *see*

22   7 C.F.R. § 990 *et seq.* (2019).

23           2.    <u>California Marijuana and Hemp Law</u>

24           On September 27, 2013, the California Industrial Hemp Farming Act ("Hemp Farming

25   Act") was signed into law, excluding industrial hemp from the definition of marijuana, and

26   setting forth procedures and regulations on industrial hemp production.  2013 Cal. Stat. Ch. 398

27

28

---

[5]  Subsequent legislation re-ordered and slightly edited the original language of the 2014 Farm Bill in ways that are not material to the present discussion.  The Court cites here the relevant language as presently codified.

(S.B. 566).  The Hemp Farming Act introduced established agricultural research institutions ("EARI"), which were first defined as "a public or private institution or organization that maintains land for agricultural research, including colleges, universities, agricultural research centers, and conservation research centers."  *Id.* § 4.  However, the Hemp Farming Act stated that "[t]his act shall not become operative unless authorized under federal law."  *Id.* § 8(a).  "If this act becomes operative, the Attorney General shall issue an opinion on the extent of that authorization under federal law and California law, the operative date of those provisions, and whether federal law imposes any limitations that are inconsistent with the provisions of this act."  *Id.* § 8(b).

On June 6, 2014, after the 2014 Farm Bill was signed into law, the California Attorney General issued its opinion on the above issues, finding that "[f]ederal law has authorized the California Industrial Hemp Act to the extent that it permits institutions of higher education and the California Department of Food and Agriculture to grow and cultivate industrial hemp, for the purposes of agricultural or academic research, in compliance with the federal definition of industrial hemp."  13 Cal. Ops. Atty. Gen. 1102 at 2 (2014).  The Attorney General noted inconsistencies between federal law and the Hemp Farming Act, specifically that federal law imposed the following limitations:

> (1) it continues to prohibit the cultivation of industrial hemp for purposes other than agricultural or academic research; (2) it restricts those persons or entities who may cultivate industrial hemp for agricultural or academic research to the California Department of Food and Agriculture or an institution of higher education; (3) it prevents even these authorized entities from instituting an agricultural pilot program to study the growth, cultivation, or marketing of industrial hemp, unless the program is conducted in compliance with additional federal requirements set forth in section 7606(b)(1)(B) of the [2014 Farm Bill]; and (4) it prohibits, even for research purposes, the cultivation or possession of the parts of the plant Cannabis sativa L. that exceed a 0.3% concentration of [THC].

*Id.*

On November 8, 2016, California voters approved Proposition 64, also known as the Control, Regulate and Tax Adult Use of Marijuana Act ("AUMA"), "to establish a comprehensive system to legalize, control and regulate the cultivation, processing, manufacture, distribution, testing, and sale of nonmedical marijuana, including marijuana products, for use by

adults 21 years and older, and to tax the commercial growth and retail sale of marijuana." 2016

Cal. Legis. Serv. Prop. 64 § 3.  The AUMA, in part, seeks to "[a]llow industrial hemp to be

grown as an agricultural product, and for agricultural or academic research, and regulated

separately from the strains of cannabis with higher [THC] concentrations." *Id.* § 3(aa).  In

contrast to the Hemp Farming Act, which stated it would not become operative until authorized

by federal law, the AUMA provides that the industrial hemp laws "shall become operative on

January 1, 2017."  Cal. Food & Agric. Code § 81010.

At the relevant time, California law defined industrial hemp as:

> a crop that is limited to types of the plant Cannabis sativa L. having no more than three-tenths of 1 percent tetrahydrocannabinol (THC) contained in the dried flowering tops, whether growing or not; the seeds of the plant; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin produced therefrom.

Cal. Health & Safety Code § 11018.5 (West 2019).[6]  The AUMA also re-defined an EARI as

either of the following:

> (1)  A public or private institution or organization that maintains land or facilities for agricultural research, including colleges, universities, agricultural research centers, and conservation research centers.
>
> (2)  An institution of higher education (as defined in Section 1001 of the Higher Education Act of 1965 (20 U.S.C. 1001)) that grows, cultivates or manufactures industrial hemp for purposes of research conducted under an agricultural pilot program or other agricultural or academic research.

Cal. Food & Agric. Code § 81000(c) (West 2019) (since renumbered to *id.* § 81000(a)(4)).

**B.    Factual Background**

1.    Plaintiff's Operations

In its complaint, Plaintiff alleges the following facts.  Plaintiff is a limited liability

corporation that "focuses on researching and commercializing hemp plants for use in foods,

nutraceuticals, and (eventually) pharmaceuticals, including to treat Dravet syndrome and other

life-threatening types of epilepsy."  (Doc. 1 ¶¶ 2, 4, 15, 48 ("[Plaintiff] is an emerging vertically-

---

[6]  The AUMA imported this statutory definition.  *See* Cal. Food & Agric. Code § 81000(d) (West 2019).

integrated player in the development of hemp-based foods, nutraceuticals, and (eventually) pharmaceuticals.").)  Plaintiff maintains hundreds of acres of land, greenhouses, and other facilities for hemp research.  (*Id.* ¶ 49.)  "[I]n addition to maintaining its own land and facilities to support research and development," Plaintiff claims it is an EARI "legally authorized to research and commercialize hemp under both federal and state law."  (*Id.* ¶¶ 2–3, 50 ("Consistent with its status as an EARI, [Plaintiff] has devoted significant funds and resources to the types of research and development activities encouraged by California law.").)  "As a result of its substantial research into hemp plants and their commercialization, [Plaintiff] has acquired patents and significant intellectual property and developed more than 100 proprietary varietals of hemp plants."  (*Id.* ¶ 51.)  Plaintiff states that its research is "largely focused on breeding plants that will not simply maximize [cannabinoid ('CBD')] levels, but instead will express the wide range of non-psychoactive chemicals (in particular micro-cannabinoids) that the hemp plant produces" in furtherance of finding "specific clinical outcomes, such as treating Dravet syndrome and other catastrophic types of epilepsy."  (*Id.* ¶¶ 55–56.)

"[A]ll of Plaintiff's hemp varietals have been independently tested via laboratory-grade chromatographs and certified to contain below 0.3% THC when measured in the mature, dried flower of the plants."  (*Id.* ¶ 61.)  Plaintiff asserts that it "routinely tests its plants for THC content" and if its plants demonstrate high THC levels at maturity, Plaintiff destroys them.  (*Id.* ¶¶ 61–62.)  However, "even plants that must be destroyed can have research value, especially if they contain high levels of other non-psychoactive cannabinoids, such as CBD and CBN."  (*Id.* ¶ 62.)  "Even when a high-THC parent plant is destroyed, the seeds it produces can be used to perform additional research, with the goal of cultivating offspring plants that bear a familial resemblance in some ways (high CBD and CBN levels) but not in others (low THC levels)."  (*Id.* (citing Cal. Health & Safety Code § 81006(e)(8)).)

Plaintiff states that since 2015, it "has partnered with academic research institutions to conduct joint research projects."  (*Id.* ¶¶ 2, 64.)  For example, in January 2018, Plaintiff executed "Research and Internship Agreements" with the Kern Community College District ("District") and Cerro Coso Community College ("College") in which Plaintiff agreed to "serve as an

internship site offering facilities, resources, and supervision to students" and "provide data and information to the college faculty" regarding "research efforts in the fields of agriculture, business, curriculum development, and job training." (*Id.* ¶¶ 66–67.) On February 14, 2019, Plaintiff and the District (on behalf of the College) entered into an Agricultural License Agreement in which they "agreed to create 'the first National Industrial Hemp Research, Development, and Commercialization Center'" to perform "ongoing 'research, development, and commercialization' of Industrial Hemp related white papers, designs, patents, and many other forms of Intellectual Property." (*Id.* ¶¶ 68–69.) Plaintiff and the College "also planned to develop additional 'public-private research affiliations'" and "share any revenues generated by these various research partnerships." (*Id.* ¶ 70.)

2.   Plaintiff's Interactions with Defendants

Plaintiff established its operations in Kern County in 2018 and asserts that it "shared extensive information about its operations, its plants, and its business plans with the Kern County Agricultural Commissioner [('Commissioner')], the Board of Supervisors, and the Kern County Sheriff's Office." (*Id.* ¶ 6.) Plaintiff claims it "has maintained close contact with Kern County officials, apprising them time and again of its research and development activities as well as its plans to commercialize its hemp." (*Id.* ¶ 75.) According to Plaintiff, it "presented written evidence about [Plaintiff's] EARI status to the Commissioner, and clearly stated its intention to research, develop, and commercialize hemp in accordance with the laws of California and the United States." (*Id.* ¶ 77.)

"In the fall of 2018, [Plaintiff] contracted with a local grower, Stenderup Farms, to plant and organically manage 141 acres of hemp using seeds created and owned by [Plaintiff]." (*Id.* ¶ 76.) Before planting any hemp, Plaintiff met with and briefed the Commissioner and on October 12, 2018, the Commissioner's office issued 2018 Map-Permit Number 1500007, Stenderup AG Partners, Map Number 1288, "which identified the location where [Plaintiff] was permitted to plant and cultivate its hemp field." (*Id.* ¶¶ 76, 78.) Plaintiff pleads it "also met with and briefed other government officials, including Defendant Nicholson, the official in charge of drugs and narcotics in the Kern County Sheriff's Office; two Chief Deputies in the Sheriff's

8

office; and the Kern County Planning Director, Lorelei Oviatt," as well as "other local officials, including the city managers, city attorney, and mayor of California City, California." (*Id.* ¶ 79.) According to Plaintiff, it reiterated its EARI status at every meeting and "[a]t no point during any of those meetings did any county official disagree, contradict, or question [Plaintiff's] status as an EARI." (*Id.* ¶ 80.)

