1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| APOTHIO, LLC, | Case No. 1:20-cv-00522-JLT-CDB |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART STATE DEFENDANTS' MOTION TO DISMISS; GRANTING IN PART AND DENYING IN PART COUNTY DEFENDANTS' MOTION TO DISMISS; GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE SUR-REPLY; DENYING PLAINTIFF FURTHER LEAVE TO AMEND THE COMPLAINT; and DENYING AS MOOT PLAINTIFF'S MOTION FOR RECONSIDERATION OF DISCOVERY STAY |
| v. | |
| KERN COUNTY, KERN COUNTY SHERIFF'S OFFICE, CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE, DONNY YOUNGBLOOD, JOSHUA NICHOLSON, CHARLTON H. BONHAM, ANDREW HALVERSON, *et al.*, | |
| Defendants. | |
| | (Docs. 94, 95, 115, 128) |

20       This case arises out of the destruction of approximately 500 acres of Apothio, LLC's

21 industrial hemp plants cultivated in Kern County.  This is the second round of motions to dismiss

22 filed by the Defendants.  For the reasons set forth below, the motions to dismiss, (Docs. 94, 95),

23 are **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's Motion for Leave to File a

24 Sur-Reply, (Doc. 115), is **GRANTED**.  The Court **DENIES** Plaintiff further leave to amend its

25 Complaint.  Accordingly, Plaintiff's Motion for Reconsideration of Discovery Stay, (Doc. 128), is

26 **DENIED AS MOOT**.

27              I.       **LEGAL FRAMEWORK: HEMP LAW**

28       The parties' briefing illustrates their continued disputes regarding the applicability of

1

1   federal and state cannabis law, as it existed at the time Apothio's crops were destroyed in October

2   2019.  (*See, e.g.*, Doc. 94 at 9, 10–11 ("Apothio conflates California and federal [cannabis]

3   law."); Doc. 95 at 14, 16; Opp'n, Doc. 103 at 16.)  For this reason, the Court will once more

4   recite the legal framework of state and federal cannabis law below.  (*See also* First Order, Doc. 86

5   at 2–6, *also located at Apothio, LLC v. Kern Cnty.*, 599 F. Supp. 3d 983, 991–995 (E.D. Cal.

6   2022).)

7           A.      Federal Cannabis Law

8           "In 1970, Congress passed the Controlled Substances Act ('CSA'), which, among other

9   things, made it unlawful to 'manufacture, distribute, or dispense' controlled substances,"

10  including categorizing marijuana as a "Schedule I" drug, and making its possession, manufacture,

11  and use a criminal offense.  *Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 923 (9th Cir.

12  2024) (citing 21 U.S.C. § 841(a)); *see also* 21 U.S.C. §§ 812 sched. I(c)(10) (listing "marihuana"

13  as a Schedule I drug), (17) (listing "Tetrahydrocannabinols" [hereinafter, "THC"] as a Schedule I

14  drug).

15          On February 7, 2014, the Agricultural Act of 2014, Pub. L. No. 113-79 ("2014 Farm

16  Bill"), *codified at* 7 U.S.C. § 5940 (2014) was enacted.  The 2014 Farm Bill allowed "an

17  institution of higher education . . . or a State department of agriculture [to] grow or cultivate

18  industrial hemp if" it is grown or cultivated under a pilot program, or for agricultural or academic

19  research.[1]  7 U.S.C. §§ 5940 (a)(1)–(2).  Then, in December 2018, the revised Farm Act, Pub. L.

20  No. 115-334, 132 Stat. 4490 ("2018 Farm Bill") was enacted, which repealed and replaced 7

21  U.S.C. § 5940, and legalized the possession and cultivation of hemp.  *See* 21 U.S.C.

22  §§ 802(16)(B), 812 sched. I(c)(17); *see also Zini v. City of Jerseyville*, No. 3:23-cv-02120-GSC,

23  2024 WL 1367806, at *4 (S.D. Ill. Mar. 30, 2024) ("In 2018, the Agriculture Improvements Act

24  of 2018 ('2018 Farm Act') repealed and replaced the 2014 Farm Act, legalizing the possession

25  and cultivation of hemp.") (internal quotation marks and citations omitted).  After passage of the

26

---

27  [1] The 2014 Farm Bill defined "industrial hemp" as "the plant Cannabis sativa L. and any part of such plant, whether
    growing or not, with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis."  7 U.S.C.

28  § 5940(2) (2014).  Delta-9 THC is the "main psychoactive component of marijuana."  *AK Futures LLC v. Boyd St.
    Distro, LLC*, 35 F.4th 682, 686 (9th Cir. 2022).

2018 Farm Bill, the term "marijuana" now explicitly excludes hemp, 21 U.S.C. § 802(16)(B)(i), which has an expanded definition, including: "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids . . . whether growing or not, with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639*o*(1).  Similarly, the 2018 Farm Bill explicitly removed hemp from Schedule I of the CSA.[2]  *See* 21 U.S.C. § 812 sched.I(c)(17) ("[THC], except for [THC] in hemp (as defined in section 1639*o* of Title 7)."); *cf. Brown v. United States*, 144 S. Ct. 1195, 1201 (2024) (same).

Essentially, "[a] straightforward reading of § 1639*o* yields a definition of hemp applicable to all products that are sourced from the cannabis plant, contain no more than 0.3 percent delta-9 THC, and can be called a derivative, extract, cannabinoid, or one of the other enumerated terms." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 691 (9th Cir. 2022).  The 2018 Farm Bill provides a "Rule of Construction," indicating that "[n]othing in this title or an amendment made by this title prohibits the interstate commerce of hemp . . . or hemp products." Pub. L. No. 115-334, § 10114(a) (capitalizations omitted); *e.g.*, *Big Sky Sci. LLC v. Idaho State Police*, No. 1:19-cv-00040-REB, 2019 WL 438336, at *2 (D. Idaho Feb. 2, 2019).

B.     California Cannabis Law

California enacted the 2013 California Industrial Hemp Farming Act ("Hemp Act"). California Industrial Hemp Farming Act, Cal. Legis. Counsel's Digest, 2013 Cal. Legis. Serv. Ch. 398, § 2(b) (S.B. 566) (Cal. Sept. 27, 2013).  The Hemp Act amended Section 11018, and added Section 11018.5, to the California Health and Safety Code, explicitly excluding "[i]ndustrial hemp" from the definition of "Cannabis."  *See* Cal. Health & Safety Code § 11018(a).  Since then, "industrial hemp" is presently defined as "an agricultural product, whether growing or not, that is limited to types of the plant Cannabis sativa L. and any part of that plant . . . with a delta-9 [THC] concentration of no more than 0.3 percent on a dry weight basis." *Id.* § 11018.5(a).  In this way, California and federal law "define 'industrial hemp' in a consistent

---

[2] The Ninth Circuit had previously held that the CSA excluded hemp.  *See Hemp Indus. Ass'n v. Drug Enf't Admin.*, 357 F.3d 1012, 1018 (9th Cir. 2004) ("But [the DEA] cannot regulate *naturally-occurring* THC *not* contained within or derived from marijuana—i.e., non-psychoactive hemp products—because non-psychoactive hemp is not included in Schedule I.") (emphases in original).

manner." *Free Spirit Organics, NAC v. San Joaquin Cnty. Bd. of Supervisors*, No. 2:17-CV-02271-KHM-JDP, 2022 WL 902834, at *1 (E.D. Cal. Mar. 25, 2022).  The Hemp Act permits the private cultivation of hemp as "regulated by the Department of Food and Agriculture."  *Id.*; Cal. Health & Safety Code § 11018.5(b).  As such, the Hemp Act added Division 24 ("Industrial Hemp") to California's Food and Agricultural Code.[3]  Cal. Food & Agric. Code §§ 81000 *et seq.*  Specifically, the Hemp Act allows Established Agricultural Research Institutions ("EARIs") and registered hemp breeders to cultivate industrial hemp.  *See id.* at §§ 81004, 81004.5.  At the time of the events of this case, an EARI was defined as "any institution that is either: (1) A public or private institution or organization that maintains land or facilities for agricultural research, including colleges, universities, agricultural research centers, and conservation research centers; or (2) An institution of higher education" that grows and cultivates hemp for research purposes under an agricultural pilot program.  *See* Cal. Food & Agric. Code §§ 81000(c)(1)–(2) (2019).

In November 2016, California voters enacted Proposition 64, also known as the Control, Regulate and Tax Adult Use of Marijuana Act ("AUMA"), "which was intended 'to establish a comprehensive system to legalize, control and regulate the cultivation, processing. . . and sale of nonmedical marijuana, including marijuana products, for use by adults 21 years and older, and to tax the commercial growth and retail sale of marijuana."  *People v. Raybon*, 11 Cal. 5th 1056, 1063 (2021) (citation omitted); *Lucas v. City of Pomona*, 92 Cal. App. 5th 508, 517 (2023).  Thus, EARIs were allowed "to cultivate or possess industrial hemp with a laboratory test report that indicates a percentage content of THC that is greater than three-tenths of 1 percent if that cultivation or possession contributes to the development of types of industrial hemp that will comply with the three-tenths of 1 percent THC limit established" elsewhere in the Code.  Cal. Food & Agric. Code § 81006(f)(9) (2017); *see also Gold Country Dev., LLC v. Cnty. of El Dorado*, No. 2:20-cv-01712-MCE-CKD, 2021 WL 4443180, at *1 (E.D. Cal. Sept. 28, 2021) ("EARIs are expressly permitted to cultivate and produce hemp plants with a THC content greater than 0.3% if such cultivation contributes to the development of types of industrial hemp that will

---

[3] The Food and Agricultural Code defines "Industrial hemp" or "hemp" in the same way as the Health and Safety Code. *See* Cal. Food & Agric. Code § 81000(a)(7); *see also id.* § 81000(d) (2019) ("'Industrial hemp' has the same meaning as that term is defined in Section 11018.5 of the Health and Safety Code.").

4

comply with the 0.3 percent THC limit.") (internal quotation marks and citation omitted).  EARIs are exempt from the requirement to "obtain a laboratory test report indicating the THC levels of a random sampling of the dried flowering tops" of the hemp, within 30 days before harvest.  Cal. Food & Agric. Code § 81006(f) (2017);[4] *Gold Country*, 2021 WL 4443180, at *1 (citation omitted).  However, though EARIs may cultivate or possess hemp above this 0.3% THC threshold, they are still subject to the Health and Safety Code's prohibition of the sale of marijuana.  *See* Cal. Health & Safety Code §§ 11360 (2017) ("Except as otherwise provided by this section or as authorized by law, every person who transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into the state, sell, furnish, administer, or give away, or attempts to import into this state or transport any cannabis shall be punished as follows . . .").[5]  With this legal framework in mind, the Court turns to the facts of the present case.

## II.    FACTUAL BACKGROUND

### A.  Hemp Background

"Hemp is a hardy plant" that grows well in dry, arid climates like Kern County.  (FAC, Doc. 88 at ¶¶ 58–59, 92.)  The amount of THC found in a mature hemp plant is determined based on both the growing conditions and plant genetics, and such levels are higher in younger, undried hemp plants, as compared to mature, dried plants.  (*Id.* at ¶ 60; *e.g.*, *id.* at ¶¶ 80–81.)  Male hemp plants have "little to no CBD/THC content," and when grown together with female plants, they destroy the value of the crop "because male plants are killed in commercial marijuana fields as seed formation reduces flower quality."  (*Id.* at ¶¶ 145e, 195.)

### B.    Apothio's Operations in Kern County

Apothio is a limited liability corporation focused on "researching and commercializing hemp plants for use in food, nutraceuticals, and (eventually) pharmaceuticals," particularly focused on the treatment of Dravet Syndrome, and other life-threatening types of epilepsy.  (FAC,

---

[4] Identical language is found in § 81006(d)(1) of the 2019 version of the Code, and similar language is found in § 81006(e)(1) of the Code currently.

[5] As a limited liability corporation (Doc. 88 at ¶ 22), Apothio is a "person" and is subject to Cal. Health & Safety Code § 11360.  *See* Cal. Health & Safety Code 11022 ("'Person' means individual, corporation, . . . *limited liability company*, or association, or any other legal entity.") (emphasis added).

Doc. 88 at ¶¶ 2, 22, 56–57, 65, 70–72, 83.)  Apothio focuses on "every segment of the hemp-based market, from seeds to retail," including hemp genetics, agriculture, harvesting, extraction, formulation, and delivery devices and distribution.  (*Id.* at ¶ 65.)

In addition to other lands and facilities dedicated to hemp research, in 2018, Apothio established its hemp operations in Kern County, operating as an EARI.  (*Id.* at ¶¶ 2, 6, 66(a)–(f).)  At around the same time, Apothio entered into a "Research and Internship Agreement[]" with the Kern Community College District ("KCCD") and the Cerro Coso Community College ("CCCC").  (*Id.* at ¶¶ 86–91.)  As a result of its hemp research, Apothio has developed "more than 100 proprietary varietals of hemp plants," with its central focus on "developing varietals of hemp that, when mature and dry, contain little or no detectable THC," and are not sold in an illegal market.  (*Id.* at ¶¶ 68, 69.)  Indeed, its leading strain—the "Noah Strain"—"is genetically predisposed to produce hemp below 0.3% Delta-9 THC."  (*Id.* at ¶¶ 75, 76.)  For example, on October 4, 2019, Apothio received a Certificate of Analysis for a sample of its hemp, produced by a third-party certified laboratory, showing that its plants contain a THC concentration of 0.25%.  (*Id.* at ¶ 80.)  "Apothio has never intended to sell hot hemp," and when its plants "demonstrate[] high THC levels at maturity, Apothio has destroyed them," keeping only the seeds of the plant for additional research.  (*Id.* at ¶ 82.)

In the fall of 2018, Apothio contracted with a local grower, Stenderup Farms, to grow 141 acres of hemp in Kern County using Apothio's seeds.  (*Id.* at ¶ 97.)  Before planting, Apothio "met with and briefed [Kern County Agricultural] Commissioner [Glenn] Fankhauser," presented him with written evidence regarding its EARI status, and "clearly stated" its intention to research, develop, and commercialize hemp in accordance with state and federal law.  (*Id.*)  Thereafter, the Kern County Agriculture Commissioner's Office issued Apothio a map of where it was permitted to plant and cultivate hemp.  (*Id.* at ¶ 98.)  Around the same time, Apothio met with Sergeant Nicholson, who was "in charge of drugs and narcotics in the [KCSO]," two Chief Deputies in the KCSO and other local officials, and briefed them on Apothio's hemp cultivation plans, informed them of its EARI status, provided "chromatograph test results" for the hemp it intended to plant and eventually commercialize, and provided copies of its commercial contracts.  (*Id.* at ¶ 100.)

No County official disagreed with or questioned Apothio's plans.  (*Id.*)  Apothio continued to chemically test its plants, which confirmed that its plants "would have THC levels of less than 0.3% at maturity," and Apothio shared these results with Fankhauser, the KCSO, KCSO Sheriff Donny Youngblood, and Nicholson, noting the "few exceptions" which would test above the threshold, and which would be destroyed if they tested above 0.3% at the time of harvest.  (*Id.* at ¶¶ 102, 103.)

### C.     October 2019 Planting & Destruction

By February 2019, "Apothio contracted with several additional local farmers" to plant additional acres of hemp.  (*Id.* at ¶ 107.)  Thereafter, the Kern County Agricultural Commissioner issued additional map permits, identifying the fields where Apothio could plant more hemp, and issued a map permit for each of the farmers with whom Apothio contracted.  (*Id.* at ¶¶ 108–09.)  Apothio then planted approximately 17 million industrial hemp seeds on approximately 500 acres of land, grown openly, and marked as industrial hemp.  (*Id.* at ¶¶ 110–11.)  Fankhauser received updates on the results of the hemp's genetic testing and THC concentrations.  (*Id.* at ¶ 114.)

#### i.     Newbridge Controversy

In July 2019, Lance Dalton and Everett Far, employees of Newbridge Global Ventures—a vendor that contracted with Apothio to extract and process the CBD from Apothio's hemp—informed Apothio that they were "willing to break the law and violate the parties' agreement." (*Id.* at ¶¶ 122–124.)  "Apothio called them out for their conduct and threatened to end all business with them if they did not immediately cease their illegal activity."  Even still, Newbridge attempted to ship "hot" hemp[6] from Oregon to Apothio in California, "with a bill of lading in Apothio's name, all without Apothio's consent or knowledge."  (*Id.* at ¶ 125.)  Apothio "immediately rejected the shipment and ensured it was promptly reported to the Kern County Agricultural Commissioner."  (*Id.* at ¶ 126.)  Newbridge's President and CFO admitted culpability and began settling debts it owed to Apothio.  (*Id.* at ¶¶ 126–128.)

Relations between Apothio and Newbridge continued to sour, resulting in Newbridge

---

[6] Plaintiff refers to "hot" hemp as hemp that has a delta-9 THC concentration above 0.3 percent.  (Doc. 88 at ¶ 3.)  All further references to "hot hemp" shall incorporate this definition.

1   initiating a lawsuit against Apothio on September 9, 2019, and allegedly beginning a "smear

2   campaign to bring law enforcement and negative publicity down on Apothio based on false

3   claims." (*Id.* at ¶ 129.) On September 18, 2019, a Newbridge employee emailed a California

4   Department of Food and Agriculture ("CDFA") investigator, claiming that all 500 acres of

5   Apothio's hemp were "hot," and falsely claimed that Apothio requested Newbridge process this

6   marijuana and sign a gag order. (*Id.* at ¶ 130.) The CDFA forwarded this email to the Kern

7   County Department of Agriculture. (*Id.*)

8           Apothio planned to harvest its additional hemp plants in October 2019, extracting the

9   beneficial parts of the hemp containing CBD, selling the extracts and byproducts, and using the

10  remainder to continue research and development into its intellectual property. (*Id.* at ¶¶ 7, 113.)[7]

11  However, on October 8, 2019, Dalton submitted a false "Health Concern Report" to a "County"

12  email address, in which he reported that Apothio intended to sell "500 acres of illegal Cannabis"

13  disguised as industrial hemp on the "Black Market" within the next couple of weeks. (*Id.* at ¶

14  131.) The email was forwarded to KCSO officer Erik Levig, and Nicholson's supervisor. (*Id.* at

15  ¶ 132.)

16          D.      Halverson & Nicholson's Warrant Applications

17          On October 17, 2019[8], Halverson applied for a search warrant to allow him to take four

18  samples from each of Apothio's fields for testing. (Doc. 88 at ¶ 134; Ex. A, Doc. 88-1 at 4.)