When the hemp plants were being grown, Plaintiff "conducted contemporaneous chemical testing of the plants," which "confirmed that the plants would have THC levels of less than 0.3% at maturity, and this indeed turned out to be the case when the plants were finally harvested." (*Id.* ¶ 82.) In January 2019, after planting, Plaintiff alleges the California Secretary of the Department of Food and Agriculture Karen Ross emailed Stenderup Farms, "specifically acknowledg[ing] that [Plaintiff] and Stenderup had been conducting a 'research project on hemp,'" "that she was 'intrigued' by the hemp research that [Plaintiff] and Stenderup had been conducting," and that she "offered to introduce [Plaintiff] and Stenderup to 'several state, national and international clients who are involved in hemp' in the hopes of creating 'future business opportunities' related to hemp commercialization." (*Id.* ¶ 84.) The following month, Plaintiff contacted several local farmers "to plant and organically manage approximately 500 additional acres of hemp" and "subsequently filed registration materials with Kern County for these hemp fields. (*Id.* ¶¶ 85–86.) Plaintiff states that the Commissioner "issued several additional map permits, which identified the precise locations of the fields where [Plaintiff's] hemp would be planted." (*Id.* ¶¶ 86–87 ("In each of these permits, the County acknowledged and certified that [Plaintiff] was growing hemp.").)

In March 2019, Plaintiff "planted approximately 17 million industrial hemp seeds on the 500 acres of land described in the permits above," which were "clearly marked with signs on every corner accurately describing the fields as containing 'Industrial Hemp.'" (*Id.* ¶¶ 88–89.) Plaintiff met with the Kern County Director of Planning and Natural Resources in May 2019 "to discuss [Plaintiff's] extraction and commercialization plans," at which time Plaintiff was informed that "no meeting was necessary and there was no license needed for processing hemp." (*Id.* ¶ 90.) With plans to harvest the plants in 2019, Plaintiff "remained in contact with the

1    County to inform the County about its continued work."  (*See id.* ¶¶ 91–98.)

2          3.    Destruction of Plaintiff's Crops

3          Plaintiff alleges that "at some point in the fall of 2019, on information and belief,

4    Defendants or their agents entered [Plaintiff's] farms without a warrant and proceeded to test

5    approximately forty female plants," but these tests were fatally flawed.  (*See id.* ¶¶ 122–39.)  For

6    example, Plaintiff claims that "Defendants tested plants before they were mature and dried,

7    virtually guaranteeing that the results would overstate the amount of THC in the hemp that

8    [Plaintiff] was cultivating."  (*Id.* ¶ 127.)  Plaintiff further alleges that defendants tested plants

9    from only one location, used the wrong equipment for testing, and that the County, the Kern

10   County Sheriff's Office and DFW "authorized the use of these inadequate test equipment and

11   procedures and failed to train the individual Defendants to properly use this equipment to

12   accurately test hemp crops."  (*Id.* ¶¶ 128, 130, 133.)

13         On October 24, 2019, Defendant Nicholson applied for a search warrant to search

14   Plaintiffs' farms.  (*Id.* ¶ 10.)  According to the complaint, the warrant application "misstat[ed]

15   and/or omit[ed] material information about [Plaintiff's] EARI status and [Plaintiff's] regular

16   communication with county officials regarding its research and commercialization efforts."  (*Id.*)

17   The following day, on October 25, 2019, Plaintiff's managing partner, Trent Jones, was notified

18   that law enforcement entered one of the hemp fields operated by Mike Cauzza Farms and when

19   he arrived, he encountered Defendant Nicholson and an unknown DFW officer.  (*Id.* ¶¶ 4,

20   99−100.)  The two officers interviewed Jones, during which time they produced a search warrant.

21   (*Id.* ¶ 102; *see* Ex. A, Doc. No. 1-1.)  The warrant permitted the search and seizure of "[c]annabis

22   and derivatives of same, and paraphernalia associated with the unlawful cultivation of cannabis,"

23   and authorized the searching officers to destroy marijuana.  (Ex. A, Doc. No. 1-1 at 4.)

24   According to Plaintiff, it was growing legal hemp, not illegal marijuana, and the officers

25   disregarded Plaintiff's EARI status.  (Doc. 1 ¶ 108.)  Plaintiff also alleges that "the warrant did

26   not accurately provide material information," including "the many communications Plaintiff had

27   with Kern County and the Kern County Sheriff['s] Office about its hemp production."  (*Id.* ¶

28   107.)

1    Plaintiff alleges that following his interview and shortly upon their arrival, Defendant

2    Nicholson and other officers "ordered the complete and total destruction of the fields—

3    approximately 17 million plants." (*Id.* ¶¶ 115–16.)  Defendants proceeded to bulldoze all 500

4    acres of Plaintiff's plants, "containing an estimated 150 million pounds of hemp biomass." (*Id.*

5    ¶¶ 116, 119.)  Plaintiff was unable to seek judicial intervention prior to the destruction of its

6    plants. (*Id.* ¶¶ 118–19.)  According to Plaintiff, "[t]he bulldozing of the plants also resulted in the

7    internment of tens of billions of seeds into the ground, roughly 120 million seeds per acre," which

8    "produced a concentration of seeds on the land that was orders of magnitude higher than

9    [Plaintiff] had ever or would ever cultivate." (*Id.* ¶ 120.)  Plaintiff alleges that the 500 acres of

10   destroyed crop was worth $1 billion. (*Id.* ¶¶ 1, 236.)

11   **C.      Disclosure of the Search Warrant**

12       Plaintiff alleged in the complaint that, as of the date of its filing (April 10, 2020), Plaintiff

13   "still ha[d] not received the search warrant materials, including any affidavit, statement of

14   probable cause, or any other documents related to the search warrant." (Doc. 1 ¶¶ 149–153.)

15   After briefing closed on the pending motions, Defendants filed a copy of the search warrant.

16   (Doc. 66-2, Ex. O.)

17       Although the parties filed additional briefing about the warrant materials, no party directly

18   addressed the mechanism(s) by which the Court could consider those materials in resolving the

19   pending motions. (*See* Doc. Nos. 74–76.)  Nonetheless, the Court concludes that the search

20   warrant materials are judicial records and are properly the subject of judicial notice under Federal

21   Rule of Evidence 201(b)(2). *See Mulligan v. Nichols*, No. CV 13-00836 RGKVBKX, 2014 WL

22   12586245, at *3 (C.D. Cal. Jan. 2, 2014), *aff'd*, 835 F.3d 983 (9th Cir. 2016); *see also Barron v.*

23   *Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (approving of court considering judicially noticeable

24   documents in the context of a motion to dismiss for failure to state a claim).

25       No party disputes the authenticity of the documents.  The warrant materials therefore may

26   be considered, to the extent they are relevant to the questions raised by these motions, for their

27   existence and content but not for the truth of the matters asserted therein. *See Coal. for a*

28   *Sustainable Delta v. John McCamman*, 725 F. Supp. 2d 1162, 1183–84 (E.D. Cal. 2010).  In the

11

1    interest of fairness, and in an abundance of caution, the Court has also considered Plaintiff's

2    "Notice of Supplemental Information" in which Plaintiff advances the position that the warrant

3    materials are consistent with their allegations in the complaint (Doc. 74), as well as State

4    Defendants' response to that Notice (Doc. 75).

5    **D.      Claims in the Complaint**

6          On April 10, 2020, Plaintiff filed its complaint in this court, asserting the following causes

7    of action:  (1) unreasonable search and seizure/destruction in violation of 42 U.S.C. § 1983

8    ("§ 1983") and the Fourth Amendment; (2) violations of the right to due process in violation of

9    § 1983 and the Fourteenth Amendment; (3) taking of private property without just compensation

10   in violation of § 1983 and the Fifth Amendment; (4) violation of California's Bane Act, Civil

11   Code § 52.1, premised upon the previously-alleged Fourth Amendment violation; (5) violation of

12   the Bane Act premised upon a parallel unreasonable search and seizure/destruction claim under

13   California Constitution art. I § 13; (6) violation of the Bane Act premised upon the previously

14   alleged federal due process violation; (7) violation of the Bane Act premised upon a parallel due

15   process claim under the California Constitution art. I § 17; (8) conversion under the California

16   Tort Claims Act ("CTCA"); (9) trespass to chattels under the CTCA; (10) negligence under the

17   CTCA; and (11) declaratory judgment under 28 U.S.C. § 2201(a).  (*See* Doc. No. 1 at 40–54.)

18                    **III.      LEGAL STANDARDS**

19   **A.      Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

20         A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the

21   allegations set forth in the complaint.  Dismissal under Rule 12(b)(6) is proper where there is

22   either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a

23   cognizable legal theory." *Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

24   In considering a motion to dismiss for failure to state a claim, a court generally accepts as true the

25   allegations in the complaint, construes the pleading in the light most favorable to the party

26   opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y Ranch Ltd. v.*

27   *Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

28   ///

To survive a 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, a plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

**B.     Motion for a More Definite Statement Pursuant to Federal Rule of Civil Procedure 12(e).**

Rule 12(e) states that a party may move for a more definite statement if the pleading is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). The moving party "must point out the defects complained of and the details desired." *Id.* Such motions are "not favored by the courts since pleadings in federal courts are only required to fairly notify the opposing party of the nature of the claim." *Griffin v. Cedar Fair, L.P.*, 817 F. Supp. 2d 1152, 1154 (N.D. Cal. 2011) (quoting *Resolution Trust Corp. v. Dean*, 854 F. Supp. 626, 629 (D. Ariz. 1994)). Therefore, motions for a more definite statement "should not be granted unless the

13

1    defendant cannot frame a responsive pleading." *Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525

2    F. Supp. 940, 949 (E.D. Cal. 1981); *see also San Bernardino Pub. Emps. Ass'n v. Stout*, 946 F.

3    Supp. 790, 804 (C.D. Cal. 1996) ("A motion for a more definite statement is used to attack

4    unintelligibility, not mere lack of detail, and a complaint is sufficient if it is specific enough to

5    apprise the defendant of the substance of the claim asserted against him or her."). "Whether to

6    grant a Rule 12(e) motion for a more definite statement lies within the wide discretion of the

7    district court." *C.B. v. Sonora Sch. Dist.*, 691 F. Supp. 2d 1170, 1191 (E.D. Cal. 2010) (citing

8    Wright & Miller, *Fed. Prac. & Proc.* § 1377 (2d. ed.)).

9                                **IV.**     **ANALYSIS**

10    **A.**    **Causation and Rule 8 Compliance**

11         "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the

12    claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of

13    what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting

14    *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Although a complaint is not required to include

15    detailed factual allegations, it must set forth "sufficient factual matter, accepted as true, to 'state a

16    claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S.

17    at 570). As mentioned, it must also contain "sufficient allegations of underlying facts to give fair

18    notice and to enable the opposing party to defend itself effectively." *Starr*, 652 F.3d at 1216.