19  Halverson submitted an affidavit in which he asserted that he had spoken with a reporting party

20  (the "RP"), who wished his identity to remain confidential. The RP reported that Apothio's

21  founder, Trent Jones, approached the RP to have the RP "process and profit share in the hemp

22  [Jones] was growing for CBD oils." (Ex. A, Doc. 88-1 at 6.) The RP had samples taken from the

23  cannabis plants growing in Jones's fields and had them tested. (*Id.*) He determined that the

---

24  [7] Apothio represents that at some unidentified point in the past, it had met "the KCSO" regarding its activities, and that
25  the KCSO "had not communicated any concerns to Apothio about its hemp research, cultivation, or commercialization
    efforts." (Doc. 88 at ¶ 7.) The Complaint does not indicate with whom "Apothio" met, when the meeting occurred,
26  what was discussed or who from Apothio was present.
    [8] As noted above, Apothio had planned to harvest the fields in October. In doing so, it intended to identify and destroy
27  any plants with THC levels that were greater than that allowed by law. The Court observes that by the time Halverson
    executed the first search warrant, only 14 days remained in the month. By the time Nicholson executed the second
28  search warrant, only six days remained in the months. At least according to the testing performed as a result of
    Halverson's search warrant, the fields continued to have plants that did not conform to law.

samples had THC over the limits allowed for industrial hemp growers.  (*Id.*)

The RP referred Halverson to Everett Farr, who the RP said had collected the "most recent samples."  (Ex. A, Doc. 88-1 at 6.)  Halverson contacted Farr, who told Halverson that in August 2019, he had collected two samples from each of the three fields that Jones was cultivating.  (*Id.*)  Farr reported that his company had purchased seeds from Jones and planted them in New Mexico and the entire crop had to be destroyed because it yielded plants with THC levels higher than that allowed by law.  (*Id.*)  Farr explained that he wanted to compare the THC levels in the plants in Kern County with the crop he had to destroy in New Mexico.  (*Id.*)  Of the six samples Farr collected, tests of five revealed THC levels higher than that allowed by law.  (*Id.*)  Farr reported that he returned to the fields about six weeks later and gathered six more samples.  (*Id.*)  Farr said that these samples tested higher than the legal limit.  (*Id.*)  Farr told Halverson that Farr used "water acuity liquid chromatograph" for testing the cannabis samples and that this was "an accepted industry practice," to test with this methodology.  (*Id.*)  Farr told Halverson that he had worked in the hemp field for five years and, in his experience, as the plant matures, "the percentage of THC and CBD continues to increase . . . and the greatest increase is in the last 2 weeks before harvest."  (*Id.*)  Farr told Halverson that he estimated that at harvest time, "these plants would be between 4-6% THC." (*Id.*)  Farr noted that "he no longer was working with Trent Jones and [that] his company is in a pending civil case with Jones."  (*Id.*)

Halverson contacted Cerise Montano of the County Agriculture Commissioner's Office and learned that Jones had contracted to plant about 512 acres of cannabis plants in Kern County.  (Ex. A, Doc. 88-1 at 6.)  Halverson confirmed the amount of acreage at issue after considering Apothio's map permits provided by Ms. Montano, and considering John Cox's newspaper article, published on September 30, 2019, on the Bakersfield.com website, in which Jones stated he was growing 512 acres of hemp.  (*Id.*)

Halverson reported to the court that though Apothio could cultivate cannabis plants with THC over .3%, Apothio was not allowed to sell any plants with THC levels higher than .3%.  (Ex. A, Doc. 88-1 at 6.)  The RP gave Halverson a copy of a contract between Apothio and ProCann LLC.  Halverson reported that the contract indicated that:

1

2

3

4

> Apothio agree[d] to send between 3-8 million pounds of hemp 'biomass' to ProCann in Nevada. The purchase price as outlined in the contract states that the 'Seller and Receiver agree to toll the biomass into liters of Biomass Extract at an equal (i.e. 50/50 split) distribution of gross sales receipts . . .' Later on in the contract[,] it states that 'ProCann LLC agrees to provide $1,800,000 to Apothio LLC as a down payment to secure the right to purchase biomass as well as provide capital support . . .'

5

(*Id.*)

6

7

8

9

10

11

12

Halverson attested that because Jones intended to sell plants with THC levels over .3%, Halverson believed the plants were not hemp but were, in fact, marijuana. (Ex. A, Doc. 88-1 at 7.) Because California law only allowed growing six marijuana plants, as opposed to hemp plants, he believed that Jones was committing a felony. (*Id.*) He sought authority to take four random samples from each of Apothio's fields to verify the THC levels in the plants. (*Id.*) Kern County Superior Court Judge Michael Dellostritto issued the warrant as requested. (Ex. A, Doc. 88-1 at 2.)

13

14

15

16

17

On October 24, 2019, Nicholson applied for a warrant to seize and destroy marijuana from Apothio's fields. (Ex. C, Doc. 88-3 at 7.) In the affidavit supporting the search warrant, Nicholson recited much of the information set forth in Halverson's affidavit and added more. (*Id.*) Nicholson reported that the RP, who was mentioned in Halverson's affidavit, was Lance Dalton. (*Id.*) Dalton said he was a consultant for Newbridge Global Ventures LLC. (*Id.*)

18

19

Nicholson detailed how Farr described to Halverson the dispute between Newbridge and Apothio. (*Id.* at 11.) Halverson reported that:

20

21

22

23

> Farr stated that around 8/13/19 Trent JONES locked them out of the contract and approximately a week before that, he took the first set of samples from farms being cultivated under JONES. Farr went on to say that JONES had sent them a proposed settlement agreement in early September to try and settle the lawsuit and reengage with the company NBGV to process the plants he was growing, even though JONES had already been told they could not process the plants because they were cannabis and not hemp and their facility was not licensed or permitted to process cannabis.

24

25

26

27

28

> Farr provided Lieutenant Halverson with a copy of the proposed settlement agreement sent by JONES, the agreement is dated 9/12/19 and signed by Trent JONES. In that agreement at the end of page 3 he talks about the King Family New Mexico Hemp Farm. Lieutenant Halverson asked Farr if this was the same farm that he had told him about previously and he said it was. Lieutenant Halverson confirmed that Farr had purchased seeds from JONES to plant that farm in New Mexico. He was told by JONES that the seeds were the same as those that had planted in Arvin. When the New Mexico field was getting close to harvest the plants were tested by an independent lab and came back with a THC content of well over the 0.3% THC.

1     Farr stated that the entire crop had to be destroyed and was plowed under the first
or second week of October.

2

3    (*Id.*)  Nicholson also reported on some of the key details outlined in the settlement agreement.

4    (Ex. C, Doc. 88-3 at 11–12.)

5        Nicholson included a link to the September 30, 2019, article published on the website of

6    the local newspaper, *The Bakersfield Californian* titled, "*Lawsuit: That really could be weed*

7    *growing near Arvin.*"  (Ex. C, Doc. 88-3 at 8.)  The article quoted Jones as acknowledging that

8    some of the plants had levels of THC over .3% but indicated that Jones expected the THC levels

9    to drop over time and that any "hot hemp" would be destroyed by Apothio.  (*Id.* at 11.)

10   Nicholson noted that Apothio was operating under a research exemption, which allowed it "to

11   grow and possess hemp/cannabis that is over 0.3% THC content; however, it does not allow them

12   to sell the hemp/cannabis that is over 0.3%."  (*Id.* at 8.)

13       Nicholson reported that Halverson obtained the prior warrant to "independently

14   corroborate the level of THC content in the plants.  This was done to be able to prove or disprove

15   statements made by . . . DALTON."  (*Id.* at 8.)  Nicholson detailed that of the 35 samples tested

16   by law enforcement, only six yielded THC results that were below .3%.  (*Id.* at 8–10.)  The

17   average THC level of the samples taken from every field was greater than .3%.  (*Id.*)  Nicholson

18   reported on the method used by Halverson to test the samples by quoting from the documentation

19   provided by the manufacturer of the analyzer, which detailed the reliability of the test results

20   produced by the equipment.  (*Id.* at 9–10.)

21       Nicholson also noted that Apothio was operating under a research exemption in

22   partnership with Cero Coso Community College, located in Ridgecrest, California.[9]  (Ex. C, Doc.

23   88-3 at 8.)  Halverson included links to two articles that discussed the relationship between

24   Apothio and CCCC, which allowed Apothio to grow industrial hemp for research purposes.  (*Id.*

25   at 10–11.)  Nicholson quoted portions of the articles in which CCCC indicated that Apothio

26   would plant hemp in California City, which would be dedicated for the research at issue.  (*Id.*)

27

28   [9] The Court takes judicial notice of the location of CCCC as a fact of ready determination, and which is widely known
in the community.  Fed. R. Evid. 201.

Nicholson noted that neither article mentioned any acreage being planted in Arvin, California, where the sampling done by Farr and Halverson occurred.  (*Id.*)

Nicholson attested that Halverson had spoken with Cerise Montanio from the Kern County Agriculture Commissioner's office.  (*Id.* at 12.)  Montanio reported that the local John Deere dealership called about the legality of harvesting the "tops" of the cannabis plants.  (*Id.*)  The person reported that Jones sought to take over the lease of two crop tractors that were used as hemp harvesters.  (*Id.*)  Jones said he wanted to harvest the tops of the plants, where the highest concentration of the THC is found and "leave the bottoms behind because the bottoms weren't as useful to him."  (*Id.*)  Nicholson observed that it is the bottom part of the plant is "often used in legitimate hemp production."  (*Id.*)

Nicholson reported on an investigation by the FBI, in which agents talked with the CEO of ProCann, Erin Turoff.  (*Id.* at 12.)  Turoff reported that she was introduced to Jones through a third party and that Jones said he wanted to transport hemp from California to an out-of-state buyer.  (*Id.*)  Though a former business partner of Turoff signed an agreement with Apothio, ProCann decided not to go through with it because after Turoff conducted her due diligence, she concluded that "Jones was running a fraud scheme."  (*Id.*)  Turoff noted that usually in the cannabis industry: "1) a seller would sell biomass upfront or 2) a seller would work out a profit sharing deal upfront. JONES had no money. JONES could not even afford his own equipment to harvest his crop, so JONES wanted to work out a profit sharing deal upfront."  (*Id.*)  Though Jones tested a sample of a plant in Turoff's presence, Turoff concluded that the testing equipment was rigged to show a THC level below .3%.  (*Id.*)  Jones told Turoff that the crop would test higher that .3% THC after it was harvested.  (*Id.*)  Turoff also discovered that Jones had tax liens in California and Indiana, which made her question whether Jones could legally grow hemp, and she learned that intellectual property Jones claimed as his own, actually belonged to a company in Georgia.  (Doc. 88-3 at 12.)  ProCann decided not to proceed with the contract and a primary reason was Jones's admission that the crop had THC levels higher than .3%.  (*Id.*)

A Kern County Superior Court Judge issued the warrant, which allowed Halverson and Nicholson to enter onto Apothio's fields and to destroy marijuana found there after certain

1   conditions were met.  (Doc. 88-3 at 4; Doc. 88 at ¶¶ 15, 251, 254.)  The next morning, the

2   "KCSO came to destroy over approximately 500 acres of hemp."  (Doc. 88 at ¶ 252.)

### III.   PROCEDURAL HISTORY

4           Plaintiff filed its original complaint against both the State and County Defendants.  (Doc.

5   1.)  Defendants filed separate motions to dismiss, (Docs. 21, 24), and a motion to strike.  (Doc.

6   19.)  The Court issued an order ("First Order") denying the motion to strike and granting in part

7   the motions to dismiss.  (*See* Doc. 86.)  Plaintiff then filed its FAC.  (Doc. 88.)  Now pending are

8   Defendants' second Motions to Dismiss, (Docs. 94, 95), and Plaintiff's Motion for Leave to File a

9   Sur-Reply (Doc. 115).  Also pending is Plaintiff's Motion for Reconsideration of Discovery Stay,

10   (Doc. 128), which is dependent on the resolution of these two motions to dismiss.

### IV.   LEGAL STANDARDS

12       A.   Rule 12(b)(6)

13           Pursuant to Rule 12(b)(6), a defendant may move to dismiss a claim in the plaintiff's

14   complaint if the allegation "fail[s] to state a claim upon which relief can be granted."  Fed. R.

15   Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint

16   "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

17   on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

18   550 U.S. 544, 570 (2007)).

19           "At the pleading stage, all allegations of material fact are taken as true and construed in

20   the light most favorable to the non-moving party."  *In re Facebook, Inc. Internet Tracking Litig.*,

21   956 F.3d 589, 601 (9th Cir. 2020).  A claim is facially plausible "when the plaintiff pleads factual

22   content that allows the court to draw the reasonable inference that the defendant is liable for the

23   misconduct alleged."  *Iqbal*, 556 U.S. at 678.  As such, the plausibility standard is a

24   "context-specific task that requires the reviewing court to [1] draw on its judicial experience and

25   common sense," *Iqbal*, 556 U.S. at 679, and [2] to "'draw all reasonable inferences in favor of the

26   nonmoving party.'"  *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop.*

27   *Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)).

28   "Ultimately, dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the

non-movant can prove no set of facts to support its claims." *Id.* at 773–74 (internal citation and quotation marks omitted) (cleaned up).  However, "[c]onclusory allegations and unreasonable inferences do not provide [] a basis" for determining a plaintiff is entitled to relief.  *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted).  Nor may the Court accept legal conclusions and threadbare recitals of the elements of a cause of action.  *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 713 (9th Cir. 2023) ("Although a reviewing court must accept a complaint's factual allegations as true, the same is not true of legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (cleaned up) (internal quotation marks and citation omitted).

Finally, though resolution of a motion to dismiss under Rule 12(b)(6) is normally confined to the allegations stated in the complaint, the court "may also 'consider [1] materials that are submitted with and attached to the complaint'; [2] judicial notice of matters of public record'; and [3] unattached evidence on which the complaint necessarily relies if:  [a] the complaint refers to the document; [b] the document is central to the plaintiff's claim; and [c] no party questions the authenticity of the document.'"  *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 439 (9th Cir. 2020) (quoting *United States v. Corinthian Colls.*, 655 F.3d 984, 998–99 (9th Cir. 2011)).  The Court may review such material without converting a motion to dismiss into a motion for summary judgment.  *Harris v. Cnty. of Orange*, 17 F.4th 849, 865 (9th Cir. 2021) (Forrest, J., concurring); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

## V.   PRELIMINARY DISCUSSION

### A.   Threshold Issues

#### i.   *Plaintiff's Motion for Leave to File Sur-Reply (Doc. 115)*

Plaintiff requests leave of Court to file a sur-reply in response to new arguments raised in the County Defendants' Reply brief (Doc. 111 at 2).  (Doc. 115-1 at 2.)  This motion is unopposed, (*id*), and the Court agrees that Plaintiff should have an opportunity to reply to this new argument.  *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188 (9th Cir. 2024) ("A district court does not abuse its discretion in considering new arguments

1   or evidence if the opposing party had an opportunity to respond.") (collecting citations).

2   Accordingly, Plaintiff's Motion for Leave to File a Sur-Reply (Doc. 115) is **GRANTED**.

3   ii.      *Defendants' Request for Judicial Notice (Doc. 94-2)*

4   Attached to their motion, State Defendants request the Court take judicial notice of five

5   separate items.  (RJN, Doc. 94-2.)  The Court addresses each request separately.

6   The State requests the Court take judicial notice of the state court criminal case details

7   against Apothio's CEO, Trent Jones, "because such information is useful in understanding the

8   context for cannabis eradication by the [KCSO]."  (RJN, Doc. 94-2 at 3.)  The State does not

9   explain how this information is useful.  Jones's case has since been dismissed due to "pre-plea

10  diversion," which did not adjudicate any guilty conduct.  (Doc. 127.)  Thus, the extent to which

11  this information is pertinent is uncertain due to the Court's task being limited to determining the

12  plausibility of Plaintiff's factual allegations.  *Iqbal*, 556 U.S. at 678.  The request is **DENIED**.

13  The State requests the Court take judicial notice of two former versions of California and

14  federal statutes in effect in 2019.  (Exs. B & C, Doc. 94-2 at 11–17.)  However, the law—even

15  prior versions of the law—is not judicially noticeable.  Rather, the Court may consider any

16  relevant domestic law without the need for judicial notice.  Judicial notice under Rule 201 may be

17  taken only of facts.  Fed. R. Evid. 201(b) ("The court may judicially notice *a fact* that is not

18  subject to reasonable dispute . . .") (emphasis added).  Thus, though the Court will consider the

19  relevant versions of the law, it will not take judicial notice of it.  Accordingly, the request is

20  **DENIED**.

21  The State also urges the Court to take judicial notice of the United States Department of

22  Agriculture's interim rules "for assessing Apothio's claims that THC content would decrease

23  from the time of testing to the time of harvest."  (Doc. 94-2 at 5 (citing FAC, Doc. 88 at ¶ 102).)

24  Because these rules are proper matter for judicial notice and are publicly available, the request is

25  **GRANTED**.  *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("We may take

26  judicial notice of records and reports of administrative bodies.") (internal quotation marks and

27  citation omitted); Fed. R. Evid. 201(b).  The Court will also take judicial notice of the portions

28  requested of the Federal Register.  44 U.S.C. § 1507 ("The contents of the Federal Register shall

1    be judicially noticed . . .").

2          Finally, as to the Restricted Materials Permits, the Court **DENIES** the State's request for

3    judicial notice of these documents.  Though the fact that these permits were issued may be subject

4    to ready determination, to understand how they bear on the issues raised in the FAC would

5    require an evidentiary showing that is not appropriate in the context of a motion to dismiss.

6    Without this showing, the permits are irrelevant to the motion.

7               **VI.     DISCUSSION: MOTIONS TO DISMISS**

8         A.    <u>Redundant Defendant: Defendant Youngblood</u>

9          Plaintiff sues Sheriff Youngblood "both in his individual and representative capacities[.]"

10    (FAC, Doc. 88 at ¶ 27.)  County Defendants first move to dismiss Youngblood as a redundant

11    Defendant.  (Doc. 95 at 22–23.)  Second, Defendants argue that Plaintiff has failed to adequately

12    plead allegations against Youngblood in his personal capacity, *i.e.*, that he personally participated

13    in the alleged constitutional violations.  (*Id.* at 23.)  "[T]he distinction between official-capacity

14    suits and personal-capacity suits is more than 'a mere pleading device.'"  *Hafer v. Melo*, 502 U.S.

15    21, 27 (1991) (citation omitted).

16          When a plaintiff sues a municipal official for monetary damages in their official capacity,

17    it "is not a suit against the official but rather is a suit against the official's office," and "[a]s such,

18    it is no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 491 U.S.

19    58, 71 (1989) (collecting cases); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("[A]

20    plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the

21    government entity itself.") (footnote omitted).  In these situations, the Court has discretion to

22    dismiss the state officer as "a redundant defendant."  *Ctr. for Bio-Ethical Reform, Inc. v. L.A.*

23    *Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).  Alternatively, a state official sued in their

24    official capacity for injunctive relief is considered a "person" under § 1983 and "official-capacity

25    actions for prospective relief are not treated as actions against the State."  *Will*, 491 U.S. at 71

26    n.10 (internal quotation marks and citations omitted); *see also Cornel v. Hawaii*, 37 F.4th 527,

27    531 (9th Cir. 2022) ("[S]tate officials are 'persons' under §1983 when sued for prospective

28    injunctive relief.") (citation omitted).

In a separate category, "[s]uits against officials in their personal capacities . . . are different.  In those cases, . . . the real party in interest is the individual, not the sovereign." *Acres Bonusing, Inc. v. Marston*, 17 F.4th 901, 909 (9th Cir. 2021) (internal quotation marks and citations omitted); *see also Magassa v. Mayorkas*, 52 F.4th 1156, 1162 (9th Cir. 2022).  For Section 1983 purposes, the term "persons" also covers "state and local officials sued in their individual capacities[.]" *Nelson v. Cnty. of Sacramento*, 926 F. Supp. 2d 1159, 1165 (E.D. Cal. 2013) (citation omitted).  In personal capacity suits, a plaintiff "seeks to impose individual liability upon a government officer for actions taken under color of law," *Magassa*, 52 F.4th at 1162 (cleaned up) (quotation marks and citation omitted), and liability arises "only upon a showing of personal participation by the defendant." *Victoria v. City of San Diego*, 326 F. Supp. 3d 1003, 1013 (S.D. Cal. 2018) (citation omitted); *see also Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("[T]here must be a showing of personal participation in the alleged rights deprivation") (collecting cases); *Nelson*, 926 F. Supp. 2d at 1165.  "In a § 1983 case against government actors in their individual capacities, it is particularly important that the complaint makes clear exactly who is alleged to have done what to whom, in order to provide each individual with fair notice," and the plaintiff must show that the "official's own individual actions" violated the Constitution.  *Haddock v. Newsom*, No. 2:23-cv-08679-VBF-KES, 2024 WL 3008858, at *5 (C.D. Cal. May 3, 2024) (cleaned up) (internal quotation marks and citations omitted).

Plaintiff has pleaded its causes of action against "All Defendants," (*see* Doc. 88 at 82–97), and seeks damages, (*id.* at 97–99), and a permanent injunction.  (*Id.* at 99.)  Plaintiff may not seek damages from Youngblood in his official capacity, because that would duplicate its claim for damages sought against the entity.  *Will*, 491 U.S. at 71; *Kentucky*, 473 U.S. at 165–66.  Instead, "when a plaintiff sues a defendant for damages, there is a presumption that he is seeking damages against the defendant in his personal capacity." *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016) (citation omitted).  In its FAC, Plaintiff alleges that "Youngblood met with Kern County officials to plan for the destruction of Apothio's hemp crops, including with members of the Kern County Highway Department, who would coordinate traffic during the destruction."

1    (Doc. 88 at ¶¶ 13, 178.)  By this time, Youngblood knew Apothio was an EARI and "legally

2    exempt from THC testing and that Apothio was legally permitted to grow hot hemp," yet ignored

3    the warning from County officials, and insisted "that he was going to destroy Apothio's crops."

4    (*Id.* at ¶¶ 14 (emphasis omitted), 179.)