19         "A complaint having the factual elements of a cause of action scattered throughout the

20    complaint and not organized into a 'short and plain statement of the claim' may be dismissed for

21    failure to satisfy Rule 8(a)." *Saunders v. Saunders*, 2009 WL 382922, at *2 (E.D. Cal., Feb. 13,

22    2009). Thus, a court may dismiss a complaint for failure to comply with Rule 8(a) if it is

23    "verbose, confusing and conclusory." *Nevijel v. N. Coast Life*, 651 F.2d 671, 674 (9th Cir. 1981).

24    "Although normally verbosity or length is not by itself a basis for dismissing a complaint, … a

25    pleading may [not] be of unlimited length and opacity." *Cafasso, U.S. ex rel. v. Gen. Dynamics*

26    *C4 Sys., Inc.*, 637 F.3d 1047, 1058–59 (9th Cir. 2011).

27         "When a complaint fails to comply with the requirements of Rule 8(a), the district court

28    has the power, on motion or sua sponte, to dismiss the complaint . . ." *Marshall v. United*

1    *Nations*, 2006 WL 1883179, at *3 (E.D. Cal. July 6, 2006) (citing *Simmons v. Abruzzo,* 49 F.3d

2    83, 86 (2d Cir. 1995)); *accord Velasco v. Sec. Nat. Mortg. Co.*, 823 F. Supp. 2d 1061, 1066 (D.

3    Haw. 2011), *aff'd*, 508 F. App'x 679 (9th Cir. 2013) (holding courts may "*sua sponte* dismiss a

4    complaint for failure to comply with Rule 8").

5          Complaints that repeatedly incorporate all preceding paragraphs by reference—sometimes

6    called shotgun pleadings—have been found to violate Rule 8.  *Weiland v. Palm Beach Cty.*

7    *Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015) ("The most common type [of shotgun

8    pleading]—by a long shot—is a complaint containing multiple counts where each count adopts

9    the allegations of all preceding counts, causing each successive count to carry all that came before

10   and the last count to be a combination of the entire complaint."); *Deerpoint Grp., Inc. v.*

11   *Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1234 n.15 (E.D. Cal. 2018) ("It is true that Paragraph 144

12   incorporates by reference Paragraphs 1 to 143.  However, incorporating literally all 143 preceding

13   paragraphs, without specific reference to either disparagement or Paragraph 81, does not give

14   Defendants (or the Court) fair notice of the factual bases of the IIPEA claim." (citing *Weiland*,

15   792 F.3d at 1321-23)).

16         Relatedly, actions brought under § 1983 must allege how each named defendant

17   personally participated to cause the deprivation of the plaintiff's rights.  *Iqbal*, 556 U.S. at 676–

18   77.  "The inquiry into causation must be individualized and focus on the duties and

19   responsibilities of each individual defendant whose acts or omissions are alleged to have caused a

20   constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  Thus, the

21   allegations of the complaint must be sufficient to apprise each defendant of the acts the plaintiff

22   claims the defendant took.

23         1.   State Defendants

24         State Defendants argue that the complaint fails to sufficiently link each Defendant to any

25   Constitutional violation.  (Doc. 21-2 at 19–20.)  State Defendants also seek to join County

26   Defendants' motion, which argues that the complaint fails to comply with Rule 8.  (Docs. 24 at

27   19–20 (County Defendants' argument); 36 (notice of joinder).)  Though Plaintiff opposes the

28   joinder (Doc. 43), as mentioned above, the Court may review compliance with Rule 8 *sua sponte*.

                                               15

Each cause of action is brought against "All Defendants" (*see* Doc. 1), and Plaintiff's complaint repeatedly refers to "Defendants" throughout, in most cases without specifying which State Defendant took what action. Take, for instance, Defendant Bonham, the director of DFW. Nowhere in the complaint does Plaintiff allege that Defendant Bonham took any actions. Moreover, the allegations against DFW are minimal. DFW allegedly "participated, either directly or indirectly, in the preparation and/or execution of the search warrant and/or the destruction of Apothio's property." (*Id.* ¶ 23.) But the specific activities DFW allegedly took were that: (1) an unknown DFW officer was at Plaintiff's hemp fields when they were destroyed and that same officer interviewed Jones; and (2) DFW authorized the inadequate tests of Plaintiff's hemp, failed to train individual Defendants about how to properly test hemp crops, and failed to obtain certified tests. (*Id.* ¶¶ 100–101, 133–34.)

State Defendants also point out that the complaint's lack of detail regarding any State Defendants' conduct makes it difficult for the State to evaluate how its Eleventh Amendment immunity might apply. (Doc. 21-2 at 19.) Due to the many nuanced issues associated with advancing § 1983 claims against state entities and/or officials, *see Tingirides v. Cal. Dep't of Corr. & Rehab.*, 5:18-CV-02098-JFW (MAA), 2020 WL 4904661, at *13 (C.D. Cal. May 5, 2020), report and recommendation adopted, 2020 WL 5847108 (C.D. Cal. Aug. 12, 2020), Plaintiff's claims in the complaint as presently pleaded are insufficient as to any State Defendant.[7]

State Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND as to all claims against all State Defendants. As a result, the Court declines to address the many other arguments raised in State Defendants' motion.[8]

---

[7] Adding to the many layers of confusion in this case, both Plaintiff (Doc. 35 at 26) and State Defendants (Doc. 39 at 18) argue about whether Plaintiff has stated *Monell* claims against the State Defendants. Yet, *Monell*'s discussion of the various ways in which municipal entities may be held liable in § 1983 is a doctrine that applies only to municipalities, not state entities. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989); *see also Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010) (explaining that "the Supreme Court has expressly declined to extend *Monell*'s theory of municipal liability under § 1983 to state entities").

[8] The Court notes that both sets of Defendants have cited caselaw and standards concerning the defense of qualified immunity, (*see* Docs. 21-1 at 14, 24 at 14 (citing *Messerschmidt v. Millender*, 565 U.S. 535, 551 (2012)), but do not directly invoke that defense. This is yet another example of the ways in which the briefs in this case have unnecessarily obfuscated the issues.

16

1      2.      County Defendants

2          County Defendants' motion to dismiss seeks, in the alternative, a more definite statement,

3    arguing that Plaintiff's complaint is a shotgun pleading.  (Doc. 24 at 18–20.)  Although aspects of

4    Plaintiff's complaint are in the form of a shotgun pleading, the complaint is sufficiently framed as

5    to give notice to County Defendants about the nature of the claims asserted against them.  *See*

6    *C.B.*, 691 F. Supp. 2d at 1191 ("A Rule 12(e) motion is proper only if the complaint is so

7    indefinite that the defendant cannot ascertain the nature of the claim being asserted, *i.e.*, so vague

8    that the defendant cannot begin to frame a response.").

9          Again, the County Defendants are two individuals (Nicholson and Youngblood), two

10   entities (Kern County and the Kern County Sheriff's Department), and ten Doe Defendants.

11   Plaintiff makes specific allegations about Nicholson's activities.  To the extent the allegations

12   against Defendant Youngblood are insufficiently specific, the Court discusses these problems

13   below in the context of those specific claims.  As to the entities, Plaintiff pleads its theories of

14   *Monell* liability in the complaint.  (*See, e.g.,* Doc. 1 ¶¶ 167, 173–74.)  Although Plaintiff's

15   theories of *Monell* liability are legally insufficient for the reasons discussed below, the

16   insufficiencies are not due to the shotgun pleading.  Any remaining lack of clarity can be

17   ascertained through the discovery process.  *See C.B.*, 691 F. Supp. 2d at 1191 ("The Court may

18   also deny the motion if the detail sought by a motion for more definite statement is obtainable

19   through discovery."); *Famalore, Inc. v. Edison Bros. Stores, Inc.*, 525 F. Supp. 940, 949 (E.D.

20   Cal. 1981) (denying motion for more definite statement where the requested specificity in

21   pleading was not required by Rule 8 and could be obtained through discovery).

22   **B.      State Defendants' Request for Judicial Notice**

23         State Defendants request that the Court take judicial notice of six restricted material

24   permits issued by the Kern County Agricultural Department cited in parts of State Defendants'

25   motion seeking to strike portions of Plaintiff's complaint.  (Docs. 21-2 at 12, 14; 22; 22-1.)

26   Because, as indicated above, the Court grants State Defendants' motion to dismiss for other

27   reasons, the materials subject to this request are irrelevant, so the Court will not take judicial

28   notice of them.

1    **C.    Merits of County Defendants' Motion to Dismiss**

2         1.    Joinder in State Motion

3         As mentioned, the County seeks to join the State Defendants' motion to dismiss.

4    However, as Plaintiff points out, the pending motions were filed on June 20, 2020; Plaintiff filed

5    its oppositions on July 13, 2020; and the County filed its notice of joinder on July 29, 2020, the

6    day before reply briefs were due.

7         "Allowing one party to join another party's motion is a matter well within the district

8    court's substantial case management discretion." *United States ex rel. Ambrosecchia v. Paddock*

9    *Lab'ys, LLC*, 855 F.3d 949, 956 (8th Cir. 2017) (internal quotation marks and citation omitted).

10   Courts in this district have declined to permit joinder under similar circumstances. *See, e.g., See*

11   *Pension Tr. Fund for Operating Engineers Local 3 v. McMorgan & Co.*, No. 06 Civ.S904 WBS

12   JFM, 2006 WL 2788340, at *3 n.7 (E.D. Cal. Sept. 26, 2006) (refusing to consider joinder to

13   motion served two days before deadline for opposition); *Florence v. Nangalama*, No.11 Civ.

14   3119, 2014 WL 3689362, at *1 (E.D. Cal. July 22, 2014), report and recommendation adopted,

15   2014 WL 4098150 (E.D. Cal. Aug. 18, 2014) (denying motion for joinder in part because joinder

16   request was filed after expiration of the opposition deadline).  The Court agrees with Plaintiff that

17   the timing of the filing of the County Defendants' joinder is problematic.  The two motions

18   advance slightly different arguments for dismissal, and Plaintiff did not have an opportunity to

19   consider how State Defendants' arguments might have applied to claims brought against the

20   County.  Therefore, the Court will confine itself in this section of its analysis to considering only

21   the arguments raised in the County Defendants' motion to dismiss.  The County Defendants also

22   filed notice that they wished to join in the State Defendant's reply brief.  Because any arguments

23   necessarily build upon the underlying motion, the Court will not permit this joinder either.