5          As such, the Court concludes that Plaintiff has adequately pleaded Youngblood's personal

6    participation in the destruction of its crops.  *See Victoria*, 326 F. Supp. 3d at 1014 (personal

7    participation not satisfied when complaint was "completely devoid of allegations that demonstrate

8    specific, affirmative actions taken by [defendant], her participation in another's affirmative

9    action, or a failure to perform.") (citation omitted); *Abney v. Alameida*, 334 F. Supp. 2d 1221,

10   1227 (S.D. Cal. 2004) ("[I]t can be inferred that Defendant was either responsible for, or aware

11   of, the alleged constitutional deprivation, and did nothing to prevent it.  These allegations are

12   sufficient to satisfy the personal participation pleading requirement of a section 1983 claim.")

13   (citations omitted).  Additionally, Plaintiff's claims clearly target Youngblood, not the state or

14   state policies, *Barrilleaux v. Mendocino Cnty.*, 61 F. Supp. 3d 906, 915 (N.D. Cal. 2014), and

15   make clear how Youngblood participated in depriving Plaintiff of its constitutional rights.

16   *Haddock*, 2024 WL 3008858, at *5.

17         Plaintiff may therefore request damages against Youngblood in his personal capacity and

18   an injunction against Youngblood in his official capacity.  *See Balzarini v. Diaz*, No. 5:18-cv-

19   01962-RGK (MAA), 2021 WL 6845545, at *14 (C.D. Cal. Dec. 16, 2021) ("As the 4AC seeks

20   both damages and injunctive relief, the Court presumed that Plaintiff was suing Defendants in

21   both their individual and official capacities, . . ."), *F. & R. adopted*, 2022 WL 393585 (C.D. Cal.

22   Feb. 8, 2022).  As such, the Court **GRANTS IN PART AND DENIES IN PART** County

23   Defendants' motion (Docs. 95) on this ground.

24         B.    Defendant Bonham

25         Defendants move to dismiss Bonham as a defendant because the FAC fails to "identify

26   any links between the alleged constitutional violations and any specific actions of [CDFW]

27   Director Charlton H. Bonham."  (Doc. 94-1 at 28.)  The Court addressed this issue in its First

28   Order, (Doc. 86 at 16 ("Nowhere in the complaint does Plaintiff allege that Defendant Bonham

1    took any actions.")), and now, though the FAC mentions Bonham, there are no factual

2    allegations—as distinguished from Apothio's conclusions—that tie Bonham to any wrongful

3    conduct. *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023); *Doe I v. Cisco*

4    *Sys., Inc.*, 73 F.4th 700, 713 (9th Cir. 2023). For example, the conclusion that Apothio draws

5    from statements made by Nicholson that Bonham was involved is unreasonable. (Doc. 88 at 8–9)

6    Apothio makes no showing as to how Nicholson would have any personal knowledge about

7    Bonham's involvement or that he made any statement specifically referring to Bonham.

8    Apothio's bare conclusion that Bonham took unlawful action fails to state a claim. For this

9    reason, the Court **GRANTS** Defendants' motions (Docs. 94, 95) and **DISMISSES** Bonham from

10   this action.

11          C.      Fourth Amendment Claims

12          Plaintiff's first cause of action alleges Defendants deprived Apothio of its Fourth

13   Amendment right against unreasonable searches and seizures, in violation of 42 U.S.C. § 1983,

14   when Halverson and Nicholson obtained two search warrants through judicial deception. (FAC,

15   Doc. 88 at ¶ 308.) Plaintiff also alleges additional Fourth Amendment theories based on the

16   excessive destruction of its crops. (*Id.* at ¶ 311.) Defendants move to dismiss both theories.

17   (Doc. 94-1 at 17–21; Doc. 95 at 10–17.)

18                 i.      *Judicial Deception*

19          "To successfully allege a violation of the constitutional right to be free from judicial

20   deception, [Apothio] must make out a claim that includes (1) a misrepresentation or omission (2)

21   made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial

22   decision." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021) (citation

23   omitted); *see also Scanlon v. Cnty. of L.A.*, 92 F.4th 781, 799 (9th Cir. 2024) ("Judicial deception

24   consists of either deliberate omission or affirmative misrepresentation.") (internal quotation

25   marks and citation omitted).

26          A statement is misleading "if, although technically true, it has been so wrenched from its

27   context that the judicial officer will not comprehend how it fits into the larger puzzle." *Scanlon*,

28   92 F.4th at 799. "Even otherwise true observations made misleading by the omission of facts that

1    are not themselves material may result in an affidavit that, considered as a whole, is materially

2    misleading." *Id.*  To determine whether an omitted or misrepresented fact is "material," the Court

3    considers "whether the affidavit, once corrected and supplemented, establishes probable cause.

4    [citations].  If probable cause remains after amendment, then no constitutional error has

5    occurred." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011) (internal quotation

6    marks and citations omitted).[10]  "Omissions or misstatements resulting from negligence or good

7    faith mistakes will not invalidate an affidavit which on its face establishes probable cause."

8    *Blight v. City of Manteca*, 944 F.3d 1061, 1069 (9th Cir. 2019) (internal quotation marks and

9    citation omitted).  The Court limits its review to examining the probable cause set forth "within

10    the four corners of the affidavit."  *Ewing v. City of Stockton*, 588 F.3d 1218, 1225 n.8 (9th Cir.

11    2009).

12                         a.    Halverson's Affidavit—Analysis

13        Plaintiff alleges that Halverson's affidavit makes several material misrepresentations and

14    omissions regarding various key details of Apothio's operations.  In this way, Apothio alleges

15    that Halverson engaged in judicial deception.

16                    **a.    *ProCann Agreement***

17        Plaintiff complains that Halverson's affidavit misrepresented Apothio's Toll Processing

18    Agreement with ProCann, wherein Halverson stated that because "Apothio will send biomass to

19    ProCann," it was "planning on selling the hemp that it is [sic] over 0.3%."  (Doc. 88 at ¶¶ 138–

20    39.)  This statement was made in relation to Halverson's assertion that though Apothio's status as

21    an EARI permitted it to cultivate cannabis plants with THC over .3%, Apothio was not allowed to

22    sell any plants with THC levels higher than .3%.  (Doc. 88-1 at 6.)

23        Plaintiff asserts that the Toll Processing Agreement "states that the biomass extract to be

24    sold is to be 'less than 0.3% THC[.]'" (Doc. 88 at ¶ 139.)  Plaintiff represents that Halverson's

25    affidavit omitted the Agreement's other provisions, including ProCann's "inspection rights,"

26

27    [10] "Probable cause is not a high bar," and "[a] search warrant affidavit will demonstrate probable cause if, under the
      totality of the circumstances, it reveals a fair probability that contraband or evidence of a crime will be found in a

28    particular place." *Blight v. City of Manteca*, 944 F.3d 1061, 1066 (9th Cir. 2019) (internal quotation marks and citations
      omitted); *see also United States v. Kvashuk*, 29 F.4th 1077, 1085 (9th Cir. 2022).

"ProCann's right to deny 'nonconforming biomass' that are not 'fit for their intended purpose,'" and the Agreement's Warranty Statement, which states that "Apothio is 'in compliance with applicable state and federal law, including (but not limited to) the 2014 Farm Bill[.]'"  (Doc. 88 at ¶¶ 140–41.)

To the contrary, a reasonable interpretation of the Toll Processing Agreement is that it documents the sale of hemp *and* marijuana.  (Ex. B, Doc. 88-2 at 2.)  First, the agreement refers to Apothio as the "Seller."  (*Id*.)  It also specifies that ProCann would pay a "Purchase Price" for the plant material including $1.8 million as "a down payment to secure the right to purchase" the plant material.  (Doc. 88-2 at 3–4)

Second, the contract called for ProCann to process the plant material provided by Apothio *into* "Crude or THC-free (less than 0.3% THC) distillate."  (Ex. B, Doc. 88-2 at 2.)  A reasonable interpretation of this section, given the use of the word "into," suggests that the plant material Apothio would sell would have varying levels of THC—some greater than .3% and some lower— such that the ultimate mixture would yield a THC level that conformed to law.  On the other hand, the contract required ProCann to process only 10% of the plant material delivered to it *into* crude or distillate with lawful levels of THC.  (Doc. 88-2 at 2–3.)  The contract is silent as to what ProCann could do with the remaining 90% of the plant material.  The fact that Apothio warranted that it grew the plant material "in compliance with Applicable Law," does not change the analysis particularly because the agreement also allowed ProCann to reject shipments that failed to comply with Apothio's warranties, if ProCann discovered the nonconformity and reported it to Apothio. (Doc. 88-2 at 5.)

"[A] warranty is not necessarily a promise or contract," but rather, an affirmation by the seller to induce the purchase of goods.  18 Williston on Contracts § 52:35 (4th ed. 2024) ("It is probable that most persons instinctively think of a warranty as necessarily a contract or promise,[] but although warranties frequently are true promises and contracts,[] they may merely be affirmations or representations that induce a sale,[] and if it is said that a promise or contract is implied from such an affirmation or representation, the implication is one of law and not of fact.") (internal footnotes omitted).  Thus, the warranty in the parties' Agreement merely states a legal

"affirmation of the quality or condition" of the hemp, meant to induce purchase, and any corresponding "promise" inherent in the warranty is one of law, not of fact.  (*Id.*)  The judge signing the search warrant is presumed to know the law such that, even if the failure to include the warranties constituted a material omission to the search warrant affidavit, the Court does not conclude that this information would have made any difference to the finding of probable cause.

Even now, the FAC provides little guidance regarding whether it was intending to sell both male and female plants to ProCann.  For example, Apothio admits that it grows both male and female cannabis plants, (*see, e.g.*, Doc. 88 at ¶¶ 145e, 195 (stating that *half* of Apothio's crops were male), 311), and that female plants test over 0.3% THC, (*id.* at ¶ 311), but that "Apothio has never intended to sell hot hemp," and that "[w]hen Apothio['s] plants have demonstrated high THC levels at maturity, Apothio has destroyed them" but kept the seeds "to perform additional research[.]" (*Id.* at ¶ 82.)  Apothio asserts that it had no obligation to test the crop.  (Doc. 88 at 8, ¶ 14.)  This assertion assumes, however, that Apothio did not contract to sell plants with an unlawful level of THC.

The officer's interpretation of the Toll Processing Agreement was reasonable.  The fact that he may have been wrong in his interpretation of the contract, does not state a claim for judicial deception.  *Benavidez,* 993 F.3d at 1147; s*ee Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009).  Indeed, the contract does not define even what "hemp biomass" includes.  The Court agrees with the officer's interpretation that the contract "describe[d] the intended sale of *entire* plants to PROCANN" and that "Apothio's intent to extract THC or only CBD does not change the character of the cannabis plants that it was growing with the intent to sell."  (Doc. 94-1 at 18 (emphasis added).)  Thus, the failure to include the entirety of the agreement, does not state a claim for judicial deception.

**b.**    ***September 30, 2019 Article***

Plaintiff alleges that Halverson's affidavit referenced John Cox's September 30, 2019 article, (Doc. 88 at ¶ 119), mentioning that Jones was growing 512 acres of hemp, yet omitted Jones's response in an interview that he would destroy all "hot" hemp.  (Doc. 88 at ¶ 142; Ex. A, Doc. 88-1 at 6.)  In Plaintiff's view, this shows "Jones's intent to comply with the law, [and]

contradicts that Apothio had any intent to harvest, let alone sell, hot hemp." (*Id.*)

It is well-settled that "officers are free to disregard either all innocent explanations,[] or at least innocent explanations that are inherently or circumstantially implausible.[] . . . innocent explanations—even uncontradicted ones—do not have *any* automatic, probable-cause-vitiating effect." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 65–68 (2018) (emphasis added) (internal footnotes and citations omitted); *see also Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009) ("[I]n considering the totality of the circumstances, Ramirez's innocent explanations for his odd behavior cannot eliminate the suspicious facts from the probable cause calculus. . . The test is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior.") (internal quotation marks and citation omitted).  Similarly, officers do not need to accept a suspect's "protestations of innocence" when the totality of the circumstances provide officers with "plenty of reasons to doubt" such protestations.[11]  *Wesby*, 583 U.S. at 62.

When considering the totality of the circumstances facing Halverson, including:  the RP's comments that Apothio approached him to "process and profit share in hemp"; that Farr tested Apothio's samples on two separate occasions in August and September 2019, which both "came back over the allowed 0.3% THC"; that seeds purchased from Jones "had to be destroyed due to a high THC content"; and that Apothio had a contract to sell between "3–8 million pounds of hemp 'biomass' to ProCann," Jones's isolated protestation or explanation of innocent behavior in the September 30th article was simply immaterial to a finding or negation of probable cause.  (Ex. A, Doc. 88-1 at 6–7; *Wesby*, 583 U.S. at 62, 65–68.)

### c.     *FBI Exculpatory Interview*

Plaintiff next alleges that Halverson knowingly and recklessly omitted "significant findings" from an October 16, 2019, interview between two FBI agents and Commissioner

---

[11] Jones's "intent to comply with the law" is not pertinent for another reason.  (Doc. 88 at ¶¶ 142, 146.)  "The offense of unlawfully selling marijuana includes just two elements—(a) a sale of marijuana and (b) knowledge of the character of the substance sold."  *People v. Bush*, 7 Cal. App. 5th 457, 485 (2017) (internal quotation marks and citation omitted).  The only material fact is whether Jones *knew* his plant material included cannabis with unlawful THC levels.  *See People v. Coria*, 21 Cal. 4th 868, 874–75 (Cal. 1999) ("In a prosecution for possession of a controlled substance, knowledge of the character of the substance possessed is an essential element of the crime . . . The requirement . . . also applies to crimes of selling or transporting a controlled substance") (citations omitted).

Fankhauser and Deputy Director Cerise Montanio.  (Doc. 88 at ¶¶ 143–46.)  The findings from the interview were purportedly memorialized in a four-page FBI report, which explains that Jones:  (1) made "efforts at compliance" with the Department of Agriculture about Apothio's crops; (2) met with County officials and provided test results showing Apothio's hemp contained "appropriate" levels of THC; (3) that as an EARI, Apothio was exempt from California testing requirements; and (4) that Apothio planted both male and female plants, demonstrating that it was not a commercial marijuana cultivator.  (*Id.* at ¶¶ 145a–e.)

Plaintiff alleges Halverson "knowingly[] and recklessly omitted the . . . significant findings from this interview," but admits that "Halverson did not attend the interview."  (*Id.* at ¶ 144.)  Plaintiff merely speculates that Halverson knew about the contents of the interview, and its accompanying memorandum, because he "spoke with Montanio the next day" and regularly kept in contact with the two FBI agents via email.  (*Id.*)  This is insufficient to show that Halverson deliberately or knowingly made any such omission in his affidavit in the first instance, which is required to plausibly state a claim for judicial deception.  *See Scanlon v. Cnty. of L.A.*, 92 F.4th 781, 800 (9th Cir. 2024) ("Olarte's Statement of Cause included at least one statement about their treatment of K.X. with cannabis oil that *Olarete knew to be false* . . . this statement constituted a misrepresentation which a reasonable trier of fact could find was recklessly or deliberately made.") (citation omitted); *Keates v. Koile*, 883 F.3d 1228, 1240 (9th Cir. 2018) ("If a state official submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, he cannot be said to have acted in a reasonable manner") (cleaned up) (internal quotation marks and citation omitted).

Plaintiff's allegations merely conclude that the elements of a judicial deception claim exist, without providing factual support.  (Doc. 88 at ¶ 144 ("Halverson intentionally, knowingly, and recklessly omitted the fact of and the significant findings from this interview, which were memorialized in a four-page FBI report.")); *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 713 (9th Cir. 2023) ("Although a reviewing court must accept a complaint's factual allegations as true, the same is not true of legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (cleaned up) (internal quotation marks

and citation omitted); *e.g.*, *Newt v. Kasper*, 85 F. App'x 37, 38 (9th Cir. 2003) ("Even though Newt has alleged that Officer Kasper 'showed reckless disregard for the truth,' we need not accept this conclusory allegation as true as it is unsupported by the facts alleged in the complaint.") (citation omitted).[12]  Though Plaintiff alleges that Halverson spoke with Montanio the day after the interview and e-mailed the two FBI agents on a regular basis, that they discussed what Apothio claims they discussed, is speculation.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (The court is not required to accept as true allegations that are merely conclusory, *unwarranted deductions of fact*, or unreasonable inferences.") (emphasis added) (cleaned up) (internal quotation marks and citation omitted); *e.g.*, *Chang v. Interactive Brokers LLC*, No. 21-cv-05967-NC, 2021 WL 5507169, at *3 (N.D. Cal. Nov. 24, 2021) (the Court will not "jump to unsupported conclusions" to infer one's actual knowledge at the motion to dismiss stage).  As such, Plaintiff has simply failed to demonstrate that Halverson knew of the contents of the FBI interview or the summarized memorandum to show that any omission relating to the two was deliberate, knowing, or in reckless disregard for the truth.  *Benavidez*, 993 F.3d at 1147; *Keates*, 883 F.3d at 1240.

Furthermore, including this interview memorandum would not have been material to a finding of probable cause.  Once more, the only issue weighing on Apothio's alleged criminality was whether it intended on selling or furnishing marijuana, not growing it.  As explained further below, Apothio's past "efforts at compliance" have no bearing on this issue, as it is unclear that Apothio's "criminal intent" is relevant.  (Doc. 88 at ¶ 145a.)  Nor is it material that Apothio grew hemp at "appropriate" levels—this allegation is conclusory, *Doe I*, 73 F.4th at 713, and may plausibly include cannabis plants with THC concentrations above 0.3%.  (Doc. 88 at ¶ 145b.)

---

[12] Indeed, not only must Plaintiff's judicial deception claims satisfy the commands of *Twombly* and *Iqbal*, but because such claims sound in fraud, they must also satisfy Rule 9(b)'s particularity requirement, and at the very least, plead knowledge generally.  *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1145 ("Knowledge, however, may be pled generally.") (internal quotation marks and citation omitted), 1147 (9th Cir. 2021) ("The Benavidezes had to allege judicial deception sufficient to meet the constitutional standard, if not the heightened pleading standard of Rule 9(b), to overcome the County's motion to dismiss under Rule 12(b)(6)."); *see also Vaezi v. Stanley*, No. 21-56273, 2023 WL 142651, at *2 (9th Cir. Jan. 10, 2023) ("[C]laims for judicial deception must comport with the pleading standards found in Rule 9(b)[.]") (citation omitted).

1   Indeed, the Court infers as much from Plaintiff's final paragraph in this portion of its FAC,

2   wherein it admits to growing both male and female plants.  (*Id.* at ¶ 145e; *see also id.* at ¶ 195

3   (alleging that half of Apothio's plants were male, thus implying the other half were female).)  As

4   such, the Court concludes that Plaintiff has not adequately shown that Halverson knowingly

5   omitted the contents of this FBI interview and accompanying memorandum, nor has Plaintiff

6   plausibly pleaded its materiality to a probable cause finding determining that Plaintiff intended on

7   *selling* marijuana.  Therefore, Plaintiff therefore cannot plausibly sustain a judicial deception

8   claim based on this fact.

9                    **d.    *Unreliable Informants***

10          Plaintiff's next judicial deception theory is premised on Halverson's alleged omission of

11   his reliance on "biased and unreliable informants[:] Lance Dalton and Everett Farr[,] without

12   disclosing that bias and unreliability" in his affidavit.  (Doc. 88 at ¶ 147.)  For instance, Plaintiff

13   contends that Halverson relied on Dalton and Farr for information regarding the hemp's THC

14   concentrations but omitted the following facts: (1) that "Dalton was a consultant and advisor to

15   Newbridge, before he more recently became its president and joined its board," (*id.* at ¶ 149); (2)

16   "that the CDFA had previously reprimanded Farr's employer, Newbridge, for getting 'caught'

17   with marijuana," (*id.* at ¶ 150); (3) that "Farr and Dalton illegally and secretly shipped marijuana

18   under Apothio's name to Apothio without Apothio's consent," (*id.* at ¶ 151); (4) "key details"

19   regarding the lawsuit between Newbridge and Apothio, (*id.* at ¶¶ 152–53), including one of Farr's

20   sworn declarations, which failed to include statements about the tests he performed on Apothio's

21   crops, (*id.* at ¶ 157); (5) that Farr was "President of the Hemp Division for Newbridge," (*id.* at ¶

22   152), and that Farr and Dalton "stood to benefit financially if Jones were prosecuted or even

23   investigated for marijuana cultivation," (*id.* at ¶ 153); (6) that Farr and Dalton's "story about their

24   testing of Apothio's crop" had "many inconsistencies," (*id.* at ¶ 154); (7) that Farr and Dalton

25   failed to provide Halverson "with test results consistent with the figures stated in the September

26   30 Article," (*id.* at ¶ 156); and (8) "inconsistencies about the origins of the samples in the test

27   results that Dalton had provided," (*id.* at ¶ 158.)