24        2.    Due Process Claim

25        Plaintiff's second cause of action is brought against all Defendants for destroying

26   Plaintiff's crop without due process of law.  (Doc. 1 ¶¶ 168–74.)  County Defendants argue that

27   Plaintiff's Due Process[9] claim should be dismissed because Plaintiff lacks any legally protected

28   _____

[9]  The briefs address only procedural due process.

18

1    property interest in the crops that were destroyed.  (Doc. 24 at 8–13.)  County Defendants extend

2    this argument to the Bane Act claim premised upon the federal due process violation.  (*Id*. at 9.)

3            "To obtain relief on § 1983 claims based upon procedural due process, the plaintiff must

4    establish the existence of (1) a liberty or property interest protected by the Constitution; (2) a

5    deprivation of the interest by the government; and (3) lack of process."  *Guatay Christian*

6    *Fellowship v. Cty. of San Diego*, 670 F.3d 957, 983 (9th Cir. 2011) (internal quotation marks and

7    citation omitted).  "The Fourteenth Amendment's procedural protection of property is a safeguard

8    of the security of interests that a person has already acquired in specific benefits.  These

9    interests—property interests—may take many forms."  *Bd. of Regents of State Colleges v. Roth*,

10   408 U.S. 564, 576 (1972).  "The constitutional right to be heard is a basic aspect of the duty of

11   government to follow a fair process of decisionmaking when it acts to deprive a person of his

12   possessions."  *Fuentes v. Shevin,* 407 U.S. 67, 80 (1972).  The due process clause operates to

13   protect the "use and possession of property from arbitrary encroachment—to minimize

14   substantively unfair or mistaken deprivations of property. . ."  *Id.* at 81.

15           County Defendants argue that Plaintiff has no cognizable property interest in its crop

16   because the crop was "contraband."  (Doc. 24 at 8.)  Whether there can be a due-process interest

17   in tangible property depends in part on its legal character.  No person can have a legally protected

18   interest in an item that is "contraband per se."  *See, e.g., Raley v. Williams*, No. 2:14-CV-2652-

19   JAM-DMC, 2019 WL 1099987, at *2 (E.D. Cal. Mar. 8, 2019); *report and recommendation*

20   *adopted*, 2019 WL 11704219 (E.D. Cal. July 11, 2019), *aff'd*, 829 F. App'x 290, 291 (9th Cir.

21   2020).  An object is contraband *per se* if its possession, without more, constitutes a crime; or in

22   other words, if there is no legal purpose to which the object could be put."  *United States v.*

23   *Harrell*, 530 F.3d 1051, 1057 (9th Cir. 2008).  "Derivative contraband," on the other hand, is

24   defined as an item that is "not inherently illegal, but becomes illegal through the manner or the

25   intent with which it is used, possessed or acquired."  *Conservation Force v. Salazar*, 677 F. Supp.

26   2d 1203, 1207 (N.D. Cal. 2009), *aff'd*, 636 F.3d 1240 (9th Cir. 2011) (citing *One 1958 Plymouth*

27   *Sedan v. Pennsylvania*, 380 U.S. 693, 699 (1965), and *United States v. Farrell*, 606 F.2d 1341,

28   1344 (D.C. Cir. 1979))); *accord United States v. McCormick*, 502 F.2d 281, 288 (9th Cir. 1974)

19

1    ("Possession of [a narcotic] is always illegal; it is contraband per se.  Possession of an

2    automobile, on the other hand, is not always, illegal; it is derivative contraband, and only its

3    illegal use makes its possession illegal[.]").  "While per se contraband may be summarily

4    forfeited without any due process protections, derivative contraband is susceptible to protectible

5    property rights and cannot be civilly forfeited without a modicum of due process protection."

6    *Conservation Force,* 677 F. Supp. 2d at 1210 (citations omitted); *accord Farrell*, 606 F.2d at

7    1344 ("The reasons that per se contraband is forfeit to the government are almost wholly

8    inapplicable to derivative contraband." (citing *One 1958 Plymouth Sedan,* 380 U.S. at 639));

9    *Conkey v. Reno*, 885 F. Supp. 1389, 1398 (D. Nev. 1995) ("While per se contraband may be

10   summarily forfeited without any due process protections, property which is derivative contraband

11   is susceptible of protectible property rights and cannot be civilly forfeited without some due

12   process protections." (citing cases)).

13          Courts within this district have determined that "marijuana is contraband per se under

14   federal law and thus no person can have a cognizable federal legal interest in it," notwithstanding

15   that it is legal to grow and/or possess marijuana under California law under certain circumstances.

16   *Evans v. Cty. of Trinity*, No. 2:18-CV-00083-TLN-JDP, 2021 WL 516796, at *3 (E.D. Cal. Feb.

17   11, 2021); *see also Raley*, 2019 WL 1099987, at *2 (collecting cases).  Citing this line of

18   authority, the County Defendants argue that Plaintiff's due process claim[10] should be dismissed

19   because Plaintiff has admitted it was growing marijuana.  Specifically, County Defendants

20   contend that Plaintiff admitted its crop had a THC content higher than 0.3%.  (Doc. 24 at 9 (citing

21   Doc. 1 ¶¶ 8, 35, 92, 108)).  County Defendants fail to apply the proper lens to the reading of the

22   complaint.  It is true that Plaintiff alleges that some of its crop did have a THC above 0.3% at

23   parts of its lifecycle.  (*See, e.g.,* Doc. 1 ¶ 82 ("Apothio shared its internal testing binders with

24   Kern County Agricultural Commissioner Glenn Fankhauser, which showed that Apothio's plants

25   were overwhelmingly testing below 0.3% THC, and that Apothio was carefully tracking the few

26   exceptions testing above that threshold so they could be destroyed if they were not compliant with

27   ───────────────
     [10]  County Defendant's motion to dismiss summarily asserts that all of Plaintiff's federal claims should be
28   dismissed because the crop was "contraband."  (*See* Doc. 24 at 10.)  The Court has evaluated this
     argument as to each claim independently.

the 0.3% limit at the time of harvest.").)  But Plaintiff's complaint alleges facts that plausibly suggest the crop would not have exceeded the limit at the time of harvest.  First, Plaintiff alleges that its "leading seed variety . . . is genetically predisposed to produce hemp below 0.3% Delta-9 THC."  (*Id.* ¶ 58.)  In addition, Plaintiff alleges that it "routinely tests its plants for THC content" and that "all of its hemp varietals have been independently tested via laboratory-grade chromatographs and certified to contain below 0.3% THC when measured in the mature, dried flower of the plants."  (*Id.* ¶ 61.)  In relation to the crop at issue in this case, "[a]t the time this crop was being grown, Apothio conducted contemporaneous chemical testing of the plants.  These tests confirmed that the plants would have THC levels of less than 0.3% at maturity, and this indeed turned out to be the case when the plants were finally harvested."  (*Id.* ¶ 82.) Relatedly, Apothio alleges that the "ad hoc field testing" utilized by Defendants "was . . . improperly conducted and unscientific."  (*Id.* ¶ 10; *see also* ¶ 126–27 ("THC content of hemp plants varies dramatically over the course of the plant's lifecycle, initially spiking before decreasing until the plants are mature, dried, and ultimately harvested.  Defendants tested plants before they were mature and dried, virtually guaranteeing that the results would overstate the amount of THC in the hemp that Apothio was cultivating.").)  Considering these allegations, the Court must assume for purposes of a motion to dismiss that the crop, if measured at an appropriate stage in its lifecycle with appropriate equipment, would <u>not</u> have tested above 0.3% THC.  The Court must therefore assume that the crop was industrial hemp, <u>not marijuana,</u> at this stage of the case.

However, that does not end the inquiry.  County Defendants suggest that the plants were nonetheless contraband because, even if the entire crop was below the 0.3% THC content threshold and could be considered industrial hemp, Plaintiff could not lawfully grow industrial hemp under federal law at the time of the events at issue in this case.  (Doc. 24 at 13.)  The question then becomes: are industrial hemp plants (i.e., cannabis plants with THC content *below* 0.3%) contraband per se?  As mentioned, "[a]n object is contraband per se if its possession, without more, constitutes a crime; or in other words, there is *no legal purpose to which the object could be put*."  *Harrell*, 530 F.3d at 1057 (emphasis added); *see also United States v. Bolar*, 569

21

F.2d 1071, 1072 (9th Cir. 1978) (*per curiam*) (explaining that while diamond rings are not contraband per se, photographic negatives of Federal Reserve Notes are because "[t]here is no legal purpose to which those negatives could be put"). "Derivative contraband, on the other hand, is not inherently illegal, but becomes illegal through the manner or the intent with which it is used, possessed or acquired." *Conservation Force*, 677 F. Supp. 2d at 1207 (citing *Farrell*, 606 F.2d at 1344). In *Conservation Force*, for example, the district court examined whether leopard trophies were contraband per se or derivative contraband. *Id.* at 1206. Because leopards are an endangered species, it is unlawful for any person subject to the jurisdiction of the United States to import such specimens of that species into the United States without a permit. *Id.* at 1207. The trophies at issue were therefore "derivative contraband" because without the proper permits they could not be possessed. *Id.* In other words, "the manner in which plaintiffs brought their trophies into the United States transformed the trophies into contraband." *Id.* To reiterate, "[p]er se contraband is an object which can be put to no legal purpose-that is an object for which simple possession is always a crime." *Id.*; *see also In re Bus. of Custer Battlefield Museum & Store Located at Interstate 90 Exit 514 S. of Billings, Montana*, No. MJ-05-22-BLG-DLC, 2013 WL 12226887, at *9 (D. Mont. Oct. 24, 2013) (seized artifacts containing eagle feathers were derivative contraband, not contraband per se, because they could be lawfully possessed if they were lawfully acquired before passage of the Bald and Golden Eagles Protection Act in 1962).