28          Even so, Plaintiff has failed to show that Halverson knew about any of these facts.

1   Plaintiff largely imputes Halverson's knowledge regarding the Newbridge Controversy—

2   Newbridge's alleged shipment of marijuana to Apothio, and subsequent lawsuit against

3   Apothio—to the parties' proposed settlement agreement.  (*See* Doc. 88 at ¶ 151 ("Halverson

4   knew or should have known about Farr and Dalton's illegal activity shipment of marijuana from

5   Oregon because of the references in the settlement agreement that Nicholson included only a few

6   days later, . . .").)  Yet, as Plaintiff impliedly admits, Nicholson provided Halverson with a copy

7   of the settlement agreement *after* Halverson filed his search warrant affidavit.  (*Id.*)  This is

8   further supported by review of Nicholson's affidavit, wherein Nicholson affirms that on October

9   22, 2019, "Halverson again spoke with Everett Farr and asked him when [Newbridge's] contract

10   with JONES was no longer valid . . . Farr went on to say that JONES had sent them a proposed

11   settlement agreement in early September to try and settle the lawsuit and reengage with the

12   company [ ] to process the plants he was growing[.]"  (Ex. C, Doc. 88-3 at 11 (capitalizations in

13   original).)  In the following paragraph, Nicholson states that "Farr provided Lieutenant Halverson

14   with a copy of the proposed settlement agreement sent by JONES[.]" (*Id.*)

15       The only inference here is that Farr provided Halverson with a copy of the settlement

16   agreement *after* they conversed on October 22, 2019.  (*See id.*)  Indeed, according to the timeline

17   in Nicholson's affidavit, Halverson had no knowledge or awareness of the proposed settlement

18   agreement by the time of their conversation, which occurred 5 days *after* Halverson signed his

19   search warrant affidavit.  (*Compare id.* ("**On 10/22/19**[,] Lieutenant Halverson again spoke with

20   Everett Farr . . . Farr went on to say that JONES had sent them a proposed settlement agreement")

21   (boldface and underlining added) *with* Halverson Aff., Ex. A, Doc. 88-1 at 2 ("**APPROVED ON**:

22   10/17/2019"), 8 ("I am the affiant of the enclosed Search Warrant which was authorized on

23   **10/17/2019,** at the Kern County Superior Court.") (boldface and underlining in original).)

24   Plaintiff has failed to allege that the timing of these events is incorrect, and if anything, seems to

25   support that the events occurred in this order.  (*See* Doc. 88 at ¶ 151.)

26       Furthermore, even if Halverson *had* a copy of the proposed settlement agreement prior to

27   his swearing of the search warrant affidavit, the Court is still not convinced that his alleged

28   omissions were material, because the settlement agreement was unsigned and there was no

1   indication that Newbridge had any opportunity to contradict the claims made in it by Jones.  (Ex.

2   D, Doc. 88-4 at 6; ("Apothio has been waiting patiently for real substantive communication from

3   [Newbridge] representatives and has not received any.").)[13]  Once again, though this might have

4   further cemented to the court the contentious relationship between Newbridge and Apothio, the

5   court was put on notice of that fact already by the information provided in the affidavit.

6   *Benavidez v. Cnty. of San Diego*, 993 F.3d at 1146 ("Furthermore, in the search warrant context,

7   we have previously held that an *omission of a fact* necessary to establish probable cause presented

8   a triable issue of material facts about whether that omission amounted to at least reckless

9   disregard for the truth.") (emphasis added) (internal quotation marks and citation omitted); *Chism*

10   *v. Wash. State*, 661 F.3d 380, 387 (9th Cir. 2011) ("Third, Gardner *omitted the fact* that Nicole

11   shared the 6907 credit card account with Todd, . . .") (emphasis added).

12          The allegation that Farr and Dalton "stood to benefit financially if Jones were prosecuted

13   or even investigated" is simply conclusory, with no factual support.  *Coronavirus Reporter v.*

14   *Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023).  Even still, Halverson acknowledged that Farr's

15   "company is in a pending civil case with Jones."  (Ex. A, Doc. 88-1 at 6.)  Yet, Plaintiff has not

16   shown how Halverson knew that the Food and Agriculture Department had "previously

17   reprimanded" Newbridge, or any of the details regarding the underlying lawsuit between

18   Newbridge and Apothio, let alone its "key details," like the "nature of the claims" or Farr's

19   October 2019 sworn declaration.  (Doc. 88 at ¶¶ 151–53, 157.)

20          Furthermore, Plaintiff does not specify the "inconsistencies" in Farr and Dalton's "story

21   about their testing of Apothio's crop" when making this allegation conclusory.  To the extent that

22   it refers to "switching" test results, the Court discusses further below, *infra*, issues plaguing that

23   theory.  Finally, to the extent that Farr and Dalton "never provided [Halverson] with test results

24   consistent with the figures stated in the September 30 Article," and instead, provided results "far

25   lower than 5%" is simply immaterial.  (Doc. 88 at ¶ 156.)  Halverson acknowledged that Apothio

26   was an EARI, and allowed to grow hemp above 0.3%, but could not sell it.  (Ex. A, Doc. 88-1 at

27

28   [13] Plaintiff admits the same in its FAC.  (*See* Doc. 88 at ¶¶ 184 ("[A] proposed settlement agreement that Apothio CEO Trent Jones had authored"), ¶ 199 ("Nicholson emphasized part of a proposed settlement agreement authored by Jones on September 12"), ¶ 202 (referring to settlement agreement as containing "Jones's words").)

6.)  According to Halverson, Farr's test results of Apothio's hemp concluded that 5 of the 6 taken "came back higher than 0.3% THC."  (*Id.*)  And such results came back on two separate occasions.  (*Id.*)  The *only* material facts militating against the probable cause determination included: (1) that Apothio was growing "hot" hemp; and (2) that it was planning on selling it. That the hemp may have returned test results lower than 5% is simply immaterial, so long as the hemp resulted in concentrations above 0.3% THC.  (*See* Ex. A, Doc. 88-1 at 6 ("When he had the tests run this time to determine THC content the 6 samples had a range of total THC percentage between .82% and 2.33% (results attached).")  Taken together, Plaintiff has not stated a judicial deception claim based on the theory that Farr and Dalton were unreliable or biased informants.

### e.   *Professional Testing Laboratory*

Plaintiff next alleges that Halverson "attached to his affidavit purported test results stamped 'Professional Testing Labs' and 'Certificate of Analysis,'"[14] but omitted the fact that Farr conducted the tests rather than having them tested by a certified, independent laboratory. (Doc. 88 at ¶ 159.)  Plaintiff contends that Halverson failed to report in the affidavit that the test results lacked any "of the hallmarks of professional or forensic lab testing," and misrepresented that "water acuity liquid chromatograph was an accepted industry practice at that time," when, Plaintiff asserts, Title 3 of the California Code of Regulations, Section 4942 required more.  (*Id.* at ¶¶ 162 (internal quotation marks omitted),[15] 221, 234, 281.)  Plaintiff continues that "these tests were fraudulent" and Halverson "should have been aware of the [tests'] shortcomings and suspicious results from the face of the test results," and because he works in drug enforcement and has a Master of Forensic Science degree.  (*Id.* at ¶ 163.)  Defendants move to dismiss this judicial deception theory, stating that "[t]he FAC does not specify the 'California law' requiring lab testing of the THC," and argue that due process does not require testing under the California Food and Agricultural Code.  (*See* Doc. 94-1 at 19.)

Title 3 of the California Code of Regulations, Section 4942 provides the "Approved

---

[14] The results are not attached to the Complaint or Halverson's affidavit.  (Ex. A, Doc. 88-1.)

[15] The Court notes that paragraph 162 of the FAC cites to "California Code of Regulations tit. 3, § 4922" for required instructions on how to test industrial hemp.  This is likely a typographical error, as § 4942 provides such instruction, and Plaintiff specifically cites to Section 4942 in other places of its FAC.  (*See* Cal. Code Regs., tit. 3, § 4942 (2019); *see also* Doc. 88 at ¶ 234 (citing § 4942(a)(4)).)

Testing Method for Testing Industrial Hemp for THC Content," and specifies, *inter alia*, how a laboratory must maintain and test the THC content of industrial hemp.  *See* Cal. Code Regs., tit. 3, §§ 4942(a)(1), (3) (2019).  The California Department of Agriculture originally adopted Section 4942 "as an emergency action" on June 10, 2019, which was continued, and amended, on December 10, 2019.  *See* Office of Administrative Law, California Regulatory Notice Register 2019, No. 42-Z, *Proposed Action on Regulations* at 1385 (Oct. 18, 2019), *located at*: https://oal.ca.gov/wp-content/uploads/sites/166/2019/10/2019-Notice-Register-Number-42-Z-October-18-2019.pdf [hereinafter, "Oct. 2019 Cal. Reg. Notice Regis."][16]; *see also* Cal. Code Regs., tit. 3, § 4942 (2019) Notes to 2019 amendment, ¶¶ 1 ("New section filed 6-10-2019 as an emergency; operative 6-10-2019 (Register 2019, No. 24)."), ¶ 2 ("New section refiled 12-10-2019 as an emergency; operative 12-10-2019 (Register 2019, No. 50).").  Though in the June edition of the Notice Register, the Department did not specify the authority on which it acted in promulgating Section 4942, the Department did so in the October 2019 proposed amendment.

The Department acknowledged its authority, stating: "The Department proposes to adopt Section . . . 4941, 4942, 4943 . . . pursuant to the authority vested by Sections 407 and 81006 of the Food and Agricultural Code of California."[17]  Oct. 2019 Cal. Reg. Notice Regis., *Proposed Action on Regulations*, Title 3, at 1387 ("AUTHORITY").  Section 81006(d)(1) of the 2019 version of the Food and Agricultural Code explicitly exempts EARIs from testing, and instead, on its face, only applies to non-EARI industrial hemp registrants.  *See* Cal. Food & Agric. Code § 81006(d)(1) (2019) ("Except when industrial hemp is grown by a registered established agricultural research institution . . . a registrant that grows industrial hemp under this section shall, before the harvest of each crop and as provided below, *obtain a laboratory test report indicating the THC levels of a random sampling of the dried flowering tops* . . .") (emphasis added).  Indeed, the Department mentioned the same, specifying that: "This amended regulation establishes time-frames, procedures, methods, and confirmation for industrial hemp sampling,

---

[16] The Court may take judicial notice of this then-proposed regulation.  *See Ams. for Prosperity Found. v. Harris*, 809 F.3d 536, 538 n.1 (9th Cir. 2015); Fed. R. Evid. 201(c)(1) (the court may take judicial notice on its own).

[17] Section 407 merely empowers the Director of the Food and Agricultural Department to "adopt such regulations as are reasonably necessary to carry out the provisions of this code[.]" Cal. Food & Agric. Code § 407 (2019).

1   *laboratory testing*, harvest, and destruction . . . *except when industrial hemp is grown by an*

2   *established agricultural research institution*[.]" Oct. 2019 Cal. Reg. Notice Regis., *Proposed*

3   *Action on Regulations*, Title 3, at 1386 ("ADOPTED TEXT") (emphases added).

4        The Court concludes that 3 C.C.R § 4942 applies only to the Food and Agricultural Code,

5   Section 81006(d)(1)'s requirements that industrial hemp registrants obtain laboratory tests prior to

6   harvest.  As an EARI, § 4942 did not apply to Apothio.  Also, § 4942 does not purport to set forth

7   the *only* method for testing THC content in industrial hemp.  Therefore, it is not material that Farr

8   did not follow Section 4942 in testing Apothio's crops.  (Doc. 88 at ¶¶ 160–63.)

9        Even if Section 4942 applied to Apothio and Farr failed to follow its procedures, Plaintiff

10   has failed to show that Halverson made knowing omissions or misrepresentations.  Halverson

11   obtained a "Bachelor of Arts degree in Sociology with an emphasis in Criminal Justice" and a

12   "Masters of Forensic Science degree specializing in Investigations."  (Ex. A, Doc. 88-1 at 5.)

13   These educational qualifications and Halverson's "over 24 hours of training . . . [on] marijuana

14   investigation and marijuana regulations," including testing protocols do not demonstrate that

15   Halverson knew that the method used by Farr was improper or that § 4942 applied to Apothio.

16   (*Id.*)  The allegation is simply speculation.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988,

17   1008 (9th Cir. 2018) (The court is not required to accept as true allegations that are merely

18   conclusory, *unwarranted deductions of fact*, or unreasonable inferences.") (cleaned up) (emphasis

19   added) (internal quotation marks and citation omitted).  In sum, there is no showing that Section

20   4942 applied to Apothio, that it prescribed the *only* method for testing hemp, or that Halverson

21   had any awareness that it was.

22               **f.**    *Requested Test Results*

23        Plaintiff asserts that "Halverson omitted the suspicious circumstances that led to Farr

24   providing these 'Professional Testing Lab' results."  (Doc. 88 at ¶ 165.)  Plaintiff alleges that on

25   October 11, 2019, Lance Dalton provided FBI Agent Callahan with a "limited excerpt of some

26   test results" showing that Apothio's hemp was "hot."  (*Id.*)  On October 15, Callahan inquired

27   about the "methodology for collection and location of sample collection," and asked about the

28   meaning of "certain columns and rows."  (*Id.* (internal quotation marks omitted).)  Farr

purportedly responded to Callahan the next day, wherein he "failed to answer about the methodology for collection," and then later sent results to Callahan and Halverson.  (*Id.* at ¶¶ 166–67.)  Plaintiff contends that Farr "did not send the full test results that Callahan had [originally] requested," but instead, "sent Callahan and Halverson different test results, based on samples [that] [Farr] had allegedly previously taken, and not the one that Dalton had provided." (*Id.* at ¶ 167.)  To put it plainly, Plaintiff asserts that Farr *switched* the test results that he sent to Callahan and Halverson, *i.e.*, sending results from samples that *Farr* had taken, rather than the completed portion of the results Dalton originally sent.

Even if true, there is no showing that Halverson's alleged omission of these events was *knowing* or deliberate.  (*See* Doc. 88 at ¶¶ 165–69; *Scanlon v. Cnty. of L.A.*, 92 F.4th 781, 799 (9th Cir. 2024) ("Judicial deception consists of either *deliberate omission* or affirmative misrepresentation.") (emphasis added) (internal quotation marks and citation omitted); *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1122 (9th Cir. 1997) (misrepresentation or omission must be "knowing and deliberate, or reckless").)  Halverson attached the test results provided by Farr to his affidavit (Doc. 88 at 47), which allowed the court to make its own judgment about them.  On the other hand, Plaintiff admits that Halverson had not been "added to the [email] chain" until *after* Dalton halted communications with Callahan and passed responsibility on to Farr.  (*See* Doc. 88 at ¶¶ 166–67.)

And Plaintiff does not allege with specificity, (*see* Fed. R. Civ. P. 9(b)), the contents of the email correspondence that were *part of the chain* by the time Halverson joined—there is simply no way for the Court to conclude, from the pleadings or otherwise, whether Halverson knew that (1) Dalton previously sent excerpted test results to Callahan, (2) that Farr's completed test results were different from the ones Dalton originally sent, or (3) that Farr's results were allegedly "biased" because they came from his own laboratory.  As such, the complaint has failed to plead that any omissions were the result of deliberate, reckless, or knowing conduct.  Thus, Plaintiff has not stated a claim for judicial deception.

### g.    *Failure to Disclose Record of Compliance*

Plaintiff complains that "Halverson omitted that Apothio had a record of compliance and

32

1   regularly communicated and cooperated with officials, including his investigative partner,

2   Nicholson."  (Doc. 88 at ¶ 170.)  Plaintiff alleges that it met and communicated with County

3   officials "through[out] 2018 and 2019," wherein Plaintiff shared with County officials "its

4   chromatograph test results and plans for extraction and commercialization," including studies

5   showing "that the THC levels of certain Apothio strains dropped significantly before harvesting."

6   (*Id.* at ¶ 172; *see also id.* at ¶ 173 ("Apothio's continuous, open, and transparent communication

7   with Kern County enforcement officials, including the author of the warrant himself, indicates a

8   lack of criminal intent.").)

9          This allegation, however, is not material to a finding of probable cause regarding

10  Plaintiff's purported intent on selling or furnishing marijuana.  To begin, Plaintiff impliedly

11  admits that indeed, some of its strains had not dropped in THC concentration at the time of

12  harvest.  (Doc. 88 at ¶ 172.)  In other words, the Court cannot reasonably infer that because

13  "certain Apothio strains dropped significantly before harvest[]," that *all* of its strains had also

14  dropped.  (*Id.*)  Furthermore, Apothio's alleged record of compliance is predicated on Apothio's

15  open communication with Kern County officials.  (*Id.* at ¶¶ 171–73.)  There is insufficient detail

16  as to who attended these meetings, when *exactly* they occurred, and what information was shared

17  between Apothio and County officials.[18]  Such absence in specific factual allegations fails Rule

18  9(b)'s heightened pleading commands.  *Benavidez,* 993 F.3d at 1145 ("Particularity includes the

19  who, what, when, where, and how of the misconduct charged, including what is false or

20  misleading about a statement, and why it is false.") (cleaned up) (internal quotation marks and

21  citation omitted); *id.* at 1147 (Rule 9(b) applies to judicial deception claims).  So, the Court

22  cannot deduce, for example, that Apothio shared the contents of its Agreement with ProCann at

23  such meetings or notified the County of its controversy with Newbridge and its employees.

24         The fact that Apothio shared all relevant information regarding its commercial contracts

25  and THC concentrations of its plants in the past, does not mean that there was no probable cause

26

27  [18] For instance, the Court agrees with Defendants' contention that "while the FAC states that on October 4, 2019,
    Apothio received a Certificate of Analysis for a sample from a field that KCSO late destroyed during the execution of

28  the warrant that showed a level of THC of 0.25% from a third party certified lab (FAC ¶ 80), *the FAC fails to allege it
    shared this information with KCSO*."  (Doc. 95 at 14 (emphasis added).)

1  to believe that Apothio was not complying with the law at the time the search warrant issued.

2  The relevant inquiry for a search warrant is whether contraband or evidence of a crime may be

3  found *at that time* in a certain place.  *See Bill v. Brewer*, 799 F.3d 1295, 1301 (9th Cir. 2015)

4  ("Rather, probable cause to search concerns the connection of the items sought with crime *and*

5  *the present location* of the items.") (cleaned up) (emphasis added) (internal quotation marks and

6  citation omitted); *United States v. Grant*, 682 F.3d 827, 835 (9th Cir. 2012) ("[T]he affidavit must

7  support an inference that [evidence of contraband] *is presently* in the residence to be searched,

8  regardless of its past position.") (emphasis added); *see also* 2 Wayne R. LaFave, *et al.*, Criminal

9  Procedure § 3.3(g) (4th ed. 2023) ("[I]n search cases[,] the concern is always with facts relating to

10  a *current* situation.") (emphasis added).

11        In sum, none of Plaintiff's judicial deception theories as to Halverson's affidavit have

12  merit.  Plaintiff has failed to plausibly state a claim against Defendants predicated on Halverson's

13  alleged judicial deception in the filing of his search warrant affidavit.  Defendants' Motions to

14  Dismiss, (Docs. 94, 95) are **GRANTED** and Plaintiff's first cause of action pertaining to

15  Halverson's warrant affidavit is **DISMISSED**.  Accordingly, Plaintiff's fourth cause of action

16  bringing a correlative Bane Act claim for judicial deception is also **DISMISSED**.  *Tillotson v.*

17  *City of S.F.*, 739 F. App'x 887, 889 (9th Cir. 2018) ("Absent any federal constitutional violation,

18  or any claim of state constitutional violation, there is no basis for a claim of liability under the

19  Bane Act.") (citing *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013)).

20                b.     Nicholson's Affidavit—Analysis

21        As noted above, Nicholson's affidavit incorporated most, if not all, of Halverson's

22  warrant affidavit, recounted above and added significantly more details.  Notably, the complaint

23  alleges conclusions, without supporting factual allegations, in an attempt to state a claim against

24  Nicholson.  This is insufficient.  *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 713 (9th Cir. 2023); *see*

25  *also Lu v. Cnty. of Riverside*, No. CV 20-1062-CBM-(SHKx), 2020 WL 8414042, at *3 (C.D.