The record does not support a finding that the "simple possession" of industrial hemp was "always a crime" under federal law in California at the time Plaintiff's crops were destroyed. This is because, at that time, it was permissible for certain entities to lawfully cultivate hemp in Kern County under federal law. Specifically, pursuant to the 2014 Farm Bill, "an institution of higher education . . . or a State department of agriculture" was permitted to grow hemp for research purposes in specified situations, so long as that activity was lawful under California law at the time, 7 U.S.C. § 5940(b, which it was, *see supra* Part II.A.2.[11] The contraband per se

---

[11] State Defendants' reply cites 81 Fed. Reg. 53,395 for the proposition that the 2014 Farm Bill permitted cultivation of industrial hemp "for purposes of agricultural or academic research under the auspices of a State agricultural pilot program," apparently in an attempt to suggest that an institute of higher education could <u>only</u> produce industrial hemp under the auspices of a State agricultural pilot program. (*See* Doc. 39 at 12.) It is undisputed that no such pilot program existed in California at the relevant time. Even still,

1    analysis is not focused on a party's conduct characteristics.  *See Serio v. Baltimore Cty.*, 115 F.

2    Supp. 2d 509, 516 (D. Md. 2000) ("Regulated firearms are not inherently illegal in Maryland, and

3    their possession, standing alone, is not a crime.  Possession becomes illegal only in certain

4    circumstances; for example, when the possessor is a convicted felon.  As such, [even possession

5    by a convicted felon] would not qualify as contraband per se by traditional standards.").  It is

6    therefore of no moment that Defendants contend that Plaintiff cannot qualify for coverage under

7    the 2014 Farm Bill as an institute of higher education.[12]  The existence of this permissible

8    pathway for some entities is dispositive of the contraband per se analysis presented here.[13]

9        For the same reason, the Court rejects Defendants' suggestion that the crop should be

10   considered contraband per se because there was no lawful way for Plaintiff to *commercialize*

11   hemp under federal law at the time the crop was destroyed.  (*See* Doc. 39 at 13.)  Plaintiff does

12   appear to admit that it intended to commercialize at least some parts of the planned harvest.

13   (Doc. 1 ¶ 91.)  Assuming, *arguendo*, that Defendants are correct that any commercialization of

14   the crop would have been unlawful under federal law, this still does not transform the crop

15   contraband per se.  *See McCormick*, 502 F.2d at 288; *see also Conkey*, 885 F. Supp. at 1398

16   ("The hydriodic acid owned by Mr. Conkey was not an article of per se contraband at the time it

17   _____

17   State Defendants' reply brief misquotes the Federal Register, which provides that the 2014 Farm Bill "was
18   limited to growth and cultivation by an institution of higher education or State department of agriculture
     for purposes of agricultural or other academic research <u>or</u> under the auspices of a State agricultural pilot
19   program for the growth, cultivation, or marketing of industrial hemp." 81 Fed. Reg. 53,395 (emphasis
     added). A plain reading of the 2014 Farm Bill indicates that an institute of higher education could grow
20   industrial hemp for research purposes wholly unconnected from a state agricultural pilot program.  No
     party suggests that an institute of higher education would have been absolutely prohibited under federal
21   law from growing industrial hemp for research purposes in California at the relevant time.

22   [12]  To make a long story short, Plaintiffs allege that they contracted with two institutes of higher education,
     (Doc. 1 ¶ 66), and argue that this contractual relationship entitled them to the protection of the 2014 Farm
23   Bill (Doc. 35 at 14).  Defendants hotly dispute the sufficiency of these allegations and of Plaintiff's related
     legal arguments.  (*See* Doc. 41 at 6; Doc. 39 at 11–12.)  The court need not resolve that dispute to
24   determine that Plaintiff's crop is not contraband per se; it is sufficient that <u>some</u> entity could claim
     coverage under that provision at the relevant time.  The existence of that possibility means that Plaintiff's
25   crop cannot be considered contraband per se, but instead may only have been derivative contraband.

26   [13] To the extent any Defendant has suggested the crop may be contraband per se because it was grown in
     contravention of state law, the same logic applies.  There is no dispute here that, at the time of the search
27   and seizure at issue in this case, there were legal pathways under California law for the growing of
     industrial hemp for research and commercial purposes. That Defendants dispute that Plaintiff *complied*
28   with state law does not obviate the existence of those pathways.  Plaintiff's crop therefore cannot be
     considered contraband per se based upon any purported violations of state law.

1   was destroyed.  Its contraband status was dependent on the purpose for which it was being or

2   intended to be used.  Therefore, Mr. Conkey was entitled to some due process before the

3   government could legitimately take and destroy it.").

4        Because some person/entity in California under some circumstance could lawfully grow

5   industrial hemp under federal law at the time of the events in this case, Plaintiff's crop was not

6   contraband per se.  Thus, on the present briefing, the Court finds that Plaintiff's has set forth

7   adequate allegations that Plaintiff was due at least some process before the hemp's destruction.

8   *See Conservation Force,* 677 F. Supp. 2d at 1210 ("While per se contraband may be summarily

9   forfeited without any due process protections, derivative contraband is susceptible to protectible

10  property rights and cannot be civilly forfeited without a modicum of due process protection.").

11       As a result, County Defendant's entire challenge to Plaintiff's due process claim–namely

12  that no process was due at all because the crops were contraband per se–fails.  The arguments

13  advanced in favor of dismissal of Plaintiff's due process claim require a contraband per se

14  finding.  The motion to dismiss the federal Due Process claim is therefore DENIED.  For the

15  same reason, the related motion to dismiss the sixth cause of action, the Bane Act claim premised

16  upon the federal due process violation, is also DENIED.

17       3.    Taking of Private Property in Violation of Fifth Amendment

18       Plaintiff's third cause of action brings claims against all Defendants for taking its property

19  without just compensation in violation of the Fifth Amendment.  (Doc. 1 ¶¶ 175–81.)  County

20  Defendants move to dismiss this cause of action, arguing that Plaintiff has no federally protected

21  interest in the property that was taken.  (Doc. 24 at 11–13.)

22       "Pursuant to the Takings Clause of the Fifth Amendment, 'private property [shall not] be

23  taken for public use, without just compensation.'"  *Schneider v. California Dep't of Corr.*, 151

24  F.3d 1194, 1198 (9th Cir. 1998) (quoting U.S. Const. amend. V).  The Takings Clause applies to

25  the states through the Due Process Clause of the Fourteenth Amendment.  *Id.*  "A Takings Clause

26  claim requires proof that the plaintiff possesses a property interest that is constitutionally

27  protected."  *Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1223 (9th Cir. 2018) (internal

28  quotation and citation omitted).  As is the case in the due process context, courts in this district

1    have found there is no Fifth Amendment right to just compensation for seized marijuana because

2    marijuana is contraband *per se*.  *Torres v. County of Calaveras*, No. 1:17-CV-1568 AWI-SKO,

3    2018 WL 1763245, at *2 (E.D. Cal. Apr. 12, 2018).  Given the Court's conclusion about the crop

4    not being contraband *per se*, and because County Defendants advance no other bases for

5    dismissal of the takings claim, the motion to dismiss is DENIED as to Plaintiff's third cause of

6    action.

7            4.      Unreasonable Search, Seizure and Destruction in Violation of the Fourth

8                    Amendment

9            The Fourth Amendment, which applies to the states through the Fourteenth Amendment,

10   provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects,

11   against unreasonable searches and seizures, shall not be violated," and that "no Warrants shall

12   issue, but upon probable cause."  U.S. Const. amend. IV.  Under the Fourth Amendment, a

13   seizure occurs if "there is some meaningful interference with an individual's possessory interests

14   in [his or her] property," even when privacy rights are not implicated.  *Soldal v. Cook Cnty.*, 506

15   U.S. 56, 61 (1992) (citation and quotation omitted).  "[A] seizure of personal property [is] per se

16   unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to

17   a judicial warrant issued upon probable cause . . ."  *United States v. Place*, 462 U.S. 696, 701,

18   (1983).  However, a warrantless seizure can still be valid "if the exigencies of the circumstances

19   demand it or some other recognized exception to the warrant requirement is present."  *Id*.

20           Plaintiff's first cause of action alleges that Defendants violated its Fourth Amendment

21   rights in five ways:

22                   (1) obtaining a search warrant through judicial deception by
                     misstating and/or omitting material information regarding
23                   [Plaintiff's] communications with the Defendants and [Plaintiff's]
                     status as an EARI; (2) entering the hemp fields without a valid
24                   warrant for the purpose of unlawfully harvesting Plaintiff's crops
                     for purposes of testing them; (3) unlawfully testing Plaintiff's
25                   crops; (4) executing the search and causing the wholesale
                     destruction of the 500 acres of hemp even though they knew or
26                   reasonably should have known there was no justification for those
                     actions; and (5) failing to return the warrant materials in a timely
27                   manner.

28

                                                     25

1   (Doc. 1 ¶ 166.)

2                    a.   Contraband Argument

3          The Court begins by addressing the County Defendants' bald assertion that Plaintiff

4   cannot maintain a Fourth Amendment claim (or a Bane Act claim premised upon the Fourth

5   Amendment) because the seizure and destruction of the hemp did not implicate any federally

6   recognized interest.  (Doc. 24 at 8.)  To the extent the County Defendants are suggesting that

7   there is no federally protected interest under the Fourth Amendment because the hemp was

8   contraband, a court in this district has rejected a similar argument.  *McFall v. Cty. of San Joaquin*,

9   No. 2:17-CV-0847-KJM-AC, 2018 WL 5619960, at *4 (E.D. Cal. Oct. 30, 2018) (rejecting the

10  premise that because marijuana is illegal under federal law, plaintiffs cannot possibly state a

11  constitutional claim based on lack of probable cause); *see also Allen v. Kumagai*, 356 F. App'x 8,

12  9 (9th Cir. 2009) ("Although [plaintiff] cannot use § 1983 to vindicate his purported state-law

13  right to use marijuana for medical purposes, the officers' knowledge of his medical authorization

14  may be relevant to whether they had probable cause to believe he had committed a crime.").

15                   b.   Judicial Deception Claim

16         To state a Fourth Amendment judicial deception claim, a plaintiff must show that the

17  investigator "made deliberately false statements or recklessly disregarded the truth in the

18  affidavit" and that the falsifications were "material" to the finding of probable cause.  *Galbraith*

19  *v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002).  A plaintiff must allege, and

20  ultimately establish, that "without the dishonestly included or omitted information, the magistrate

21  would not have issued the warrant.  Put another way, the plaintiff must establish that the

22  remaining information in the affidavit is insufficient to establish probable cause."  *Hervey v.*

23  *Estes*, 65 F.3d 784, 789 (9th Cir. 1995), *as amended on denial of reh'g* (Dec. 5, 1995) (emphasis

24  added).