26  Cal. Dec. 15, 2020) ("The Complaint includes conclusory allegations that such statements were

27  'deliberately and/or recklessly' made . . . and does not include any supporting facts.  Therefore,

28  the Court need not accept these conclusory allegations as true for purposes of the instant

1    Motion.") (citation omitted).

2       **a.**  ***Contracts with ProCann and Newbridge***

3       Plaintiff first complains that like Halverson, Nicholson "intentionally, knowingly and

4    recklessly made the same material misrepresentations regarding the [Toll] Processing Agreement

5    with ProCann," when he stated that Apothio agreed to send 3–8 million pounds of hemp biomass,

6    and then concluded that Jones was planning on selling hemp over 0.3% THC.  (Doc. 88 at

7    ¶¶ 186–87.)  In Plaintiff's view, the Agreement "states that the biomass extract to be sold is to be

8    'less than 0.3% THC[.]'"[19] (*Id.* at ¶ 188.)  For the same reasons as stated above, this contention

9    lacks merit.

10      Plaintiff next contends that "Nicholson also intentionally, knowingly, and recklessly

11   misrepresented that Apothio 'attempted to sell his [hot hemp] to [Newbridge] to profit share," and

12   attested to such information "without stating any support or source."  (Doc. 88 at ¶ 189.)  Plaintiff

13   represents that "Apothio was not contracted to sell hemp to Newbridge," but only intended on

14   using "Newbridge's extraction and refining equipment to process its hemp, splitting revenues

15   with Newbridge from sales to third parties," and that Nicholson knew this was false because of

16   the terms of the proposed settlement agreement.  (*Id.* at ¶¶ 190–92.)  However, information about

17   the contract was provided to Halverson, and Nicholson described it in his search warrant

18   affidavit.  (Ex. C, Doc. 88-3 at 7 (Jones approached Dalton, the Consultant for Newbridge, "to

19   process and profit share in hemp he was growing for CBD oils.").)  Moreover, the fact that Jones

20   drafted this document, without input or agreement by Newbridge, fails to demonstrate anything

21   other than Jones's views, which does not undermine a finding of probable cause.  *See supra*.

22   Determining the import of this information was the judge's obligation.  Thus, this does not state a

23   claim for judicial deception.

24      **b.**  ***FBI Interview & Memorandum***

25      Plaintiff asserts that Nicholson "knew the contents of the FBI interview because he

26

---

27   [19] Neither Nicholson nor Halverson were obligated to take Jones for his word that he would destroy the hot hemp.  *Dist. of Columbia v. Wesby*, 583 U.S. 48, 65–68 (2018) (emphasis added) (internal footnotes and citations omitted); *Ramirez*

28   *v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009). Rather, Nicholson believed that Jones was planning on "selling the hemp that is over 0.3%[.]" (Ex. B, Doc. 88-3 at 8.)

1  received a copy of it before applying for" his search warrant but omitted "the entire FBI interview

2  and all of its findings" from his affidavit.  (Doc. 88 at ¶ 194.)  Plaintiff argues that these

3  documents would have "exposed flaws in Halverson's testing of Apothio's fields[] [because]

4  Halverson tested only female plants."  (*Id.* at ¶ 195.)  Because male plants "accounted for

5  approximately half of Apothio's crops," Nicholson "knew or plainly should have known from the

6  FBI interview" that the other half "contained no THC at all" and that "marijuana fields cultivated

7  for sale consist only of female plants[.]" (*Id.* at ¶¶ 196–97.)

8          The complaint, however, details only that Fankhauser and Montanio allegedly explained

9  that Jones provided County officials with "test results with hemp levels that were 'appropriate,'"

10  which holds no significance regarding Apothio's alleged intent to *sell* hot hemp.  (*Id.* at ¶ 145b.)

11  Furthermore, the FBI interview and memorandum discussed that "Apothio had planted both male

12  and female plants," which was significant "because no commercial marijuana cultivator would

13  keep male and female plants together because it would destroy the value of the crop."  (*Id.* at ¶

14  145e.)

15          Accepting these allegations as true, however, does not indicate that Apothio did not intend

16  to sell hot hemp—particularly when it impliedly admits that half of its fields consisted of female

17  plants.  (*Id.* at ¶ 195.)  Moreover, there is no basis to conclude, from the portion of the FAC

18  detailing the contents of the FBI interview, or anywhere else in the FAC and warrant affidavits,

19  that "Halverson tested only female plants."  (*Id.*)  It appears that such an allegation is speculative,

20  or rather, based on Plaintiff's own inferences—*i.e.*, Halverson *must* have tested only the female

21  plants because the male plants would have tested close to 0%.  Yet, Nicholson's reporting of test

22  results from Apothio's hemp clearly illustrates that some *did* test at 0% or *close* to 0%.  (*See, e.g.*,

23  Ex. C, Doc. 88-3 at 8–9 (showing some plants testing at "0.12%," "0.13%," "0.1%," and two

24  plants testing at "0%").)  Halverson tested five samples from nine fields and produced a wide

25  range of THC test results.  (*Id.*)[20]  Even if Plaintiff is correct and Halverson tested only female

26

27  ───────────────

[20] Additionally, Nicholson acknowledged that the test results had a 2% variation rate.  (Ex. C, Doc. 88-3 at 9.)  Taking
that into account, there may be even *more* of Apothio's plants that tested at or close to 0%.  The issue is, of course, not
28  *all* of Apothio's plants fell into the appropriate THC level range for hemp—even with the variation, it cannot account
for plants that produced, for example, a "7.3%" or "6%" THC concentration.  (*See id.*)

1    plants, Plaintiff fails to explain how Nicholson knew or should have known this fact at the time

2    he swore his affidavit.  And even if Nicholson knew that half of Apothio's fields were male plants

3    and purposefully omitted this fact from his affidavit, this is still of no legal import—the fact that

4    half of Apothio's fields contained high-THC, female plants was material.  Plaintiff has not

5    plausibly stated a claim based on this theory.

6                              **c.    *Unreliable Informants***

7          In this next set of allegations, Plaintiff contests that like Halverson, Nicholson

8    "knowingly, intentionally, and recklessly, omitted details concerning" Newbridge's lawsuit with

9    Apothio, Farr and Dalton's biases, inconsistencies in Farr's declarations under oath, and biases

10   pertaining to the "Professional Testing Labs" results, which lacked a "name, address, or other

11   verifiable details."  (Doc. 88 at ¶ 198.)  The Court has already addressed these allegations, *supra*,

12   and concludes that the same issues undermine these allegations as they did with Halverson's

13   affidavit and allegations.  In other words, Plaintiff has failed to show that Nicholson knew, or

14   should have known, about the details underlying Newbridge and Apothio's lawsuit, including the

15   existence of Farr's declaration, and has failed to show how or why Nicholson would have reason

16   to believe Farr and Dalton were biased.  Furthermore, it is simply an unwarranted deduction from

17   Nicholson's background and experience to conclude that he knew or should have known that a

18   Professional Testing Laboratory necessarily needed to have a "name, address, or other verifiable

19   details."  Any conclusion in the alternative is speculation.

20         Plaintiff again alleges that the proposed settlement agreement "possessed exactly the

21   opposite intent that Nicholson falsely attributed to it," and therefore Nicholson allegedly

22   misrepresented the settlement language in four ways.  (*Id.* at ¶ 200.)  However, even accepting all

23   of Plaintiff's allegations on this point as true, Plaintiff has not shown how these four alleged

24   omissions and misrepresentations are "material"—*i.e.*, that after "correcting" the affidavit in

25   Plaintiff's view, that probable cause would still not exist.  *See Martinez v. United States*, 997 F.3d

26   867, 880 (9th Cir. 2021) ("A judicial deception claim requires that the Nieves family . . . 2)

27   establish that, but for the dishonesty, Nieves Martinez's arrest and detention would not have

28   occurred.") (cleaned up) (internal quotation marks and citation omitted); *Chism v. Wash. State*,

661 F.3d 380, 386 (9th Cir. 2011) (summary judgment context: plaintiffs must "establish that, but for the dishonesty, the searches and arrest would not have occurred.") (cleaned up) (internal quotation marks and citation omitted); *Schindler v. Contra Costa Cnty.*, No. 21-cv-02984-JSW, 2023 WL 2414864, at *3 (N.D. Cal. Mar. 8, 2023) ("[E]ven assuming these statements were false, Plaintiff has not alleged that but for these statements, the court's determination in the dependency proceedings would have been different.").

For instance, Plaintiff has alleged that Nicholson misrepresented that the proposed settlement agreement showed that Apothio conspired with Newbridge to ship marijuana from Oregon to Arvin, California, but that the agreement indicates the opposite.  (Doc. 88 at ¶ 201.)  For the reasons set forth above, the settlement agreement drafted by Jones does not address whether probable cause existed.

In any event, Plaintiff complains that Nicholson mischaracterized the proposed agreement when he stated that Apothio demanded Newbridge refrain from reporting illegal activity to law enforcement, but that Apothio actually demanded that Newbridge stop lying about Apothio.[21] (*Id.* at ¶ 205.)[22]  Finally, Plaintiff asserts that Nicholson "falsely represented that the Proposed Settlement Agreement implies that Apothio intended to sell refined cannabis to Newbridge when there is no such statement or implication."  (*Id.* at ¶ 207.)[23]

---

[21] Though Plaintiff characterizes this clause as concerning Newbridge apparently lying about Apothio, the Court notes that the clause very clearly states that Newbridge shall "agree to:  Immediately cease and desist *any and all calls*, letters and communication to *any* local, state or federal agencies regarding *any* subject related to Apothio, LLC . . ."  (Ex. D, Doc. 88-4 at 4 (emphases added).)  The clause is preceded by a statement that "Reputations matter," including Newbridge's alleged "willful misrepresentations, lies, [and] malicious claims," (*id.*), however, it is unclear what "agencies" and what "subjects" this clause contemplated.  Even if Nicholson made an erroneous assumption, it is insufficient to state a judicial deception claim on that basis.  *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009).

[22] Regarding Plaintiff's third point, the Court is unconvinced that this is a misrepresentation.  Plaintiff proposes that the clause in the agreement stating "Apothio will not be restricted in using any form of cavitation, controlled cavitation, . . . and more for the purposes of extracting, refining, or processing cannabis, whether hemp or marijuana," (Ex. D, Doc. 88-4 at 5), does not indicate that "Apothio will continue to use methods to extract and refine product in processing its cannabis whether hemp or marijuana."  (Doc. 88 at ¶ 206; Ex. C, Doc. 88-3 at 11.)  This reading of the proposed agreement makes no sense—that Apothio "will not be restricted from using Newbridge's technology" for the purposes of extracting, refining, or processing cannabis clearly indicates that Apothio is reserving its right and intent to do so.  In any event, at best this was an "erroneous assumption about the evidence [Nicholson] ha[d] received," which is an insufficient basis to state a claim for judicial deception.  *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (citation omitted).

[23] Upon review of Nicholson's affidavit, however, he states that because the proposed agreement provides that "Apothio will provide 10% of the profits earned by Apothio to [Newbridge][,] [this] further impl[ies] JONES' intent to sell refined cannabis."  (Ex. C, Doc. 88-3 at 11–12.)

Nicholson's ultimate conclusion, however, stated: "Based on my training, experience, and the above-mentioned information, it is my opinion JONES is in possession [of] and attempted to sale [sic] illegal cannabis to *two* separate companies . . . and may [be] attempting to export cannabis out of the State of California." (Ex. C, Doc. 88-3 at 13 (emphasis added).) Thus, Plaintiff has not shown how, even if "corrected" according to its allegations, such corrections are "material" to the determination of probable cause.[24]  Indeed, even if isolated to only the sale of marijuana to ProCann, Plaintiff has not demonstrated how "but for" these misrepresentations, there would not be probable cause to issue the search warrant. Accordingly, Plaintiff's judicial deception theory fails.

### d.    *Agreement with Cerro Coso*

Nicholson stated that he "did some research of the claims JONES made in the [September 30th] article about growing the plants under the guides [sic] of agricultural research for Cerro Coso College." (Ex. C, Doc. 88-3 at 10.)  However, after reviewing an article in CCCC's "The Chronicle," and a letter on KCCD's website, Nicholson noted that "it makes no mention of JONES growing any hemp or cannabis *in the Arvin area*, California, where the fields tested were located, *only the 20 acres in California City*, California." (*Id.* at 11 (emphases added).)

Plaintiff deduces that, since Apothio and CCCC's agreement "covered Apothio's commercial and research activity in the Arvin fields," Nicholson must have "falsely stated that the agreement . . . did not cover the hemp research being performed in the Arvin lots at issue[.]" (Doc. 88 at ¶¶ 212–13.)  To the contrary, Nicholson makes no such statement in the affidavit.  He simply states his observations based upon his review of the material quoted in the affidavit. The judge reviewing the warrant application could accept or reject it when evaluating whether probable cause existed.  *Harper v. Nedd*, 71 F.4th 1181, 1184 (9th Cir. 2023) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss.") (internal quotation marks and citation omitted); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

---

[24] Plaintiff has, however, stated legal conclusions that "[w]ithout those material misstatements and omissions, both individually and collectively, the issuing judges would not have found probable cause to destroy Apothio's crops." (Doc. 88 at ¶ 309.)  The Court cannot accept this legal conclusion as true, and it is inadequate to show the materiality of such misrepresentations on these facts.

39

1   988, 1008 (9th Cir. 2018) (The court is not required to accept as true allegations that are merely

2   conclusory, *unwarranted deductions of fact*, or unreasonable inferences.") (emphasis added)

3   (cleaned up) (internal quotation marks and citation omitted).  Importantly, Plaintiff has simply

4   failed to apprise the Court of what "research" Nicholson conducted into parties' arrangement, and

5   whether that included review of CCCC's and Apothio's agreement.  The Court will not speculate

6   that this "research" included reading their agreement.  Plaintiff has therefore failed to plausibly

7   state a claim based on these allegations.

8                          **e.      *Exculpatory Emails***

9          Plaintiff complains that in his affidavit, Nicholson "relied in part on" the FBI agents'

10  interview of Turoff, "but knowingly, intentionally, and recklessly, omitted all of the exculpatory

11  information contained in the emails that Turoff had provided."  (Doc. 88 at ¶ 215.)  For instance,

12  Nicholson acknowledged that Turoff planned on emailing documentation to the agents, relating to

13  her dealings with Jones, but in Plaintiff's view, "[t]he referenced emails do not support any of

14  Turoff's statements to the FBI . . . that her former company [ProCann] pulled out of its deal with

15  Apothio after due diligence."  (*Id.* at ¶¶ 216–17.)  Nor do the emails "support the claim that Jones

16  'acknowledged' hot hemp being grown," but instead, "they show the opposite[.]" (*Id.* at ¶ 218.)

17         The issue, once more, is that it is simply unclear from the FAC whether Nicholson knew,

18  or had reason to know, about the contents and substance of these emails.  Nicholson included the

19  fact that "Turoff agreed to email [Special Agent] Scott documentation pertaining to her dealings

20  with JONES," but did not indicate that he personally received or read them.  (Ex. C, Doc. 88-3 at

21  13.)  When Nicholson mentioned that Apothio was growing hemp that would test above 0.3%

22  THC levels, he attested that "*JONES* told Turoff" this information "[a]t one point during the

23  visit[.]" (*Id.* at 12 (emphasis added) (capitalizations in original).)

24         Though Plaintiff may be correct that the emails do not support what Turoff said in her

25  interview, (Doc. 88 at ¶ 218 (chart of THC levels allegedly contained in emails)), Plaintiff has not

26  provided any factual support that Nicholson was aware of this.  (*See generally* Doc. 88 at ¶¶ 214–

27  18.)  Instead, Plaintiff has only provided legal conclusions and a threadbare recitation of the

28  elements, which again, is not permitted at this juncture.  *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700,

713 (9th Cir. 2023); *Newt v. Kasper*, 85 F. App'x 37, 38 (9th Cir. 2003); *see also Lu v. Cnty. of Riverside*, No. CV 20-1062-CBM-(SHKx), 2020 WL 8414042, at *3 (C.D. Cal. Dec. 15, 2020). As such, the FAC does not state a claim for judicial deception.

### f.      *Sampling of Hemp*

Like its earlier arguments, Plaintiff relies on Title 3, California Code of Regulations, Section 4941 (as opposed to Section 4942), for the proposition that Nicholson "knowingly, intentionally, and recklessly, omitted both the details of the relevant regulatory guidelines to sample hemp crops for testing and the fact that the authorities had not followed those guidelines[.]" (Doc. 88 at ¶¶ 219–225.)  This theory, however, fails for two reasons.

First, "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997).  Hence, Nicholson's only obligation was providing "[s]ufficient information . . . presented to the magistrate to allow that official to determine probable cause[.]" *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *see, e.g.*, *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 948 (9th Cir. 2010) (warrant "failed to inform the state court judge of *relevant facts* that supported the conclusion that UMCC was not in violation of state law.") (emphasis added); Cal. Penal Code § 1527 ("The affidavit or affidavits must set forth *the facts* tending to establish the grounds of the application, or probable cause for believing that they exist.") (emphasis added).

Second, even if Nicholson *was* obliged to inform the judge of this regulation, it is immaterial to the probable cause determination because, like Section 4942, Section 4941 does not apply.  The Department of Agriculture adopted Section 4941 as part of the same set of regulations—and at the same time as—Section 4942 (and as mentioned below, Section 4943), specifying California Food and Agricultural Code Section 81006 as its authority for issuing these regulations.  Oct. 2019 Cal. Reg. Notice Regis., *Proposed Action on Regulations*, Title 3, at 1387 ("AUTHORITY").  Section 81006(d)(1) speaks not only of testing, but "random sampling," however, such sampling applies only to non-EARI registrants.  *See* Cal. Food & Agric. Code § 81006(d)(1).  All references to "sampling" that occur in this section thereafter clearly only refer to the underlying obligation for non-EARI registrants to sample their industrial hemp prior to

1   testing it.  *See id.*  As such, Section 81006—and its corresponding regulation found in Section

2   4941—cannot apply to Apothio and was immaterial to a determination of probable cause.

3   Plaintiff' judicial deception claim fails on this ground.

**g.      *Testing Equipment***

5       Plaintiff alleges that "California law requires THC testing to be done by a laboratory," but

6   that "Nicholson omitted this requirement and that Halverson failed to follow it.  These allegations

7   depend on application of Title 3, California Code of Regulations, Section 4943.[25] (Doc. 88 at

8   ¶¶ 226–32.)  Plaintiff disputes Halverson's use of the LightLab analyzer to test the THC

9   concentrations of its hemp.  The Court need not review these arguments any further, as it has

10  already disposed of them *supra*—Section 4943 simply does not apply to Apothio.  Any omission

11  of this regulation was immaterial to a finding of probable cause.

**h.      *Halverson's Test Results***

13      Plaintiff contends that Nicholson "omitted details about how the samples were tested, and

14  intentionally, knowingly, and recklessly misrepresented that the test results showed Apothio was

15  growing hot hemp when in fact it was not."  (Doc. 88 at ¶ 233.)  For instance, Halverson dried a

16  portion of the flower with a microwave, but Plaintiff contends by relying on Title 3 of the

17  California Code of Regulations, Section 4942, that this method was improper.  (*Id.* at ¶ 234

18  (citing Cal. Code Regs., tit. 3, § 4942(a)(4)).)  The Court has already addressed this argument and

19  concluded that Section 4942 cannot apply to Apothio because it is an EARI.  *See supra.*

20      Plaintiff next asserts that Nicholson "misrepresented the test results that Halverson

21  obtained and their validity" when he stated that "29 out of 36 tested 'between 0.67% and 7.3%

22  [THC] thus making the majority of the samples taken cannabis."  (*Id.* at ¶ 235 (internal quotation

23

---

24  [25] Section 4943 prescribes "[t]esting of industrial hemp for THC content shall be conducted by a laboratory with
25  International Organization for Standardization (ISO) / International Electrotechnical Commission (IEC) 17025
    accreditation using a validated method for total THC analysis." Cal. Code Regs., tit. 3, § 4943 (2019). Though Plaintiff
    does not explicitly cite to Section 4943, it appears to quote this language. (*See* FAC, Doc. 88 at ¶ 226 (". . . 'a laboratory
26  with International Organization for Standardization (ISO) / International Electrotechnical Commission (IEC) 17025
    accreditation . . .'").) Section 4943 immediately follows Section 4942, explaining proper testing—which the Court has
27  already previously determined applies to non-EARI registrants—and cites to the California Food and Agricultural
    Code, Section 81006 for its authority. The bottom of the regulation cites to the same June 10, 2019 and December 10,
28  2019 issuances in the California Regulatory Notice Register.  Thus, the Court is convinced that, like Section 4942,
    Section 4943 does not apply to Apothio.

marks omitted).  Plaintiff claims that this was a misrepresentation because "the Lightlab has a margin of error of 2% compared to a lab result on average" and "12 out of 36 were within the 2% margin of error for the 0.3% threshold." (*Id.*)  Indeed, Nicholson plainly informed the judge of the 2% margin of error immediately after reporting the results of the samples from nine of Apothio's fields.  (*See* Ex. C, Doc. 88-3 at 9 ("Typical results will fall within 2% of a lab result for flower 3% for concentrates.  LightLab repeatability is +/- 1%.").)