25         As mentioned above, two relevant search warrant affidavits were disclosed after the close

26  of briefing on these motions:  (1) a search warrant and affidavit sworn to by DFW Agent

27  Lawrence Halverson and issued on October 17, 2019, authorizing entry onto a specified list of

28  fields for the purpose of taking samples of plant material (Doc. 66-2, Ex. N); and (2) a search

                                          26

1    warrant sworn to by Defendant Nicholson and issued on October 24, 2019, authorizing the

2    seizure of cannabis plants at certain locations and, among other things, the destruction of

3    "marijuana" in excess of certain amounts.  (*Id.*, Ex. O.)  As indicated, these affidavits are

4    judicially noticeable for their existence and content, although not for the truth of the matters

5    stated therein.  Considering the affidavits with that limitation in mind, they nonetheless materially

6    shift the foundation upon which any Fourth Amendment claim can be built in this case.  For

7    example, Plaintiff alleges on information and belief that various County Defendants:

8            intentionally or recklessly included material misstatements and/or
             omissions in the affidavit and/or statement of probable cause
9            submitted in support of the search warrant application, including by
             misstating and/or omitting material information about Apothio's
10           EARI status and Apothio's regular communication with county
             officials regarding its research and commercialization efforts, and
11           by including the results of ad hoc field testing that was not only
             improperly conducted and unscientific, but irrelevant given
12           Apothio's EARI status.

13   (Doc. 1 ¶ 10.)  This claim has several layers, some of which are rendered facially obsolete by the

14   content of the probable cause affidavits.  Those allegations that remain, are insufficient to make

15   out a judicial deception claim.

16           First, the probable cause affidavit submitted in support of the request for a warrant to seize

17   and, if necessary, destroy Apothio's crop discusses in detail Apothio's asserted EARI status.

18   (*Passim* Doc. 66-2 at 51–59.)  The affiant in fact assumes, at least for purposes of framing the

19   probable cause showing, that Apothio qualifies under California law as an EARI.  (*Id.* at 53 ("The

20   fields that are being cultivated by Apothio, are operating under the research exemption in the

21   [California] Food & Agricultural Code").)[14]  The affiant reasons that, while this status "allows for

22   cultivators to grow and possess hemp/cannabis that is over 0.3% THC content," it "does not allow

23   them to sell the hemp/cannabis that is over 0.3%."  (*Id.*)  The probable cause showing therefore

24   turns, instead, on the affiant's assertion that Plaintiff was "planning on selling" at least some

25   _____

26   [14]  In its opposition, filed before Plaintiff was able to view the content of the October 24, 2019 warrant
     affidavit, Plaintiff's argued that County Defendants' should be estopped from asserting that it was not an
27   EARI.  (*See* Doc. 34 at 19–21.)  At least in the context of the Fourth Amendment judicial deception claim,
     the Court finds it unnecessary to reach this issue because the warrant affidavit itself appears to accept that
28   Plaintiff is an EARI.  To the extent County Defendants have asserted otherwise in their briefs, the Court
     has not relied on those arguments here.

1  "hemp that is <u>over 0.3%</u>." (*Id.* (emphasis added).) Thus, despite Plaintiff's claim, the affidavit

2  does not misstate Apothio's claimed EARI status.

3        Plaintiff asserts that its existing allegations are "entirely consistent" with the warrant

4  affidavit because, among other things, the affidavit "misleadingly omits all of the testing and

5  research that Apothio conducted and shared with Defendants before the destruction" of the crop.

6  (Doc. 74 at 3–4 (citing Doc. 1 ¶¶ 79–82, 107).)  As discussed above, the complaint plausibly

7  alleges that Plaintiff's crops would not have been above the legal THC limit had they been tested

8  at the proper time using the proper methods, but this is not sufficient to make out a judicial

9  deception claim.  Even at this stage of the case, Plaintiff must allege facts that give rise to a

10  plausible inference that the affiant made "deliberately false statements or recklessly disregarded

11  the truth" with regard to information material to the probable cause determination.  *Galbraith*,

12  307 F.3d at 1126.  The complaint as currently framed fails to do so.

13        The complaint alleges that Plaintiff met with Kern County Sheriff's Deputies and other

14  County officials before planting any crops and that Apothio shared its own internal test results

15  and extraction plans with those officials.  (Doc. 1 at ¶¶ 79–80.)  But those allegations are

16  explicitly limited to communications that occurred *before* Plaintiff planted any crops, (*see id.* at

17  79), and could not have resulted in the sharing of test results for the actual crop in question.

18  Plaintiff alleges that it later conducted "contemporaneous testing" of the crop that was eventually

19  seized and destroyed and that this testing was "shared" with Kern County Agricultural

20  Commissioner Glenn Fankhauser.  (*Id.* at ¶ 82.)  There is no suggestion that any such

21  contemporaneous testing information made its way to anyone at the Kern County Sheriff's Office

22  let alone to Defendant Nicholson.  The complaint does not allege that Nicholson lied about the

23  results of the tests he <u>did</u> disclose in his probable cause affidavit; only that he did not disclose

24  potentially contradictory information.  Without any allegations suggesting that Nicholson had

25  knowledge of contradictory information, however, the complaint fails to plausibly allege that

26  Nicholson made "deliberately false statements or recklessly disregarded the truth" with regard to

27  the THC content of the plants.

28  ///

28

Similar logic applies to Plaintiff's allegations regarding the testing that *was* performed by Defendants and included in the probable cause affidavit. The complaint does generally allege that the testing utilized by Defendant was substandard and inappropriate. (Doc. 1 at ¶¶ 130–132.) Even assuming, *arguendo*, that these allegations are sufficient to infer that the affiants acted recklessly in relying on *those* test results, the Court is unable to determine on the present record that "the remaining information in the affidavit is insufficient to establish probable cause." *Hervey*, 65 F.3d at 789. The search warrant sworn to by Halverson and issued on October 17, 2019, relied at least in part on lab tests run by a third party, using samples the third party collected from the hemp crops in dispute in this case. (*See* Doc. 66-2 at 37, 44–45.) The subsequent seizure warrant sworn to by Nicholson and issued on October 24, 2019, incorporated that information by reference and indicated that law enforcement's own testing was done to "independently corroborate the level of THC content in the plants." (*Id.* at 53.)

With regard to the separate assertion in Defendant Nicholson's affidavit that Plaintiff was planning on selling the hemp that was in excess of the 0.3% limit, Apothio argues in its briefing that the probable cause affidavit "blatantly misrepresents" a communication between Apothio's CEO and a potential business partner to claim that Apothio "conspired" to import marijuana. (Doc. 74 at 3.) Apothio further asserts that the actual communication, which was omitted from the warrant affidavit, reveals "exactly the opposite." (*Id.*) The problem is that nothing in the complaint as presently pleaded mentions misrepresentations of this nature. For these reasons, the Court finds that the complaint as presently framed fails to state a claim for judicial deception.

### c.   Other Fourth Amendment Theories

As mentioned, Plaintiff alleges that Defendants entered Plaintiff's hemp fields "without a valid warrant" for the purpose of "unlawfully harvesting Plaintiff's crops for purposes of testing them." (Doc. 1 ¶ 166.) This claim turns at least in part on the validity of the October 17, 2019 warrant. Because the complaint does not presently state a claim that effectively undermines that warrant, the Court declines to address the numerous other theories Defendants advance in favor of dismissal of that claim.[15]

---

[15]   The Court notes that Defendants have invoked the open fields and plain view doctrines without

1    The same logic extends to Plaintiff's related assertion that Defendants violated the Fourth

2    Amendment by "executing the search and causing the wholesale destruction of the 500 acres of

3    hemp even though they knew or reasonably should have known there was no justification for

4    those actions." (*Id.*)  This claim is derivative of the judicial deception claim.  To the extent the

5    motions to dismiss articulate separate challenges to this claim, the Court declines to address those

6    arguments at this time.

7         Plaintiff alleges that Defendants "unlawfully test[ed] Plaintiff's crops. (*Id.*)  It is unclear

8    what Plaintiff means by this.  If Plaintiff is asserting that the testing protocols violate state law,

9    the Court is not aware of any authority, and Plaintiff fails to cite any, which indicates such a

10   violation can support a § 1983 claims based upon the Fourth Amendment.

11        Finally, Plaintiff alleges that Defendants failed to return the warrant materials in a timely

12   manner.  This claim is explicitly premised on state law.  (Doc. 1 at ¶ 147 (citing Cal. Penal. Code

13   § 1534).)  Again, the Court is unaware of any authority that suggests such a violation translates

14   into a federal constitutional claim.

15        For these reasons, the County's motion to dismiss Plaintiff's Fourth Amendment Claim is

16   GRANTED.  This ruling also extends to the Bane Act Claim premised upon the Fourth

17   Amendment violation.  However, because it is possible that Plaintiff can cure the identified

18   deficiencies, the Court will grant Plaintiff leave to amend this claim.

19        5.   *Monell* Liability

20        The County moves separately to dismiss any claims premised upon *Monell* liability.

21   (Doc. 24 at 17–18.)  It is well-established that "a municipality cannot be held liable solely

22   because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under

23   § 1983 on a respondeat superior theory." *See Monell*, 436 U.S. at 692; *see also Bd. of Cnty.*

24   *Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  To state a *Monell* claim, Plaintiff must allege facts

25   demonstrating "that an 'official policy, custom, or pattern' on the part of [defendant] was 'the

26   actionable cause of the claimed injury.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th

27   Cir. 2012) (quoting *Harper v. City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008)).

28

_____

thoroughly considering how those doctrines apply to the facts and allegations in this case.

1    County Defendants point out that all of Plaintiff's § 1983 causes of action contain an

2    identical recitation of the elements of a *Monell* cause of action:

3        On information and belief, Kern County, the Kern County Sheriff's
         Office, and the California Department of Fish and Wildlife (1)
4        intentionally authorized or directed the individual Defendants to
         undertake the actions that violated Plaintiff's rights; (2) ratified the
5        actions the individual Defendant's took to violate [Plaintiff's]
         rights; (3) failed to adequately train the individual Defendants; and
6        (4) maintained an official policy and/or custom of deliberate
         indifference to violations of constitutional rights by [Kern County
7        Sheriff's Deputies].