Plaintiff alleges that "Nicholson knew that the taking of 36 samples is not a statistically representative sample for 17 million plants" and that his "own flawed testing showed only that 0.000141% of the plants in the fields tested above 0.3% THC, but [he] omitted the statistical unreliability of his sampling and testing results entirely while overstating his findings." (Doc. 88 at ¶ 237.)  Once more, Plaintiff has not shown that this omission was knowing, reckless, or deliberate—*i.e.*, Plaintiff has not demonstrated *how* Nicholson would plausibly know or should have known that 36 samples was insufficient.  Furthermore, Nicholson purportedly attached "maps of the hemp field locations associated with Trent JONES" (Ex. C, Doc. 88-3 at 7 (noting that these maps were attached to affidavit)) and informed the judge that Apothio was "grow[ing] 512 acres of hemp." (*Id.* at 8 ("[I]f you add up the total acreage of and subtract the last two growers . . . you come up with a total of 512 acres.").)  Thus, the judge knew that Halverson tested 36 of Apothio's hemp plants, but also knew that Apothio grew over 500 acres of hemp.

Further, Plaintiff alleges that "Nicholson omitted that Halverson evidently had no training with the Lightlab analyzer, before running the tests, he simply read an instruction manual.  And on information and belief, in part based on the lack of any statements about his training in the search warrant application, he had no training in industrial hemp generally, or even any basic knowledge about how to properly calibrate a scale." (Doc. 88 at ¶ 238.)  Plaintiff complains also that Nicholson "does not state that he had any training or experience in investigating or testing hemp crops" and that he "and Kern County knew or should have known that a trained technician in a certified lab using reliable equipment should have done the testing . . . as required by the California Department of Food and Agriculture guidelines." (*Id.* at ¶¶ 239, 241.)  Once more, then, Plaintiff wholly relies on regulations that simply do not apply to Apothio, and that do not

43

indicate they are the *only* method for properly testing THC concentrations of hemp.

Furthermore, Plaintiff suggests that Nicholson knew that Halverson lacked such training "on information and belief" and "in part[,] based on the lack of any statements about his training" in his search warrant application.  (Doc. 88 at ¶ 238.)  This theory of pleading, however, is entirely circular and without any supporting *facts*.  *See Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022) ("But a plaintiff may plead facts on information and belief where the belief is based on factual information that makes the inference of culpability plausible.") (internal quotation marks and citation omitted).  Simply put, Plaintiff speculates that Halverson lacked training because such training is absent in his affidavit—but this is a logical fallacy without any factual support.  Even still, Plaintiff has not adequately shown how Nicholson knew or should have known that Halverson lacked the proper training to use the LightLab analyzer, or that further training beyond the instruction manual was required.

### i.   *Failure to Disclose Record of Compliance*

Plaintiff contends that Nicholson "omitted that Apothio had a record of compliance and regularly communicated and cooperated with officials, including himself."  (Doc. 88 at ¶¶ 242–45.)  In Plaintiff's view, the "open and transparent nature and prior dialogue with Kern County officials underscored its lack of criminal intent."  (*Id.* at ¶ 245.)  For the same reasons as stated earlier, this argument fails.

### j.   *John Deere Salesman*

Finally, Plaintiff takes issue with Nicholson's description of Hopeky's conversation with Jones, wherein Hopeky reported that Jones "wanted something that would cut the tops off of his plants and leave the bottoms behind because the bottoms weren't as useful to him."  (Ex. C, Doc. 88-3 at 12.)  Plaintiff complains about Nicholson's assertion "that Jones was only interested in the top portion of the plants . . ." and takes issue with Nicholson's conclusion that "this further demonstrates Jones is wanting to harvest cannabis for profit, not research."  (*id.*)

First, Plaintiff states that Nicholson misrepresented "that EARIs cannot commercialize hemp" and "cites no authority for the proposition, because there is none."  (Doc. 88 at ¶ 248.)  This allegation is undermined by the face of Nicholson's warrant itself, wherein Nicholson cites

1   to, and quotes from, several pertinent California laws regarding EARIs and hemp.  (*See, e.g.*, Ex.

2   C, Doc. 88-3 at 6–7 ("Established agricultural research institutions shall be permitted to cultivate

3   or possess industrial hemp with a laboratory test report . . .") (italics omitted) (citing Cal. Food &

4   Agric. Code § 81006(d)(1)), 7 (quoting from Cal. Health & Safety Code §§ 11018, 11018.5), 13

5   (quoting Cal. Health & Safety Code §§ 11359(b), 11360(a)(2)).)[26]  Moreover, the thrust of the

6   affidavit relates to the sale of marijuana, not hemp.

7            Second, Plaintiff alleges that "Nicholson omitted that the top portion of the plant is where

8   the highest concentration of most cannabinoid resides, not just THC[.]" (Doc. 88 at ¶ 249.)

9   However, Plaintiff has not pleaded, even in conclusory or threadbare recitation, that this omission

10  was made knowingly or deliberately.  In other words, Plaintiff has not shown that Nicholson

11  knew or should have known this fact in the first instance.  *Scanlon v. Cnty. of L.A.*, 92 F.4th 781,

12  799 (9th Cir. 2024).  Indeed, the Court cannot reach this conclusion, as Nicholson's background

13  and education only speaks to expertise in "drug trafficking," "controlled substances," and

14  "narcotics."  (Ex. C, Doc. 88-3 at 6.)  Nicholson's experience with marijuana appears to lie in his

15  "investigation and eradication of many marijuana gardens on public land and private property."

16  (*Id.*)  Even still, the fact that the tops of the plant contain cannabinoids does not address the fact,

17  which Plaintiff admits, that the tops also contain levels of THC, which, due to their unlawful

18  levels, formed a basis for Nicholson's conclusion that probable cause existed that a crime was

19  being committed.  As such, Plaintiff has failed to plausibly state a judicial deception claim on this

20  theory as well.

21           Taken together, Plaintiff has not plausibly alleged a judicial deception claim based on

22  Nicholson's warrant affidavit.  As such, Defendants' Motions to Dismiss, (Docs. 94, 95) are

23  **GRANTED** and Plaintiff's first cause of action pertaining to Nicholson's warrant affidavit is

24  **DISMISSED**.  Accordingly, Plaintiff's fourth cause of action bringing a correlative Bane Act

25  claim for judicial deception is also **DISMISSED**.  *Tillotson v. City of S.F.*, 739 F. App'x 887, 889

26  (9th Cir. 2018).  Because the Court has dismissed both judicial deception claims, the Court need

---

[26] More importantly, Nicholson was under no obligation to inform the judge of applicable hemp laws, only *facts* giving rise to probable cause, as "trial judges are presumed to know the law[.]" *Andrus v. Texas*, 590 U.S. 806 n.5 (2020) (cleaned up) (quoting *Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997)); *see also* Cal. Penal Code § 1527.

1   not address the merits of Defendants' arguments pertaining to the "open fields exception."  (*See*

2   Doc. 94-1 at 20.)

3                    ii.       *Other Fourth Amendment Theories*

4          County Defendants move to dismiss Plaintiff's additional Fourth Amendment claims.  The

5   County contends the claims arising from "searching Apothio's property without probable cause"

6   fail because "the warrant was valid" and "plaintiff has failed to plead a claim for judicial

7   deception[.]" (Doc. 95 at 16.)  Because the Court has determined that Plaintiff has failed to

8   plausibly plead a claim for judicial deception against both warrants, the County Defendants'

9   motion (Doc. 95) is **GRANTED** on this ground.

10         Plaintiff continues to allege a Fourth Amendment violation of its "right to be free from

11  unreasonable searches and seizures," which it asserts was committed when "Halverson and

12  Nicholson destroyed hemp that (1) Apothio had a legal right to possess (2) that Halverson and

13  [Nicholson] did not test, (3) that tested under 0.3% THC, and (4) that would have tested under

14  0.3% THC had it been tested appropriately, such as the half of the crops that were male plants

15  with no flower." (Doc. 88 at ¶¶ 311, 336, 348.)  County Defendants move to dismiss these

16  allegations based on the sufficiency of the warrants.  (Doc. 95 at 16–17.)  To the extent that the

17  warrants allowed for seizure of the plants, the Court agrees.  (Ex. C, Doc. 88-3 at 4 ("Marijuana

18  Destruction").)  The seizure warrant provides:

19         In making the determination to destroy excess amounts of cannabis, pursuant to this
           order, officers shall demonstrate it was not reasonably possible to preserve the
20         suspected controlled substance in place, or to remove the suspected controlled
           substance to another location.  In making this determination, the difficulty of
21         transporting and storing the cannabis to another site and the storage facilities shall
           be taken into consideration.  Consideration shall also be given to the availability,
22         or unavailability, of helicopters in removing or transportation process.  Such
           consideration will be articulated in the search warrant return.
23

24  (Ex. C, Doc. 88-3 at 4.)

25         Plaintiff alleges that the officers failed to return the warrants.  (Doc. 88 at ¶¶ 176, 253,

26  285 ("Neither Halverson nor Nicholson timely filed the search warrant return required by

27  California Penal Code § 1534 or the affidavit required by California Health and Safety Code

28  § 11479.")  Plaintiff alleges that the officers failed to comply with the warrant's sampling

                                                      46

1    procedures, failed to demonstrate that they could not preserve Apothio's plants or that it was

2    impossible to do so, and that it was possible to do so.  (Doc. 88 at ¶¶ 260–62.)  Based upon these

3    allegations, Defendant's motion is **GRANTED IN PART** to the extent that Defendants seized

4    Plaintiff's plants, but it is **DENIED IN PART** to the extent they destroyed the plants without

5    complying with the court's orders, which required them to demonstrate that it was not reasonably

6    possible to preserve them.

7         Along these same lines, Plaintiff alleges that Halverson and Nicholson violated its Fourth

8    Amendment rights by "excessively destroying all of Apothio's hemp crops" without probable

9    cause.  (Doc. 88 at ¶ 311.)  Defendants move to dismiss this as "derivative of the judicial

10   deception claim, because Nicholson's warrant allowed the destruction of crops, as did Health and

11   Safety Code § 11479(a)[.]" (Doc. 95 at 16.)

12        A judicial deception claim speaks to the manner of applying for and receiving a search or

13   seizure warrant, while an excessive destruction claim speaks to "the manner of *executing* a search

14   [or seizure] warrant."  *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (emphasis added); *id.*

15   ("The general touchstone of reasonableness which governs Fourth Amendment analysis,

16   [citation], governs *the method of execution of the warrant*.  Excessive or unnecessary destruction

17   of property in the course of a search may violate the Fourth Amendment, even though the entry

18   itself is lawful and the fruits of the search are not subject to suppression.") (emphasis added);

19   *United States v. Ankeny*, 520 F.3d 829, 836 (9th Cir. 2007) (analyzing the "nature and quality of

20   the intrusion" for an excessive destruction of property claim); *Liston v. Cnty. of Riverside*, 120

21   F.3d 965, 979 (9th Cir. 1997) ("[U]nnecessarily destructive behavior, beyond that necessary to

22   *execute* a warrant, violates the Fourth Amendment.") (emphasis added) (citation omitted);

23   *Lechner v. LVMPD*, 696 F. Supp. 3d 963, 1000 (D. Nev. 2023).  Accordingly, Plaintiff's

24   excessive destruction claim is not derivative of its judicial deception claim.

25        As recited above, the search warrant tracked California Health and Safety Code § 11479,

26   which permits, but does not require, destruction of illegal plants and allows for this only if other

27   requirements are met.  For example, Section 11479 mandates that "[d]estruction *shall not take*

28   *place* pursuant to this section *until all* of the following requirements are satisfied . . ."  Cal. Health

1   & Safety Code § 11479 (emphases added).  These include, *inter alia*, taking "[a]t least five

2   random samples . . . for evidentiary purposes, from the total amount of suspected controlled

3   substances to be destroyed," taking "[p]hotographs and videos" to "demonstrate the total amount

4   of the suspected controlled substance to be destroyed," and a determination "that it is not

5   reasonably possible to preserve the suspected controlled substance in place, or to remove the

6   suspected controlled substance to another location."  *Id.* §§ (a), (b), (d).  More importantly,

7   though Section 11479 authorizes such destruction "at any time after seizure," this does not imply

8   that the California Legislature intended on usurping the Fourth Amendment's requirement to

9   lawfully seize the hemp in the first instance.

10          Finally, County Defendants point the Court to the *Dines* decision in their Reply brief to

11  stand for the proposition that the 2018 Farm Bill "did not create a possessory interest in the hemp

12  which is enforceable through a § 1983 claim."  (Doc. 111 at 2–3 (relying on *Dines v. Kelly*, No.

13  2:22-cv-02248-KHV-GEB, 2022 WL 16762903 (D. Kan. Nov. 8, 2022)).)  *Dines* stands for the

14  proposition that "[t]he 2018 Farm Act does not create a private right for plaintiff to possess[] and

15  sell hemp and hemp products, either under Section 1983 or as an implied cause of action under

16  the 2018 Farm Act itself."  *Dines*, 2022 WL 16762903, at *7.  In other words, under *Dines*, a

17  plaintiff may not sue a defendant for a violation of the 2018 Farm Bill and may not use the 2018

18  Farm Bill as an underlying "law" for a Section 1983 lawsuit.  Apothio does not rely on the 2018

19  Farm Bill as the underlying basis to bring suit.  Instead, Plaintiff has asserted various

20  constitutional claims as the bases for Plaintiff's Section 1983 lawsuit.  *Cf.* 42 U.S.C. § 1983;

21  (FAC, Doc. 88.)  Therefore, *Dines* does not apply.

22          For these reasons, the County Defendants' motion to dismiss (Doc. 95) Plaintiff's Fourth

23  Amendment claim based on excessive destruction is **DENIED**.

24          D.      Procedural Due Process

25          Plaintiff's second cause of action asserts a Fourteenth Amendment procedural due process

26  claim against all Defendants.  (Doc. 88 at 85.)  Plaintiff alleges that Defendants destroyed

27  "Apothio's entire hemp crop" without providing the company with notice and a meaningful

28  opportunity to be heard.  (*Id.* at ¶¶ 1, 15, 120, 319–20.)  "A procedural due process claim has two

48

1    elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a

2    denial of adequate procedural protections." *Miranda v. City of Casa Grande*, 15 F.4th 12119,

3    1224–25 (9th Cir. 2021) (internal quotation marks and citation omitted).

4                            i.      *Pre-Deprivation Due Process*

5            Plaintiff complains that Defendants seized and destroyed its hemp crops "without

6    providing any notice or opportunity to be heard."  (Doc. 88 at ¶¶ 1, 15, 120.)  Defendants move to

7    dismiss this claim, asserting that "[t]he FAC acknowledges that Trent Jones was provided with a

8    copy of the relevant warrant for destruction (FAC ¶ 254) before the crops were destroyed, and

9    thus he had adequate procedural mechanisms to traverse the warrant . . . All of the procedures

10   required to be followed in the execution of the Nicholson warrant were alleged to have occurred."

11   (Doc. 95 at 18.)  To the extent this pertains to pre-deprivation due process, the Court agrees with

12   Defendants.

13           Though the FAC states that when Nicholson and Halverson arrived to execute the warrant,

14   they "produced the October 24 Search Warrant," the Court need not address whether this

15   constituted proper pre-deprivation notice because the Court has already concluded that the

16   warrants were not subject to judicial deception.  In other words, because Plaintiff has failed to

17   make out a Fourth Amendment violation, *supra*, the warrants are presumed to be valid and in

18   compliance with the Fourth Amendment.  *See United States v. Fisher*, 56 F.4th 673, 679 n.7 (9th

19   Cir. 2022); *Forster v. Cnty. of Santa Barbara*, 896 F.2d 1146, 1148 (9th Cir. 1990) ("A warrant is

20   valid only if supported by an affidavit establishing probable cause. [citation]. There is a

21   'presumption of validity' with respect to the affidavit supporting a warrant.") (internal citations

22   omitted).  It is well-settled that "compliance with the Fourth Amendment also serves to comply

23   with procedural due process." *Sanders v. City of San Diego*, 93 F.3d 1423, 1428 (9th Cir. 1996).

24           Indeed, in *Sanders*, the Ninth Circuit explained:

25           We have found no case in which compliance with the Fourth Amendment in the
             context of a criminal investigation or proceeding has been held not to satisfy due
26           process as well.[]  Nor have we found any case that addresses whether a seizure of
             property as evidence in a criminal investigation must comply with any other
27           constitutional standard than that of the Fourth Amendment in order to satisfy due
             process.[]
28

                                                    49

1
2
3

> For these reasons, we conclude that here, as in *Gerstein*, the Fourth Amendment supplies the 'process that is due.' We hold that, when seizing property for criminal investigatory purposes, compliance with the Fourth Amendment satisfies pre-deprivation procedural due process as well.

4   93 F.3d at 1429 (internal footnotes and citations omitted); *see also Sasin v. Cnty. of Kings*, 67 F.

5   App'x 413, 415 (9th Cir. 2003) ("Whether the property is seized pursuant to a search warrant or

6   without a warrant but in accordance with the plain view exception, compliance with the Fourth

7   Amendment also serves to comply with procedural due process.") (citation omitted); *Jones v. City*

8   *of Vallejo*, No. 2:22-cv-01574-WBS-JDP, 2024 WL 2153646, at *3 (E.D. Cal. May 14, 2024)

9   (dismissing procedural due process claim as "duplicative of the Fourth Amendment claim").

10   Accordingly, because Plaintiff has failed to state a claim for judicial deception, the Court

11   has no alternative but to **GRANT** Defendants' motions to dismiss, (Docs. 94, 95) and **DISMISS**

12   Plaintiff's pre-deprivation due process claim and correlative Bane Act claim.

13   *ii.    Post-Deprivation Due Process*

14   Plaintiff complains that Defendants violated its rights to due process by "destroying

15   Apothio's entire hemp crop" and "failing to return the warrant materials in a timely manner."

16   (Doc. 88 at ¶ 320.) Though Plaintiff has not shown a protected property interest in receiving the

17   warrant return, it may still bring a post-deprivation claim regarding destruction of its crops,

18   notwithstanding Defendant's compliance with the Fourth Amendment. *See Marutyan v. Las*

19   *Vegas Metro. Police Dep't*, No. 2:16-cv-01089-MMD-GWF, 2017 WL 1091787, at *3 (D. Nev.

20   Mar. 22, 2017) ("Seizing property for criminal investigatory purposes pursuant to a warrant

21   satisfies pre-deprivation procedural due process requirements. [citation]. However, the seizure of

22   property pursuant to a valid search warrant may still support a procedural due process claim if

23   post-deprivation procedures are inadequate.") (citations omitted), *aff'd*, 778 F. App'x 489 (9th

24   Cir. 2019).

25   Post-deprivation procedures must be "both meaningful and sufficient[.]" *Miranda v. City*

26   *of Casa Grande*, 15 F.4th 1219, 1227 (9th Cir. 2021). "[M]eaningful postdeprivation remedies

27   will suffice when the deprivation was the result of a random and unauthorized act by a state

28   employee." *Id.* at 1226 (internal quotation marks and citation omitted); *see also Hudson v.*

*Palmer*, 468 U.S. 517, 533 (1984).  "Thus, where the state provides a meaningful postdeprivation remedy, only authorized, intentional deprivations constitute actionable violations of the Due Process Clause."  *Singh v. CDCR*, No. 2:23-cv-01624-EFB (PC), 2024 WL 3498576, at *8 (E.D. Cal. July 22, 2024); *Hossein v. Sheriff's Police Dep't*, No. 2:23-cv-2002-KJN-P, 2024 WL 37053, at *2 (Jan. 3, 2024) ("Authorized intentional deprivation of property pursuant to an established state procedure is actionable under the Due Process Clause.") (citations omitted).