8    (Doc. 1 ¶¶ 167, 173, 181, 187, 199.)  In its briefing, Plaintiff advances its *Monell* claims on two

9    theories.  First, Plaintiff asserts that Kern County Sheriff's Office and Kern County had a

10   deliberately indifferent and deficient training program that resulted in constitutional violations

11   specifically related to defendants' testing of crops.  (*See* Doc. 34 at 29.)  Second, Plaintiff argues

12   that Defendant Youngblood ratified the constitutional violations of a subordinate when approving

13   the destruction of Plaintiff's crops pursuant to California Health and Safety Code § 11479.  (*Id.* at

14   30.)

15                    a.   Failure to Train

16       A public entity may be held liable for a "longstanding practice or custom."  *Thomas v.*

17   *Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014).  Such circumstances may arise when, for

18   instance, the public entity "fail[s] to implement procedural safeguards to prevent constitutional

19   violations" or when it fails to adequately train its employees.  *Tsao*, 698 F.3d at 1143 (citing

20   *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992)); *see Connick v. Thompson*, 563 U.S. 51,

21   61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a

22   claim turns on a failure to train."); *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014)

23   (requiring a plaintiff asserting a claim based on a failure to train to allege facts showing that

24   defendants "disregarded the known or obvious consequence that a particular omission in their

25   training program would cause municipal employees to violate citizens' constitutional rights")

26   (quoting *Connick*, 563 U.S. at 61).

27       Plaintiff argues it alleges that Kern County and the Kern County Sheriff's Office failed to

28   train its deputies on proper usage of laboratory equipment used to test THC concentrations.  (Doc.

                                                     31

34 at 24–25.)  It argues that Kern County and the Kern County Sheriff's Office did not train their

employees to use the laboratory-grade equipment that California law requires for hemp-crop

testing.  (*Id.* (citing Cal. Food & Agric. Code § 81006).)  Plaintiff argues that the actual tests used

were neither laboratory grade nor conducted properly.  (*Id.* (citing Doc. 1 ¶¶ 130–35).)  The

showing required for a deliberate-indifference claim is high:

> "Deliberate indifference" is a stringent standard of fault, requiring
> proof that a municipal actor disregarded a known or obvious
> consequence of his action.  Thus, when city policymakers are on
> actual or constructive notice that a particular omission in their
> training program causes city employees to violate citizens'
> constitutional rights, the city may be deemed deliberately
> indifferent if the policymakers choose to retain that program.  The
> city's policy of inaction in light of notice that its program will cause
> constitutional violations is the functional equivalent of a decision
> by the city itself to violate the Constitution.  A less stringent
> standard of fault for a failure-to-train claim would result in *de facto
> respondeat superior* liability on municipalities.
>
> A pattern of similar constitutional violations by untrained
> employees is ordinarily necessary to demonstrate deliberate
> indifference for purposes of failure to train.  Policymakers'
> "continued adherence to an approach that they know or should
> know has failed to prevent tortious conduct by employees may
> establish the conscious disregard for the consequences of their
> action—the "deliberate indifference"—necessary to trigger
> municipal liability.  Without notice that a course of training is
> deficient in a particular respect, decisionmakers can hardly be said
> to have deliberately chosen a training program that will cause
> violations of constitutional rights.

*Connick*, 563 U.S. at 61–62 (internal quotations and citations omitted).

As County Defendants argue (Doc. 41 at 7–8), Plaintiff makes no specific allegations

about the obviousness of the need to train.  Plaintiff does not allege a pattern of similar

constitutional violations by untrained employees with respect to testing THC content in hemp or

their continued adherence to an approach that fails to prevent tortious conduct.  Plaintiff alleges

that the Kern County Sheriff's Office has a broad history of violating constitutional rights, but

those allegations do not relate to testing hemp or marijuana for THC content.  (Doc. 1 ¶¶ 155–61.)

Accordingly, Plaintiff has not sufficiently alleged that County Defendants had notice of any

deficiencies in their training.

Plaintiff's citation to *Harte v. Board of Commissioners of County of Johnson*, 864 F.3d

1154, 1167 (10th Cir. 2017) (separate opinion of Judge Lucero), is unpersuasive.  In *Harte*,

1   officers obtained a search warrant after claiming their field tests showed the presence of

2   marijuana in a substance that turned out to be tea leaves.  864 F.3d at 1198.  The resulting opinion

3   from the Tenth Circuit was highly fractioned.  The court's *per curiam* opinion[16] was one

4   paragraph long and did not address *Monell* liability.  Each of the three judges on the panel wrote

5   separate opinions.  Judge Lucero would have permitted the plaintiffs' claim against the sheriff to

6   go forward with respect to the sheriff's "decision to authorize the use of inconclusive field tests

7   with a high false positive rate, and without the laboratory confirmation expressly required by the

8   manufacturer's label, as the sole basis for probable cause."  *Harte*, 864 F.3d at 1167.  This,

9   according to Judge Lucero, was a "policy" sufficient to trigger *Monell* Liability.  *Id.*  The other

10   two judges disagreed.  *See id.* at 1178 (Judge Phillips, concluding that for purposes of qualified

11   immunity officers reasonably relied on field tests), 1194–95 (Judge Phillips, concluding sheriff

12   not responsible for any violations of constitutional rights), 1202–03 (Judge Moritz, determining

13   defendants protected by qualified immunity as to the inaccuracy of the tests).

14         Even assuming Judge Lucero's logic had been a part of a majority opinion, *Harte* does not

15   obviously fit within any established line of failure to train jurisprudence.  For one thing, Judge

16   Lucero did not describe the circumstances as a "failure to train."  Rather, as mentioned, he

17   indicated that the sheriff had arguably promulgated a "policy" through his "decision to authorize

18   the use of inconclusive field tests with a high false positive rate, and without the laboratory

19   confirmation expressly required by the manufacturer's label, as the sole basis for probable cause."

20   *Id.* at 1167.  There is no mention of any failure to train or of *Connick*'s requirement that failure to

21   train claims normally must be supported by pattern and practice evidence.

22         Plaintiff's other citations are equally unpersuasive.  Plaintiff cites *Finkelstein v. San*

23   *Mateo Cty. Dist. Attorney's Off.*, No. 18-CV-00009-EMC, 2019 WL 1048244, at *16 (N.D. Cal.

24   Mar. 5, 2019), *aff'd in part, rev'd in part sub nom. Finkelstein v. Jangla*, 816 F. App'x 98 (9th

25   Cir. 2020), for the proposition that "courts have upheld failure to train theories based on officials'

26   ──────────────
    [16]  Within the Tenth Circuit, only the one-paragraph *per curiam* opinion is binding precedent.  *Harte v. Bd.*
27   *of Comm'rs of Cnty. of Johnson*, 940 F.3d 498, 510 (10th Cir. 2019) (in opinion following remand, "We
    recognize that the district court faced the unenviable task of analyzing three separate opinions on remand.
28   Although none of these individual opinions carries binding precedential effect, our per curiam 'mandate'
    had the concurrence of two judges and is therefore the law of the case.").

1   failure to train officers on specific technologies relevant to an investigation." (Doc. 34 at 29.)

2   *Finkelstein* does not so hold.  There, the court merely rejected a timeliness objection to a new

3   variation on such a theory being advanced during summary judgment briefing.  2019 WL

4   1048244 at *16.  The court did not rule on the validity of that theory or discuss whether the

5   theory was properly supported by the evidence.  *Id.*  Instead, further discovery on the issue was

6   permitted and defendants were invited to renew their summary judgment motion thereafter.  *Id.*

7        Plaintiff has not properly alleged facts to support a failure to train theory under the

8   relevant caselaw.  County Defendants' motion to dismiss wis granted as to any such *Monell*

9   claim.

10            b.   Ratification

11        Liability for ratification of unconstitutional conduct arises "when 'the individual who

12   committed the constitutional tort was an official with final policy-making authority' or such an

13   official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'"

14   *Clouthier v. Cnty. of Santa Clara*, 591 F.3d 1232, 1250 (9th Cir. 2010) (quoting *Gillette v.

15   Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)), *overruled on other grounds by Castro v.

16   Cnty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).  "Stated differently, a final

17   policymaker must make a deliberate choice to endorse the subordinate's actions in order for the

18   municipality to be liable."  *Gonzalez v. Cnty. of Merced*, 289 F. Supp. 3d 1094, 1115 (E.D. Cal.

19   2017) (citing *Sheehan v. City and Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014),

20   *rev'd in part on other grounds*, 575 U.S. 600 (2015)).  "The policymaker must have knowledge of

21   the constitutional violation and actually approve of it," and a "mere failure to overrule a

22   subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382

23   F.3d 978, 987 (9th Cir. 2004).

24        County Defendants argue that Plaintiff failed to make specific allegations about

25   ratification but instead included broad language mirroring the elements of a cause of action.

26   (Docs. 24 at 17–18; 41 at 7–8.)  Plaintiff responds that it has sufficiently alleged ratification by

27   Youngblood, the Sheriff, because the warrant cites California Health and Safety Code § 11479,

28   which, according to Plaintiff, permits "the chief of a law enforcement agency" to destroy

34

1    cannabis without a court order.  (Doc. 34 at 30.)  Plaintiff is selectively quoting the statutory

2    language, which provides in full that destruction may be authorized "by the chief of the law

3    enforcement agency *or a designated subordinate*."  Cal. Health & Safety Code § 11479

4    (emphasis added).

5          Plaintiff's allegations about Youngblood are not specific enough to show that he ratified

6    any unconstitutional conduct.  The complaint does not allege, either directly or plausibly by

7    inference, that Youngblood himself ordered the hemp's destruction under § 11479.  Nor does

8    Plaintiff allege any other facts that plausibly suggest Youngblood otherwise ratified any

9    unconstitutional conduct.  The Court will therefore grant County Defendants' motion to dismiss

10   as to *Monell* liability.  However, because it is possible that Plaintiff can cure these deficiencies

11   through amendment, this dismissal will be with leave to amend.

12         6.    California's Bane Act

13         County Defendants argue the claims arising under the California Bane Act, Cal. Civ. Code

14   § 52.1, should be dismissed.  The Bane Act "creates a cause of action against a person if that

15   person 'interferes by threat, intimidation, or coercion ... with the exercise or enjoyment by any

16   individual or individuals of rights secured by the Constitution or laws of the United States.'"