Though "California law provides an adequate post-deprivation remedy for any property deprivations," *Barnett v. Centoni*, 31 F.3d 813, 816–17 (9th Cir. 1994), Plaintiff has alleged not mere deprivation but destruction of its property.  "California Penal Code §§ 1536 and 1540 set forth procedures for retaining and returning property pursuant to a warrant."  *Bjorklund v. Cnty. of Santa Barbara*, No. CV 23-2140-CBM-RAOx, 2024 WL 3468327, at *5 (C.D. Cal. June 3, 2024).  For instance, Section 1536 requires "[a]ll property or things taken on a warrant must be retained by the officer in his custody," while Section 1540 requires the judicial officer to review what has been taken: "If it appears that the property taken is not the same as that described in the warrant . . . the magistrate must cause it to be restored to the person from whom it was taken."  Cal. Penal Code §§ 1536, 1540.

The seizure warrant did not require the destruction of Apothio's crops and allowed the destruction only if the "officers [could] demonstrate it was not reasonably possible to preserve the suspected controlled substance in place, or to remove the suspected controlled substance to another location."  (Ex. C, Doc. 88-3 at 4.)  Plaintiff has alleged that the officers failed to make this showing and that it "would have been possible" to preserve its plants in place.  (Doc. 88 at ¶¶ 260–62.)  The Court notes also that though §§ 1536 and 1540 provide a meaningful mechanism for the return of retained property, they do not provide a remedy for destroyed property.  The Court reads the FAC in Plaintiff's favor and concludes that Plaintiff has plausibly alleged a post-deprivation due process claim in the intentional deprivation of its hemp crops.  Though the warrant allowed for the crops' destruction, the Court simply cannot conclude—at this procedural juncture—whether it was practical or even possible for officers to sift through the 500 acres of crops and delineate Plaintiff's hemp versus marijuana—only the officers at the scene

1    could make that decision.  (Ex. C, Doc. 88-3 at 4.)  On the present record, Defendants' motions to

2    dismiss are **DENIED** on this ground.  (Docs. 94, 95.)

3                                *iii.*       *Intangible Property Interests*

4          Plaintiff alleges that Defendants violated Plaintiff's procedural due process rights by, in

5    part, failing to comply with testing procedures contained in the warrant and the Food and

6    Agricultural Code, failing to comply with Kern County Code of Ordinances §§ 8.54.050,

7    8.44.060,[27] failing to provide Apothio an opportunity to respond to Defendants' "unscientific

8    testing," and finally, failing to return the warrant materials to Plaintiff.  (FAC, Doc. 88 at ¶ 320.)

9    Defendants argue that because "EARI's [sic] were not subject to the testing procedures set forth

10   in the Food & Ag. Code," Plaintiff cannot allege "a liberty or property interest in the testing

11   procedures which don't apply."  (Doc. 95 at 10.)  Similarly, Defendants maintain that "plaintiff

12   does not allege any authority that failing to comply with a county ordinance translates into a

13   federal constitutional claim," and argues the same regarding Plaintiff's other state law grounds.

14   (*Id.* at 10–11.)

15         "[T]he first question in any case in which a violation of procedural due process is alleged

16   is whether the plaintiffs have a protected property interest or liberty interest and, if so, the extent

17   or scope of that interest."  *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1190–91 (9th Cir.

18   2015) (citation omitted).  "A legitimate claim of entitlement is created and its dimensions are

19   defined by existing rules or understandings that stem from an independent source such as state

20   law—rules or understandings that secure certain benefits and that support claims of entitlement to

21   those benefits."  *Id.* (cleaned up) (internal quotation marks and citation omitted).  Though the

22   Supreme Court has "made clear that the property interests protected by procedural due process

23   extend well beyond actual ownership of real estate, chattels, or money," *Bd. of Regents of State*

24   *Colls. v. Roth*, 408 U.S. 564, 572 (1972), in the analogous Takings Clause context, the Court has

---

[27] These Kern County Code of Ordinances provisions relate to keeping premises free from creating a public nuisance—

26   *i.e.*, the proper maintenance of property—and the subsequent notice a public official must provide to the property owner
     upon a "reasonable determination that a public nuisance exists[.]" Kern County Code of Ordinances §§ .54.050,

27   8.44.060.  It is unclear whether Plaintiff alleges that its operations constituted a "public nuisance" such that it fell under
     the purview of these Code provisions, as that is entirely absent from the FAC.  In other words, the Court cannot

28   conclude that Plaintiff was ever entitled to the process afforded in these statutes, because the FAC does not allege that
     Plaintiff was committing a public nuisance.

1   recently held that "state law cannot be the only source" for determining property that the

2   Constitution protects.  *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023).  This is because "a

3   State could sidestep the Takings Clause [or Due Process Clause] by disavowing traditional

4   property interests in assets it wishes to appropriate."  *Id.* (internal quotation marks and citation

5   omitted).  So, the Court "look[s] to traditional property law principles, plus historical practice and

6   [the Supreme] Court's precedents."  *Id.*

7           It is unclear whether Plaintiff's allegations pertain to the types of procedure it believes the

8   Due Process Clause required, *i.e.*, the procedures afforded under state law and, perhaps, industry-

9   accepted THC testing practices, or alternatively, whether, as Defendants suggest, Plaintiff is

10  invoking state law testing procedures as its protected liberty or property interest.  Regardless, the

11  Court is convinced that Plaintiff has not stated a due process claim for Defendants' alleged failure

12  to comply with these laws.  First, as an EARI, Plaintiff is exempt from the requirement to "obtain

13  a laboratory test report indicating the THC levels of a random sampling of the dried flowering

14  tops" of the hemp, prior to harvest.  Cal. Food & Agric. Code § 81006(f) (2017);[28] *Gold Country*,

15  2021 WL 4443180, at *1.  Plaintiff cannot maintain a due process claim on this theory.[29]  Second,

16  Plaintiff's due process claim is premised on its industrial hemp as its protected property interest.

17  Any lack of notice or meaningful opportunity to be heard would correspond to Defendants'

18  deprivation of *this* property, as frequently alleged in the FAC, and would not correspond to the

19  deprivation of *testing procedures*.  (*See, e.g.*, Doc. 88 at ¶¶ 1 ("[W]ithout providing any notice or

20  opportunity to be heard, Defendants deliberately and wrongfully destroyed approximately 500

21  acres of Apothio LLC's legal property[.]"), 15 ("[W]ithout providing Apothio with any notice of

22  opportunity to be heard, Nicholson and Halverson used the guise of a warrant to lead a team to

23

24  [28] Identical language is found in § 81006(d)(1) of the 2019 version of the Code, and similar language is found in § 81006(e)(1) of the current version of the Code.

25  [29] This is not to say, however, that the Government could destroy its hemp without conducting *any* testing of the crops. The Court sees no other way for authorities to discern whether Plaintiff was growing hemp or marijuana.  *Cf. Gautier*
26  *v. L.A. Police Dep't*, No. CV 20-8091-DMG (PDx), 2022 WL 19829441, at *2 (C.D. Cal. Dec. 21, 2022) (the 0.3 percent measurement is "the only metric used in federal law to distinguish controlled marijuana—derived from the
27  same cannabis plant—from legal hemp.")  Once more, "[t]he percentage of delta-9 THC in marijuana cannot be determined by sight or smell or on-site field testing," but instead, "lab testing is required to determine the percentage
28  of delta-9 THC present in any submitted sample."  *Id.*  "In other words, without specialized chemical testing, hemp is indistinguishable from marijuana in the same form (*i.e.*, whether in bud form, tincture, etc.)."  *Id.*

1 destroy all approximately 500 acres of Apothio's legal hemp plants.").)  The Court has already

2 concluded that Plaintiff has not adequately stated a pre-deprivation procedural due process claim

3 for this conduct.

4          Nevertheless, it is likely that traditional property law principles, historical practice, and

5 Supreme Court's precedents would not allow for the Court to determine that there is a

6 constitutionally protected property interest in the proper THC testing of hemp.  Testing is a

7 *procedure* not traditionally understood as a property or liberty interest.  Likewise, that Plaintiff

8 has claims to a liberty or property interest in the Kern County Code of Ordinances provisions is

9 similarly defective.  State law "is one important source" that defines property, but state law itself

10 cannot *be* property.  *Tyler*, 598 U.S. at 638.  Plaintiff's FAC is unclear as to whether it intends on

11 relying on such state law as predicate liberty interests, *e.g.*, *Redd v. Guerrero*, 84 F.4th 874, 899

12 (9th Cir. 2023) (example of state law giving rise to a protected liberty interest), or whether it

13 believes it had a constitutional right to the procedures outlined in these materials.  The Court

14 **GRANTS** Defendants' motions to dismiss, (Docs. 94, 95), and **DISMISSES** the procedural due

15 process claim and the Bane Act claim based on these theories.

16          E.       Takings Clause

17          Plaintiff's FAC has once more brought a Takings Clause claim, with nearly identical

18 allegations as its original Complaint.  (*See* FAC, Doc. 88 at 86–87.)  Defendants move to dismiss

19 this claim, primarily arguing that because "KCSO acted pursuant to its police power to seize and

20 destroy Apothio's crops, . . . this cannot be a taking."  (Doc. 95 at 17; Doc. 94-1 at 21–22.)  This

21 argument has merit.

22          "The government commits a physical taking when it uses its power of *eminent domain* to

23 formally condemn property," "physically take[] possession of property without acquiring title to

24 it," and "when it occupies property[.]"  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–48

25 (2021) (emphasis added) (citations omitted).  Importantly, the Takings Clause is only triggered

26 "[w]hen the government physically acquires private property *for a public use*"—only then, when

27 the government acts pursuant to its eminent domain powers *and* takes private property for a

28 public use, will the government have to "pay for what it takes."  *Id.* at 147, 148 (citations

1    omitted); U.S. CONST. amend. V.  Conversely, however, "[t]he government may not be required

2    to compensate an owner for the property which it has already lawfully acquired under the exercise

3    of governmental authority *other than the power of eminent domain*."  *See Bennis v. Michigan*,

4    516 U.S. 442, 452 (1996) (emphasis added) (citations omitted).

5        Absent in Plaintiff's FAC is any allegation that Defendants destroyed its hemp for a

6    "public use."  (*See generally* Doc. 88.).  This alone is fatal to Plaintiff's taking claim.  *See Scott v.*

7    *Jackson Cnty.*, 297 F. App'x 623, 625–26 (9th Cir. 2008) ("Moreover, the Takings Clause is

8    implicated only when the taking is question is for a public use.  Here, Scott never alleged that her

9    property was taken or retained for any reason other than for law enforcement purposes."); *see*

10    *also Agro Dynamics, LLC v. United States*, 692 F. Supp. 3d 1003, 1018 (S.D. Cal. 2023)

11    ("Plaintiff alleges the hemp plants were seized and destroyed and sets forth no allegations they

12    were taken for any public purpose.").  Furthermore, because Plaintiff has failed to state a Fourth

13    Amendment claim, its Takings Clause claim must fail because the seizure of its hemp was lawful.

14    *Mateos-Sandoval v. Cnty. of Sonoma*.  942 F. Supp. 2d 890, 912 (N.D. Cal. 2013) ("If, on the

15    other hand, Plaintiff[] ultimately fail[s] to prove [its] Fourth Amendment claim, [its] taking clause

16    claim would also fail because Defendants lawfully acquired [its] [hemp] 'under the exercise of

17    governmental authority other than the power of eminent domain.'") (quoting *Bennis*, 516 U.S. at

18    452); *see also Brewster v. City of L.A.*, 672 F. Supp. 3d 872, 974 (C.D. Cal. 2023) (same). For

19    these reasons, the Court **GRANTS** Defendants' motions to dismiss (Docs. 94, 95) and

20    **DISMISSES** Plaintiffs' third cause of action for a Takings Clause violation.

21        F.     *Monell* Liability

22        Plaintiff has sued Kern County and the KCSO, (*e.g.*, Doc. 88 at ¶¶ 23–24), which are

23    municipalities that must be sued pursuant to *Monell v. Department of Social Services of City of*

24    *New York*, 436 U.S. 658 (1978).  *See Perez v. City of Fresno*, 98 F.4th 919, 931 (9th Cir. 2024)

25    ("Municipalities and local governments can be sued under § 1983 for constitutional deprivations

26    caused by governmental policy or custom.") (citing *Monell*, 436 U.S. at 690); *see also Sabbe v.*

27    *Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 829 (9th Cir. 2023) (applying *Monell* liability to a

28    county); *Steel v. Alameda Cnty. Sheriff's Off.*, 428 F. Supp. 3d 235, 240 (N.D. Cal. 2019) ("To

1  hold local entities like the Sheriff's Office or Alameda County liable under Section 1983,

2  plaintiffs must plausibly allege that the 'challenged conditions were part of a policy, custom or

3  practice officially adopted by [those] defendants.'") (quoting *Upshaw v. Alameda Cnty.*, 377 F.

4  Supp. 3d 1027, 1032 (N.D. Cal. 2019)).

5        To sustain a *Monell* claim, Plaintiff "must show that the action that caused [its]

6  constitutional injury was part of an official municipal policy of some nature." *Scanlon v. Cnty. of*

7  *L.A.*, 92 F.4th 781, 811 (9th Cir. 2024) (internal quotation marks and citation omitted). "There

8  are four criteria: (1) [Plaintiff] had a constitutional right of which [it] [was] deprived; (2) the

9  municipality has a policy; (3) the policy amounts to deliberate indifference to [its] constitutional

10 right; and (4) the policy is the moving force behind the constitutional violation." *Id.* (internal

11 quotation marks and citation omitted). Thus, "*Monell* claims . . . are [ ] contingent on a violation

12 of constitutional rights" and "require a plaintiff to [first] show an underlying constitutional

13 violation." *Lockett v. Cnty. of L.A.*, 977 F.3d 737, 741 (9th Cir. 2020) (citation omitted). There

14 are "three ways a plaintiff can satisfy *Monell*'s policy requirement: [1] The municipal government

15 acts pursuant to an express official policy, [2] the government maintains a longstanding practice

16 or custom, or [3] the act was committed or ratified by an official with policy-making authority."

17 *Id.* at 811–12 (citation omitted); *see also Steel*, 428 F. Supp. 3d at 240.

### i.      Ratification

19       Plaintiff alleges Youngblood "was the final policymaker for KCSO" in making the

20 decision to apply for and execute Nicholson's warrant."[30]  (Doc. 88 at ¶¶ 27, 315.)  Regarding its

21 Fourth Amendment claim, Plaintiff asserts that Youngblood "ratif[ied] and approv[ed]

22 Nicholson's application for the search warrant to destroy Apothio's crops," and that "[t]hrough

23 Youngblood's ratification, KCSO violated Apothio's right to be free from unreasonable searches

24

---

25 [30] As a preliminary matter, the Court agrees that Donny Youngblood, as Kern County Sheriff, is the "final policymaker" for the County. "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *City of*

26 *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis in original) (citation omitted); *Atkinson v. Cnty. of Tulare*, 790 F. Supp. 2d 1188, 1210 n.4 (E.D. Cal. 2011). The Kern County Sheriff "acts for the County, not the state, when

27 investigating crime in the county." *Brewster v. Shasta Cnty.*, 275 F.3d 803, 807 (9th Cir. 2001); *Atkinson*, 790 F. Supp. 2d at 1210 n.4. As evidenced by the criminal charges eventually brought against Jones and the nature of the

28 investigation giving rise to the search warrant, it is without reasonable dispute that the Sheriff was acting as a policymaker for the County.  (*E.g.*, Doc. 127.)

1   and seizures." (*Id.* at ¶ 314–15.)  As the Court has dismissed the judicial deception claims, *supra*,

2   the Court only analyzes this ratification claim regarding Plaintiff's Fourth Amendment claim for

3   excessive destruction.  (*See* Doc. 88 at ¶ 315 ("Youngblood was the final policymaker for KCSO

4   and Kern County on the decision *to apply for and **execute** the warrant that Nicholson had

5   obtained *and on the decision to destroy Apothio's crops*.") (emphases and boldface added).)

6        Plaintiff alleges that Youngblood "met with Kern County officials to plan for the

7   destruction of Apothio's hemp crops," specifically, "members of the Kern County Highway

8   Department, who would coordinate traffic during the destruction," and that Fankhauser "warned

9   Defendant Youngblood that as an EARI, Apothio's crops were *legally exempt from THC testing*

10  and that Apothio was legally permitted to grow hot hemp" yet "Youngblood ignored this

11  warning," and "insist[ed] that he was going to destroy Apothio's crops" anyway.  (Doc. 88 at

12  ¶¶ 13–14 (emphasis in original), 177–79.)  When Nicholson arrived at the farm to execute the

13  seizure warrant, he apparently acknowledged that Youngblood "approved and ratified the

14  destruction." (*Id.* at ¶¶ 16, 258e.)  County Defendants move to dismiss this claim, contending

15  that the FAC "fails to make specific allegations about ratification but instead includes broad

16  language that just mirrors the elements of a cause of action," and fails to allege "that Youngblood

17  himself ordered the hemp's destruction." (Doc. 95 at 22.)  The Court disagrees.

18       Ratification "occurs when authorized policymakers approve a subordinate's decision and

19  the basis for it."[31]  *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 788 (9th Cir. 2022)

20  (internal quotation marks and citation omitted).  "Ratification generally requires more than

21  acquiescence and a mere failure to discipline does not amount to ratification of allegedly

22  unconstitutional actions." *Id.* (cleaned up) (internal quotation marks and citation omitted).

23  Ultimately, "[c]oncluding that conduct was not prohibited is not the same as adopting or

24

---

25  [31] Regarding Plaintiff's Fourteenth Amendment claim, Plaintiff alleges that "Kern County, the [KCSO], and the [CDFW] . . . ratified the actions the individual Defendants took to violate Apothio's rights[.]" (Doc. 88 at ¶ 321.)

26  Plaintiff therefore has apparently confused the standard, as the policymaker is the figure that ratifies allegedly unconstitutional conduct on behalf of the municipality, and Plaintiff has not shown—nor can it—that KCSO, CDFW,

27  and the County were the official policymakers behind this action.  Relatedly, CDFW is a state entity, not a municipality, and therefore not subject to *Monell* liability.  *See, e.g.*, *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002); *see also* First Order, Doc. 86 at 16 n.7 (*Monell* "applies <u>only to municipalities, not state entities</u>.") (emphasis in

28  original).

approving such conduct." *Id.* (citation omitted). "Ratification requires, among other things, knowledge of the alleged constitutional violation." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 885 (9th Cir. 2022) (internal quotation marks and citation omitted). Thus, Plaintiff has plausibly pleaded a claim for ratification, as Plaintiff has described, albeit with few specifics, that Youngblood knew of the impending destruction of Apothio's crops, and Plaintiff explained exactly "*how* [Youngblood] ratified [Nicholson and Halverson's] conduct." *Perryman v. City of Pittsburg*, 545 F. Supp. 3d 796, 803 (N.D. Cal. 2021) (emphasis in original); *see also Robertson v. Bruckert*, 568 F. Supp. 3d 1044, 1049–50 (N.D. Cal. 2021) (amendment to *Monell* claim not futile where "FAC here alleges that (1) Chief Swanger showed 'affirmative agreement' with Officer Bruckert's actions by expressly ratifying the internal affairs investigation" and "(2) the City 'specifically found' that officer's conduct in the various civil rights incidents was appropriate.").

The Ninth Circuit has "found municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) (collecting cases). "A single incident causally related to the constitutional deprivation may be sufficient for liability to attach" based on ratification. *Id.* at 918 n.2 (citations omitted); *Segura v. City of La Mesa*, 647 F. Supp. 3d 926, 939 (S.D. Cal. 2022). Youngblood's alleged meeting with the County Highway Department to plan for the destruction of Apothio's crops shows that Youngblood knew of the impending seizure of Apothio's hemp, and authorized, if not directed, its destruction. This is sufficient to state a claim for ratification. *Robertson*, 568 F. Supp. 3d at 1049–50. The County Defendants' motion to dismiss (Doc. 95) this claim is **DENIED**.

### ii.   Failure to Train

Turning to Plaintiff's second *Monell* theory, Defendants allegedly "fail[ed] to train Nicholson properly on methods to sample and test hemp crops, as opposed to marijuana crops, even though Kern County had recognized the importance of proper testing and results." (Doc. 88 at ¶¶ 316, 321.) "*Monell* liability can turn on a municipality's failure to train its officers, but the failure must amount to a deliberate indifference to the rights of persons with whom [law

enforcement] come into contact." *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1167 (9th Cir. 2022) (internal quotation marks and citation omitted); *see also Perez v. City of Fresno*, 98 F.4th 919, 931 (9th Cir. 2024). "To allege such a failure, the plaintiff must establish sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Vanegas*, 46 F.4th at 1167.