17   *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 519 (9th Cir. 2018) (quoting Cal. Civ. Code § 52.1).

18         The Bane Act claims in this case are premised upon alleged "unreasonable search and

19   seizure/destruction" of Plaintiff's crops in violation of the Fourth Amendment (Doc. 1 ¶¶ 182–87

20   (fourth cause of action)); parallel allegations of "unreasonable search and seizure" in violation of

21   Article I, Section 13 of the California Constitution (*id*. ¶¶ 188–93 (fifth cause of action)); alleged

22   violations of Plaintiff's right to due process under the U.S. Constitution (*id*. ¶¶ 194–99 (sixth

23   cause of action)); and alleged violations of Plaintiff's related due process rights under Article I,

24   Section 17 of the California Constitution (*id*. ¶¶ 200–205 (seventh cause of action)).[17]  County

25   Defendants argue that the complaint fails to state any Bane Act claims because it fails to allege

26

27   [17]  Although the Court has found that the fourth and sixth causes of action must be dismissed because
     Plaintiff has failed to state a claim for judicial deception, the Court addresses the entirety of this state law
28   challenge to the Bane Act claims because the argument applies to claims that have not otherwise been
     dismissed.

1   any use of force, intimidation, or threats by any Defendant.  (Doc. 24 at 16–17.)  Plaintiff

2   contends that a showing of a specific intent to violate its constitutional rights satisfies the threat,

3   intimidation, or coercion element of a Bane Act claim.  (Doc. 34 at 30–31.)  In reply, County

4   Defendants argue that Plaintiff's citations are distinguishable.  (Doc. 41 at 8–10.)

5           Plaintiff points to several cases, including *Sandoval*, 912 F.3d at 519, which hold that the

6   "threat, intimidation, or coercion" requirement is satisfied when the defendant had a specific

7   intent to violate the plaintiff's constitutional rights.  In *Sandoval*, local authorities impounded two

8   vehicles under a state law permitting such impounds if the owners had never been issued a

9   driver's license.  *Id.* at 513.  The plaintiffs brought a § 1983 claim alleging that their Fourth

10  Amendment right against unreasonable search and seizure was violated.  *Id*. at 515.  Plaintiffs

11  also alleged a Bane Act claims on the same Fourth Amendment violations.  *Id.* at 519.  The

12  defendants argued at summary judgment that the Bane Act claim failed because the plaintiffs had

13  failed to show any threat, intimidation or coercion separate from the act of impounding the

14  vehicles.  *Id.* at 519.  The Ninth Circuit disagreed:

15              [A]fter the briefs were filed in this case, we decided *Reese v.*
16              *County of Sacramento*, which substantially clarified the legal
                standard to be applied in a Bane Act claim.  In that case, the district
17              court granted summary judgment to police defendants after they
                shot the plaintiff in his home.  888 F.3d at 1035–36.  The district
18              court, like the district court here, did so by applying the rule that
                there must be a showing of coercion independent from the coercion
19              inherent in the Fourth Amendment violation itself.  *Id.* at 1042.  We
                reversed, concluding that *Lyall*'s independent coercion rule only
20              applies when the plaintiff shows that the defendant negligently
                violated the plaintiff's constitutional rights, and that the coercion
21              inherent in a Fourth Amendment violation could support a Bane
                Act claim if the coercion occurred with "specific intent to violate
22              the arrestee's right to freedom from unreasonable seizure." *Id.* at
                1043, 1044 n.5 (quoting *Cornell*, 17 Cal. App. 5th at 801).

23              *Reese* requires us to hold that the district court erred to the extent it
24              concluded that the plaintiffs were required to show "transactionally
                independent" threats, intimidation, or coercion separate from the
25              Fourth Amendment violation.  *See id.* at 1043 . . .

                The specific intent inquiry for a Bane Act claim is focused on two
26              questions:  First, "is the right at issue clearly delineated and plainly
                applicable under the circumstances of the case," and second, "did
27              the defendant commit the act in question with the particular purpose
                of depriving the citizen victim of his enjoyment of the interests
28              protected by that right?"  *Cornell*, 17 Cal. App. 5th at 803.  So long

1
2
3

> as those two requirements are met, specific intent can be shown "even if the defendant did not in fact recognize the unlawfulness of his act" but instead acted in "reckless disregard" of the constitutional right. *Id.*

4  *Id.* at 519–20.

5      In their reply, County Defendants attempt to distinguish Plaintiff's cited cases about the

6  Bane Act as concerning excessive force or arrests. (Doc. 41 at 8–10.) Though the Court

7  appreciates the facial appeal of the County Defendants' argument, *Sandoval* specifically

8  addresses a seizure of property without an arrest or use of force. There, after articulating the

9  relevant standard as quoted above, the Ninth Circuit applied that standard to a Bane Act claim

10  premised upon the temporary impound of two vehicles under California state law by local

11  law enforcement. 912 F.3d at 513. The Ninth Circuit first acknowledged that "[a]t a broad level

12  of generality, it is of course indisputable that the right to be free from warrantless seizures of

13  personal property is well-established and clearly delineated." *Id.* at 520. Nonetheless, a court

14  "must look to whether there is anything vague or novel about the application of the right under

15  the circumstances of this case." *Id.* (internal quotation and citation omitted). The Ninth Circuit

16  held that as of the date of the impounds in question (2011), "it was legally unclear whether

17  the 30-day impounds were 'seizures' at all within the meaning of the Fourth Amendment." *Id.*

18  As a result, the defendants "could not have had the requisite specific intent to violate the

19  plaintiffs' Fourth Amendment rights." *Id.*

20      In contrast, the County does not suggest that it is legally unclear whether the confiscation

21  and destruction of non-contraband plants is a "seizure" or that there is anything vague or novel

22  about the seizure theory advanced in this case.[18] *See United States v. Ramirez*, 523 U.S. 62, 71

23  (1998). County Defendants do not otherwise argue that Plaintiff failed to allege a specific

24  intent.[19] Therefore, County Defendants' motion to dismiss the Bane Act claims is denied.

25
26
27

[18] County Defendants also argue that *Sandoval* is distinguishable because the Ninth Circuit was reviewing a grant of summary judgment in that case, (Doc. 41 at 9), but County Defendants fail to explain why that procedural distinction is material. *Sandoval* stands for the proposition that the specific intent test applies to property seizure cases.

28

[19] County Defendants do not, for example, separately address whether *Sandoval* extends to due process claims, although there is some authority to suggest that it does. *Armstead v. Cty. of Alameda*, No. 21-CV-

1  **D.    County Defendants' Motions to Strike Pursuant to Federal Rule of Civil Procedure**

2  **12(f)**

3       Under Federal Rule of Civil Procedure 12(g)(2), "[e]xcept as provided in Rule 12(h)(2) or

4  (3), a party that makes a motion under this rule must not make another motion under this rule

5  raising a defense or objection that was available to the party but omitted from its earlier motion."

6  The underlying rationale for this rule is to prevent piecemeal defenses:

7           Simply stated, the objective of the consolidation rule is to eliminate
           unnecessary delay at the pleading stage. Subdivision (g)
8           contemplates the presentation of an omnibus pre-answer motion in
           which the defendant advances every available Rule 12 defense and
9           objection he may have that is assertable by motion. The defendant
           cannot delay the filing of a responsive pleading by interposing these
10          defenses and objections in piecemeal fashion, but must present
           them simultaneously.  Any defense that is available at the time of
11          the original motion, but is not included, may not be the basis of a
           second pre-answer motion.
12

13  *Puccio v. Love*, No. 16-CV-2890 W (BGS), 2018 WL 3105494, at *3 (S.D. Cal. June 25, 2018)

14  (quoting 5C, Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1384 (3d ed. 2018)); *see*

15  *also Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Rsrv.*, 329 F.R.D. 247,

16  254–55 (S.D. Cal. 2018) (denying motion to dismiss under Rule 12(b)(6) when defenses could

17  have been presented simultaneously with motion to strike under Rule 12(f)); *1 Moore's Manual--*

18  *Federal Practice and Procedure* § 11.10[1] (2021) ("This consolidation requirement applies not

19  only to Rule 12(b) defenses, but also to a motion for a more definite statement under Rule 12(e)

20  and to a motion to strike under Rule 12(f).").

21       County Defendants have filed multiple motions under Rule 12.  Their first noticed motion

22  was for the motion to dismiss and for a more definite statement under Rules 12(b)(6) and (e).

23  (Doc. 18.)  They subsequently filed an amended version of that motion (Doc. 24), which the

24  Court has reviewed in this order.  (*See also* Doc. 25 (in stipulation for extension of time, referring

25  to docket entry 24 instead of docket entry 19)).  Their second noticed motion under Rule 12 was a

26  motion to strike pursuant to Rule 12(f).  (Doc. 19.)  Because the issues in the motion to strike

27  ───────────────────────────────

28  05257-LB, 2022 WL 888660, at *8 (N.D. Cal. Mar. 26, 2022) (applying *Sandoval* framework to claim
    premised upon violation of due process rights under the state-created danger doctrine). The Court will not
    manufacture such an argument for County Defendants.

1  could have been raised in the motion to dismiss and for a more definite statement, the motion to

2  strike is denied.  *See* Fed. R. Civ. P. 12(g)(2).[20]

3  **V.     CONCLUSION AND ORDER**

4  Based upon the foregoing, the Court **ORDERS**:

5  1.  County Defendants' motion to strike (Doc. 19) is **DENIED**.

6  **2.**  State Defendants' motion to dismiss (Doc. 21) is **GRANTED**.

7  3.  County Defendants' motion to dismiss (Doc. 24) is **GRANTED IN PART** and

8  **DENIED IN PART**, as set forth above.

9  4.  Plaintiff is granted leave to amend consistent with the instructions set forth in this

10  order.  Any amended complaint is due 30 days from the date of this order.

11

12  IT IS SO ORDERED.

13  Dated:   __April 22, 2022__

UNITED STATES DISTRICT JUDGE

---

[20]  Although County Defendants' motion to strike was filed before their amended motion to dismiss, the Court will deny the motion to strike under Rule 12(g)(2) because the original motion to dismiss was filed first.  *Cf.* 5C Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1389 (3d ed.) ("some courts have held that a preliminary motion may be amended to include a defense or objection inadvertently omitted by the movant, thereby avoiding the waiver consequences that would otherwise apply.").