Confusingly, Plaintiff admits that "the County signed an agreement to obtain training for law enforcement specifically for industrial hemp testing, and published a report about requiring qualified labs to do hemp testing, [ ] to avoid the types of inadmissible and inaccurate results obtained here."[32] (Doc. 88 at ¶ 240.) It appears, then, that Plaintiff admits that the County has adopted a proper municipal training policy. Plaintiff has therefore not "show[n] the need for more or different action is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymakers of the county can reasonably be said to have been deliberately indifferent to the need." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 829 (9th Cir. 2023) (cleaned up) (internal quotation marks and citation omitted). In any event, "[w]hile deliberate indifference can be inferred from a single incident when the unconstitutional consequences of failing to train are patently obvious, [citation], an inadequate training policy itself cannot be inferred from a single incident." *Hyde v. City of Wilcox*, 23 F.4th 863, 875 (9th Cir. 2022) (internal quotation marks and citations omitted). The Court cannot infer, based on this isolated incident alone, that the County maintains a patently obvious unconstitutional policy for testing hemp crops. *Id.* If anything, it appears Plaintiff is content with the County's current policies and is alleging a failure to train based on this single incident. Plaintiff cannot plausibly sustain a failure to train claim on that theory. Accordingly, the County

---

[32] Further, Plaintiff alleges that the Cities and Joint Powers Committee—a committee within the "Kern County Grand Jury"—"made two findings and recommendations": (1) that "[t]he only accurate way to determine if a plant is marijuana or hemp is through lab testing"; and (2) "that California City should contract with a testing lab to verify whether plants are Cannabis or hemp." (*Id.* at ¶¶ 278–79 (internal quotation marks omitted).) Plaintiff does not allege or cite to authority that the Grand Jury makes policy for the County of Kern or its agencies, and the Court has found no authority for that proposition.

1   Defendants' motion to dismiss (Doc. 95) the failure to train theory is **GRANTED** and this *Monell*

2   theory is **DISMISSED**.

3                     *iii.      Custom or Policy*

4          In support of an unconstitutional custom or policy *Monell* claim, Plaintiff has pleaded the

5   following examples:  (1) a newspaper publication showcasing "KCSO's repeated disregard of

6   civil and constitutional rights"; (2) that in 2015, "Kern County had the largest number of people

7   killed by police per capita in the entire country"; (3) that *The Guardian* newspaper reported that

8   the KCSO "takes steps to cover-up its misconduct"; (4) that KCSO "has repeatedly withheld

9   evidence . . . from the district attorney's office and the courts"; (5) an ACLU finding that KCSO

10  had a practice of filing "intimidating or retaliatory criminal charges against individuals"; (6) that

11  in 2020, KCSO settled with the California Department of Justice "regarding its pattern and

12  practice of unconstitutional behavior," including "a  pattern of unreasonable stops, searches,

13  arrests and seizures"; and finally, (7) that KCSO "has a custom and practice of intentionally

14  misleading the court and omitting material information" such that "several KCSO warrants have

15  been quashed due to these material omissions and misrepresentations regarding cannabis."  (*Id.* at

16  ¶¶ 292–303.)  County Defendants move to dismiss these allegations because they "are the same

17  allegations made in the original complaint, which this court found did not adequately plead

18  *Monell* liability, because these allegations do not relate to testing hemp or marijuana for THC

19  content."  (Doc. 95 at 21.)  Defendants are correct.

20         As the Court found, "Plaintiff alleges that the [KCSO] has a broad history of violating

21  constitutional rights, but those allegations do not relate to testing hemp or marijuana for THC

22  content."  (First Order, Doc. 86 at 32.)  Thus, the Court invokes the law-of-the-case doctrine to

23  reach the same conclusion regarding allegations pertaining to KCSO's alleged pattern and

24  practice of committing murder, covering up its misconduct, withholding evidence, filing

25  retaliatory criminal charges, and conducting unreasonable stops, searches and arrests.  *Musacchio*

26  *v. United States*, 577 U.S. 237, 244 (2016).  This is because a policy must be "the moving force

27  behind the constitutional violation" underlying the *Monell* violation.  *Scanlon v. Cnty. of L.A.*, 92

28  F.4th 781, 811 (9th Cir. 2024).  Plaintiff has successfully alleged two viable underlying

1  constitutional violations under the Fourth and Fourteenth Amendments (e.g., excessive

2  destruction and post-deprivation of due process); as such, the custom or policy must directly tie to

3  these violations.

4        Plaintiff has, however, alleged that KCSO has a "custom and practice of intentionally

5  misleading the court and omitting material information" regarding the legality of cannabis or

6  hemp operations, sourced from unreliable informants, and using "faulty testing by officers not

7  properly trained in industrial hemp testing[.]" (Doc. 88 at ¶ 299.)  In support, Plaintiff attests that

8  "two warrant applications in one case were quashed where one contained material

9  misrepresentations and omissions regarding the legality of operations of a cannabis business," and

10 in a second example, "KCSO search warrants that were executed in late 2021 . . . contained

11 intentional material misrepresentations and omissions with respect to the source of information

12 and legality of hemp operations[.]"[33]  (*Id.* at ¶¶ 301–02.)

13       First, these two instances fail because they appear to support Plaintiff's judicial deception

14 claims, which the Court has dismissed above.  *See supra*.  Second, Plaintiff has provided only two

15 instances of judicial deception in circumstances different from those set forth above. "While there

16 is no per se rule for the amount of unconstitutional incidents required to establish a custom under

17 Monell, . . .[t]he Ninth Circuit and district courts within the Ninth Circuit have repeatedly

18 declined to infer a custom of constitutional violations based on two unconstitutional incidents

19 alone." *Wettstein v. Cnty. of Riverside*, No. EDCV 19-1298-JGB (KKx), 2020 WL 2199005, at

20 *5 (C.D. Cal. Jan. 22, 2020) (collecting cases); *see also Oyenik v. Corizon Health Inc.*, 696 F.

21 App'x 792, 794 (9th Cir. 2017) ("[O]ne or two incidents are insufficient to establish a custom or

22 policy[.]") (citing *Davis v. City of Ellensburg*, 869 F.2d 1230, 1234 (9th Cir. 1989)); *Ingall v.*

23

24  [33] Attached to Plaintiff's Opposition is a copy of the Kern County Superior Court decisions quashing the search
warrants, as well as an excerpted, certified transcript of criminal proceedings against Apothio's CEO in Kern County

25  Superior Court.  (Exs. A, B, Docs. 103-1, 103-2.)  When ruling on a motion to dismiss, "the Court may not consider .
. . exhibits that Plaintiff has attached to its opposition, nor may the Court consider the facts that Plaintiff asserts only

26  in its opposition."  *Bd. of Trs. of the Bay Area Roofers Health & Welfare Tr. Fund v. Gudgel Yancey Roofing Inc.*, 225
F. Supp. 3d 1106, 1114 (N.D. Cal. 2016) (citation omitted); *see also Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th

27  Cir. 2003) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a
plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.") (emphasis in

28  original) (internal quotation marks and citation omitted).  The Court accordingly limits its review solely to Plaintiff's
Complaint for these allegations.

1  *Rabago*, No. 20-00306-ACK-WRP, 2021 WL 431467, at *7 (D. Haw. Feb. 8, 2021) ("For one,

2  Plaintiff's allegation of a 'longstanding' informal practice or custom is based on only two prior

3  incidents . . . which took place four years apart with no intervening events to suggest a

4  'pattern.'").

5        Even if Plaintiff's two examples of improper KCSO search warrants were sufficiently

6  similar, the Court, at this stage, cannot plausibly deem them to constitute a "permanent and well

7  settled" KCSO policy or practice. *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021).

8  This is in large part because a widespread custom or practice must have "sufficient duration,

9  frequency and consistency that the conduct has become a traditional method of carrying out

10  policy." *Id.* For these reasons, the County Defendants' motion to dismiss (Doc. 95) this *Monell*

11  theory is **GRANTED** and this *Monell* theory is **DISMISSED**.

12        G.    <u>California's Bane Act</u>

13        Plaintiff's FAC launches four causes of action pursuant to California's Bane Act, Cal.

14  Civ. Code § 52.1. (FAC, Doc. 88 at 87–95.) State Defendants move to dismiss these claims

15  based on the same grounds as their underlying constitutional allegations. (*See* Doc. 94-1 at 16

16  ("The California Bane Act claims . . . rely on the same allegations as the first through third causes

17  of action and suffer from the same defect to the lack of a protected right.").) The Court has

18  already considered, and disposed of, the underlying constitutional merits of Plaintiff's claims, as

19  well as its correlative Bane Act claims. *See supra*. Accordingly, State Defendants' motion to

20  dismiss (Doc. 94) Plaintiff's Bane Act claims is **DENIED AS MOOT**.

21        County Defendants, on the other hand, attack Plaintiff's Bane Act claims "on the grounds

22  that the plaintiff has failed to allege the specific intent as [required] under the Bane Act." (Doc.

23  95 at 24 (footnote omitted).) From the face of the FAC, it appears that Plaintiff brings a

24  correlative Fourth Amendment-related Bane Act claim for *both* judicial deception and excessive

25  destruction. (*See* Doc. 88 at ¶¶ 333–336.) However, County Defendants only appear to move to

26  dismiss Plaintiff's Bane Act claim for judicial deception. (*See* Doc. 95 at 24–27.) Indeed, the

27  County makes no mention of excessive destruction in this section of its motion, and only

28  discusses "[t]he warrants obtained by defendant Halverson on October 17, 2019 and the warrant

1   obtained by defendant Nicholson on October 24, 2019, and their supporting affidavits" in making

2   the argument that Plaintiff failed to plead the specific intent required to state a Bane Act claim.

3   (*Id.* at 26.)  As the Court has already dismissed the underlying judicial deception claims—and

4   their Bane Act correlatives—the County Defendants' Motion to Dismiss (Doc. 95) is **DENIED**

5   **AS MOOT** on these grounds.

6         H.     <u>Qualified Immunity</u>

7         The Defendants assert that the individual defendants are entitled to qualified immunity.

8   (Doc. 94-1 at 27 ("State Defendants Halverson and Bonham are entitled to qualified immunity

9   and should be dismissed."); Doc. 95 at 27 ("Joshua Nicholson and Donny Youngblood are

10   entitled to qualified immunity.") (capitalizations and boldening omitted).)[34]  At the outset,

11   Plaintiff responds that "the Individual Defendants fail to distinguish between the types of claims

12   that Plaintiff[] [has] asserted," and moreover, simply fail on the merits.  The Court agrees, in part.

13         "Qualified immunity is an affirmative defense that the government has the burden of

14   pleading and proving." *Tan Lam v. City of Los Banos*, 976 F.3d 986, 997 (9th Cir. 2020) (internal

15   quotation marks and citation omitted); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980)

16   ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant.")

17   (citations omitted).  In evaluating whether a law enforcement officer is entitled to qualified

18   immunity, the Court asks "(1) whether there has been a violation of a constitutional right; and (2)

19   whether that right was clearly established at the time of the officer's alleged misconduct." *Tan*

20   *Lam*, 976 F.3d at 997 (internal quotation marks and citation omitted).  "To be entitled to qualified

21   immunity at the motion to dismiss stage, an officer must show that the allegations in the

22   complaint do not make out a violation of a constitutional right or that any such right was not

23   clearly established at the time of the alleged misconduct." *Hampton v. California*, 83 F.4th 754,

24   765 (9th Cir. 2023) (citation omitted).  "Dismissal is not appropriate unless [the Court] can

25   determine, based on the complaint itself, that qualified immunity applies." *Id.* (internal quotation

26

27   [34] It is unclear whether Plaintiff sues Defendants Nicholson and Halverson in either their personal or official capacities.
    (*See* Doc. 88 at ¶¶ 28–29.)  This is dispositive to the qualified immunity inquiry, as qualified immunity is only available
28   to government officials sued in their individual capacities, "and is *not* available to those sued only in their official
    capacities." *Wright v. Beck*, 981 F.3d 719, 737 (9th Cir. 2020) (emphasis in original) (citation omitted).

1    marks and citation omitted).  "If the operative complaint contains even one allegation of a

2    harmful act that would constitute a violation of a clearly established constitutional right, then

3    [the] plaintiff[] [is] entitled to go forward with [its] claims."  *David v. Kaulukukui*, 38 F.4th 792,

4    799 (9th Cir. 2022) (internal quotation marks and citation omitted).

5            Defendants have raised the defense of qualified immunity, but only in cursory fashion.

6    For example, State Defendants have provided a two-paragraph explanation of the legal standards.

7    (*See* Doc. 94-1 at 27.)  They have not, however, identified as to which claims they assert this

8    defense.  (*Id.*)  County Defendants, on the other hand, have provided one paragraph mentioning

9    qualified immunity, and indeed, do the same as their State-Defendant counterparts: they recite the

10   two-step framework for qualified immunity, with nothing more.  (*See* Doc. 95 at 27.)[35]  *See, e.g.*,

11   *Stenson v. King Cnty.*, No. C23-1316-MJP, 2024 WL 1741472, at *8 (W.D. Wash. Apr. 22, 2024)

12   (Officer "Leenstra does not articulate precisely why he is entitled to qualified immunity . . .the

13   Court finds this oversight fatal to the request.  Leenstra's failure to brief the applicable standard

14   subjects the Motion to dismissal."); *see also Shen v. Albany Unified Sch. Dist.*, No. 3:17-cv-

15   02478-JD (lead case), 2017 WL 5890089, at *13 (N.D. Cal. Nov. 29, 2017) ("[T]he District

16   appended to its main arguments a cursory reference to qualified immunity.  The reference is

17   underdeveloped legally and factually, and the District did not differentiate between the conduct of

18   the ten different plaintiffs for immunity purposes.  The Court declines to take up qualified

19   immunity on this inadequate record."); Fed. R. Civ. P. 7(b)(1)(B) (movant must "state with

20   particularity the grounds for seeking the order").  Like these other district courts, here too the

21   Court declines to address Defendants' cursory requests for qualified immunity, as it was simply

22   inadequately briefed.  Defendants' motions to dismiss (Docs. 94, 95) are **DENIED** on this

23   ground.

24           I.    <u>Leave to Amend</u>

25           The Ninth Circuit has admonished district courts to *sua sponte* determine whether leave to

---

[35] It appears, however, in their final paragraph, that perhaps County Defendants raise this defense for Plaintiff's judicial deception, due process, and Takings Clause claims.  (Doc. 95 at 27.)  The Court declines to resolve this issue of qualified immunity, however, as first, the Court has already dismissed the merits of Plaintiff's judicial deception, pre-deprivation due process, and Takings Clause claims, and second, Defendants have simply failed to brief whether qualified immunity applies to Plaintiff's post-deprivation due process claim.

1    amend should be granted.  *See Unified Data Servs., LLC v. Fed. Trade Comm'n*, 39 F.4th 1200,

2    1208 (9th Cir. 2022).  Courts have broad discretion to grant leave to amend a complaint.  *Nguyen*

3    *v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020).  Generally, Rule 15 advises that "[t]he court

4    should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In determining

5    whether a plaintiff should be granted leave to amend, the Court considers "the presence or

6    absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by

7    previous amendments, undue prejudice to the opposing party and futility of the proposed

8    amendment."  *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 814–15 (9th Cir. 2020) (internal

9    quotation marks and citation omitted).  Further, "the district court's discretion to deny leave to

10   amend is particularly broad where [the] plaintiff has previously amended the complaint."

11   *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011)

12   (internal quotation marks and citation omitted); *see also Becker v. Wells Fargo Bank*, 672 F.

13   App'x 660, 663 (9th Cir. 2016).

14          Though Plaintiff has, in passing, requested leave to amend at the conclusion of its

15   Opposition, (Doc. 103 at 49), the Court denies this request.  First, Plaintiff has provided the Court

16   with *both* warrant affidavits, attached to its FAC, and has provided *several* different theories and

17   factual allegations in attempting to make out a judicial deception claim.  Plaintiff spent 30 of its

18   100-page FAC to attempt to make out a judicial deception claim but has failed even still.  (Doc.

19   88 at 38–68.)  The Court concludes, therefore, that granting leave to amend these two claims is

20   futile.  Amending Plaintiff's pre-deprivation due process claim, then, is similarly futile, as the two

21   claims are related.

22          Plaintiff's Takings Clause claim is futile for the reasons set forth by the Northern District

23   in *Mateos-Sandoval v. County of Sonoma*, 942 F. Supp. 2d 890, 912 (N.D. Cal. 2013).  Even if

24   the Court allowed Plaintiff to amend its judicial deception claim, Plaintiff cannot simultaneously

25   maintain both a Fourth Amendment and Takings Clause claim.  Plaintiff has not shown, despite

26   two opportunities, that Defendants seized and destroyed its crops pursuant to its eminent domain

27   authority.  The Court therefore denies Plaintiff leave to amend its third cause of action.  (FAC,

28   Doc. 88 at 86.)  The Court previously apprised Plaintiff of similar deficiencies regarding its

failure-to-train, and longstanding policy or practice theories, in the Court's First Order.  (Doc. 86 at 30–34.)  This gives rise to an inference that any further leave to amend is futile.  *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1008 (9th Cir. 2009) ("[R]epeated failure to cure deficiencies" constitutes "a strong indication that the [plaintiff] has no additional facts to plead" and "that any attempt to amend would be futile"); *Nguyen*, 962 F.3d at 420 (district court did not err in denying leave to amend "because it was clear that the plaintiff had made her best case and had been found wanting").  Similarly, any due process owed to Plaintiff clearly arose out of the intended destruction of its industrial hemp crops, and not out of the testing procedures it believes Defendants should have utilized; nor can Plaintiff viably maintain a property right to statutory testing procedures.  Such amendment would be futile.  Thus, the Court **DENIES** Plaintiff further leave to amend its Complaint.

## VII.   CONCLUSION AND ORDER

Based upon the foregoing, the Court **ORDERS**:

(1) Plaintiff's Motion for Leave to File a Sur-Reply (Doc. 115) is **GRANTED**.

(2) State Defendants' Request for Judicial Notice (Doc. 94-2) is **GRANTED IN PART AND DENIED IN PART**.

(3) State and County Defendants' Motions to Dismiss (Docs. 94, 95) are **GRANTED IN PART AND DENIED IN PART**.

(4) Defendants Charlton H. Bonham, Kern County, the Kern County Sheriff's Office[36], and the California Department of Fish and Wildlife[37] are **DISMISSED** from the federal causes of action.  County Defendants' Motion to Dismiss (Doc. 95) Defendant Donny Youngblood as a redundant defendant is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff may request damages against Youngblood in his personal capacity, and injunctive relief against Youngblood in his official capacity.

(5) Plaintiff's judicial deception claims, procedural due process theories premised on

---

[36] This is the order except to the extent that the official capacity claim against Youngblood is, in fact, an action against the entity.

[37] Plaintiff acknowledges CDFW is "an agency of the State of California."  (Doc. 88 at ¶ 25.)  It is well-settled that states and state agencies are not "persons" within the meaning of § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989); *Culinary Studios, Inc. v. Newsom*, 517 F. Supp. 3d 1042, 1058 (E.D. Cal. 2021).

Defendants' pre-deprivation allegations and failure to comply with testing procedures, Plaintiff's Takings Clause claim, and Plaintiff's *Monell* claims against KCSO and Kern County premised on failure-to-train theories and custom or practice theories are **DISMISSED WITHOUT LEAVE TO AMEND**. Plaintiff's Bane Act claims based on these theories, set forth in the FAC's fourth through seventh causes of action are similarly **DISMISSED WITHOUT LEAVE TO AMEND**.

(6) This action **SHALL** proceed against Defendants Donny Youngblood, Joshua Nicholson, and Andrew Halverson on Plaintiff's Fourth Amendment claim for excessive destruction of property, Plaintiff's ratification claim, Plaintiff's Fourteenth Amendment procedural due process claim stemming from the post-deprivation of its hemp without process and the Bane Act claims.[38]

(7) Plaintiff's Motion for Reconsideration of Discovery Stay (Doc. 128) is **DENIED AS MOOT**.

IT IS SO ORDERED.

Dated:   **August 20, 2024**

UNITED STATES DISTRICT JUDGE

---

[38] The County Defendants did not seek to dismiss the Eighth through Eleventh Causes of Action as to any County Defendant. Thus, these causes of action proceed as to all County Defendants.